[No. S004607. Crim. No. 23533. Mar. 12, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES EDWARD HARDY and MARK ANTHONY REILLY, Defendants
and Appellants.

---

## COUNSEL

Harvey R. Zall and Fern M. Laethem, State Public Defenders, under appointments by the Supreme Court, Peter R. Silten and Philip M. Brooks, Deputy State Public Defenders, and Maxwell S. Keith, under appointment by the Supreme Court, for Defendants and Appellants.

Michael G. Millman, Kathryn K. Andrews, Jean R. Sternberg, Karen S. Schryver, Neoma D. Kenwood, Andrew S. Love and Suzi Alexander as Amici Curiae on behalf of Defendants and Appellants.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Steve White, Richard B. Iglehart and George Williamson, Chief Assistant Attorneys General, Edward T. Fogel, Jr., Assistant Attorney General, Carol Wendelin Pollack, Acting Assistant Attorney General, Linda C. Johnson, Susan L. Frierson, John R. Gorey and Roy C. Preminger, Deputy Attorneys General, for Plaintiff and Respondent.

---

## OPINION

**LUCAS, C. J.**—James Edward Hardy and Mark Anthony Reilly were each convicted in Los Angeles County of two counts of first degree murder (Pen. Code, § 187; all further statutory references are to this code unless otherwise stated) resulting from the stabbing death of Nancy Morgan and her eight-year-old son, Mitchell. Both defendants were also convicted of one count of conspiracy to commit murder to collect life insurance proceeds. (§ 182.) In addition, the jury sustained six of eight charged special-circumstance allegations for each defendant, finding that each murder was committed for financial gain, that defendants committed a multiple murder, and that they killed while lying in wait. (§ 190.2, subds. (a)(1), (3), & (15).) Defendant Reilly was also found guilty of soliciting the murders. (§ 653f, subd. (b).) After the penalty phase of the trial, the jury set the penalty at death for both defendants. This appeal is automatic. (§ 1239, subd. (b).)[1]

For the reasons stated below, we conclude one multiple-murder special-circumstance finding must be set aside for each defendant but the judgment as to each defendant should otherwise be affirmed in its entirety.

---

[1]In addition to briefing by the parties, we have received a substantial brief on the merits from the California Appellate Project as amicus curiae in support of defendant Reilly. Hardy joins in the majority of claims raised by amicus curiae. For simplicity, we will refer to claims

FACTS

*Guilt Phase*

Jack Parsons lived in Van Nuys, across the street from Cliff and Nancy Morgan. On May 21, 1981, he received an early morning telephone call from an operator asking him to call Cliff Morgan in Carson City, Nevada; Morgan had recently moved to Nevada for business purposes. Parsons called Morgan, who expressed concern because he had been telephoning his wife since seven in the morning but no one answered. Morgan asked Parsons to check his house to see if anything was wrong. Parsons did so but saw nothing amiss, although no one responded to his pounding on the door. He reported this to Morgan, who then instructed Parsons to lift open a certain back window, reach inside, and unlock the back door, and check the inside of the house. Parsons did so while Morgan waited on the line. When Parsons returned, he told Morgan, "You got to hang up right now. I got to call the police." Morgan hung up and immediately began driving back to his Van Nuys home.

Summoned by Parsons, the police arrived at the Morgan home and discovered the bodies of Morgan's wife, Nancy, and their eight-year-old son, Mitchell. Police determined that the house had been entered through the front door on which the security chain lock had been cut with bolt cutters. (As an investigation aid, police did not publicly reveal this latter fact.) In addition, it appeared the light bulb in the porch light had been rotated to break the connection.

Later tests showed that Nancy Morgan had been stabbed 45 times with a stiletto-type knife about 4 hours before Parsons discovered the body. Experts placed the time of death around 3 or 4 a.m. Mitchell Morgan had been stabbed 21 times, probably with the same knife. Because Nancy Morgan was not cut below the pelvis, a police expert opined that an accomplice probably held her legs while the actual killer stabbed her. Also, because the second victim would almost certainly have run away while the other was being killed, the same expert believed that at least two people committed the crime.

Cliff Morgan arrived home about six hours after his conversation with Jack Parsons. Although distraught, he managed to inform police that several guns had been stolen, as well as a coin collection that had been on top of a cabinet. (Investigating officers, however, noticed that the cabinet was covered with a heavy layer of dust and there was no indication that any type of

raised by either Reilly, Hardy, or amicus curiae as raised by "defendants" unless it is clear from the briefs that only one defendant is making the claim.

container had been on the cabinet recently.) Morgan later told police he had discovered a diamond ring was also missing.

The following day, police received a call from James Sportsman. Mr. Sportsman stated that his 18-year-old daughter, Debbie, was dating defendant Mark Reilly and that Reilly was a frequent dinner guest in their home. Mr. Sportsman recalled remarks Reilly made in April 1981 to the effect that he had a friend named Morgan who wanted to have his wife killed in order to collect on some insurance policies. Mrs. Sportsman, Debbie's mother, recalled that Reilly said he would receive $25,000 if he could find a "hit man" to do the job. At the time, Mrs. Sportsman thought it was "just talk."

Police investigation, however, revealed a complex conspiracy between Reilly, defendant James Hardy, and codefendant Cliff Morgan to kill the victims in order to obtain insurance benefits. The conspiracy began when Morgan met Reilly while both were studying to become auto salesmen. They became friends and were eventually assigned to the same auto dealership as sales trainees. Reilly would often spend time at Morgan's home during this period.

In January 1981, Morgan began selling life insurance for Equitable Life Insurance Company at the suggestion of his wife, Nancy, who was a secretary there. Shortly thereafter, Morgan took out life insurance policies on himself, Nancy, and his son Mitchell. An expert testified that the policies were an unwise investment because the premiums would be more than $10,000 annually, or more than 25 percent of Morgan's projected annual gross income. Deducting his commission, however, the premium for the first year would be only $5,261, and only a fraction of that amount was due before June 1, 1981. Under the policies, Cliff Morgan would receive more than $850,000 should both Nancy and Mitchell Morgan die.

Debbie Sportsman met Reilly in April 1981 and became intimate with him. She testified that Reilly told her about Morgan's plan to kill his wife and child. Reilly said he agreed to find Morgan someone to do the actual killing. In return, Morgan promised to open a bar for Reilly to manage, and allow Reilly to live in Morgan's home. Reilly told Debbie he knew a kick-boxer who knew someone in the Mafia who would do the killing. Reilly also told Debbie he gave some money and a ring (supplied by Morgan) to the kick-boxer who was, in turn, to give the money to the Mafia hit man. The

plan went awry when the hired killer was himself killed and the money stolen.[2]

Later, Reilly told Debbie he tried to convince an acquaintance, Calvin Boyd, to do the killing. Reilly told Debbie that Boyd asked for money up front but Reilly said Morgan had no more cash after the incident with the kick-boxer. After Debbie learned of the two killings, she assumed Boyd was the killer but Reilly told her it was not Boyd and that it was better for her if she did not know the real killer's identity. Boyd learned Reilly had given Debbie the impression that Boyd was the killer and warned Reilly to stop spreading such rumors.

In the days following the crime, Boyd pressed Reilly to reveal the name of the actual killer. Reilly eventually told him that he and Hardy killed the victims, but asked Boyd not to tell Hardy that Boyd knew. Later, Hardy confronted Boyd and said he had been asking too many questions.

According to Debbie Sportsman, Reilly began associating with Hardy around May 10, 1981. She testified that the two men had many private conversations during this period and often drank and took drugs together. On the evening of May 20, 1981, the night of the killings, Debbie met with Hardy and Reilly at the latter's apartment. Reilly spoke with Morgan on the telephone and asked him if he wanted to go through with the killing. Morgan, who was in Carson City, answered that he did. When Reilly asked what to do with Mitchell, Morgan said that if it was necessary, his son must also be killed. Reilly told Debbie he did not want her around after 10 o'clock that night.

When Debbie read about the murders in the newspaper the next day, she became hysterical and went to Reilly's apartment. She found him there with Hardy; Reilly was calm and both were laughing and drinking. Reilly told her to behave normally so people would not suspect something was amiss. Without revealing the identity of his crime partner, Reilly admitted to her that he had gone with another person to Morgan's home, unlocked the front

---

[2]The kick-boxer was Marc Costello, who worked in a local nightclub as a bouncer. Costello apparently defrauded Reilly and Morgan of the money by simply pretending to know someone in the Mafia. Instead of passing the money to the alleged assassin, Costello merely pocketed the $2,000 and the ring. Reilly also gave Costello a coin collection and the latter sent it to his mother to sell. When Costello told Reilly and Morgan that the assassin had been killed and the money stolen, they became suspicious and pressed Costello for more of an explanation. To allay their suspicions, Costello telephoned them at a prearranged time from a pay phone, disguised his voice, and pretended to be someone in the Mafia. When contacted by police, Costello said he lost some of the diamonds from the ring down his sink. Police recovered one diamond from the sink's drainpipe. The coins and ring were apparently the same items Morgan claimed were stolen in the "robbery."

door, cut the security chain lock with bolt cutters, and entered the house, his partner apparently entering the bedroom. Reilly said that when he heard Nancy Morgan pleading for her life, he went to wait outside. His partner, the actual killer, eventually emerged and told him Nancy "just wouldn't die." Reilly told Debbie that "you just don't know how it feels" to stab someone. He encouraged Debbie to speak to Hardy and another friend, Colette Mitchell, in order to coordinate their alibi stories. He then gave her a few $100 bills that he had received from Morgan.

Debbie Sportsman went to work the next day but was too upset to work and left before noon. She went to the home of her friend, Kim H. Mrs. Sportsman called Debbie there and asked her to come home. On arriving home, Debbie found Detectives Jamieson and Bobbitt waiting for her. They questioned her about the crime and she told them about Morgan's desire to kill his wife but did not reveal Reilly's involvement. After the interview, she returned to Kim H.'s apartment. Reilly called her there and she told him of the police inquiry. He became upset and they went to a local park to talk. When she revealed that she told the police about Morgan, Reilly became livid, exclaiming, "Debbie, if he goes—you don't understand. If Cliff goes down, I go down." He then endeavored to learn everything Debbie had revealed so as to conform his story to hers. He also mentioned that he would speak to Hardy and Colette Mitchell to coordinate their alibi stories.

Reilly was subsequently arrested but later released. He and Debbie again went to a park to talk. He was drinking from a bottle of scotch and crying. He admitted that he had used their friend Mike Mitchell's car to drive to the Morgan home and that he used bolt cutters to cut the chain. He said he stayed in the hallway while his accomplice entered the bedroom and stabbed Nancy Morgan with a fish knife. Reilly said he could hear Nancy crying and saying, "Please don't kill me." He became ill and went outside to wait. When his accomplice joined him, the accomplice described how hard it was to kill the victim. Reilly said he became sick again. When Debbie asked about the slaying of Mitchell Morgan, Reilly became defensive but admitted the boy was killed first.

Later, Reilly told Debbie that Morgan called and said there would be a delay in payment because the insurance company was investigating the killings. Reilly said his crime partner understood about the delay.

After these revelations, Debbie Sportsman's feelings for Reilly changed and she eventually went to police and told them everything she knew. Reilly was rearrested and the booking officer noticed what appeared to be a bloodstain on the tip of Reilly's shoe. Reilly said it was blood that had

leaked from a package of meat he had purchased. Later tests showed the stain was human blood.

Much of Debbie Sportsman's testimony was corroborated by other witnesses. For example, Kim H. testified she knew Reilly, Hardy, and many of their friends, including Mike Mitchell, whom she had dated. She said she once heard Morgan say he wanted to have his wife killed for the insurance money and also testified Debbie had told her Reilly admitted the killings to her.

Mike Mitchell (apparently no relation to Colette Mitchell) testified he had known Reilly for 13 years. Prior to the killings they were roommates in an apartment on Vose Street. Reilly told him about a coworker at the auto dealership who wanted to kill his wife for the insurance money. Reilly told him he had given some coins and a ring to a kick-boxer to do the killing but the deal fell through. One day, Reilly pointed out Hardy to Mike Mitchell and said Hardy would do the killing. Hardy lived next door to Reilly and Mike Mitchell.

On the night of May 20, 1981, Mike Mitchell and his girlfriend Sharon Morgan (apparently no relation to codefendant Cliff Morgan) went to a baseball game. They returned to the Vose Street apartment around 11 p.m. and went to sleep. When they retired for the night, neither Hardy nor Reilly was in the apartment. When Mitchell awoke about an hour later, however, both defendants were present, drinking and smoking with Colette Mitchell and possibly another friend, Steve Rice, who lived next door to the Reilly/Mitchell apartment. Mike Mitchell did not see Hardy and Reilly again until the next day, although sometime in the middle of the night he heard the shower running and two male voices. The next morning, he found some wet towels in the bathroom, indicating someone had taken a shower that night. Reilly told Mike Mitchell that if anyone should ask about the night of the murders, he should say that Reilly and Hardy were in the apartment all night, having a party with Colette.

Colette Mitchell testified under a grant of immunity. She met Hardy in early 1981 and began living with him and her brother, Ron Leahy. She understood from Hardy that he was going to participate in some sort of criminal endeavor, that he would steal something to make it look like a robbery, and that someone would collect some insurance money as a result. Hardy said he would use bolt cutters to gain entry to the house and that the crime must be committed before June 1, 1981, because the insurance policy would expire.

On the night of May 20, 1981, Colette drank beer and snorted cocaine with Reilly, Hardy, and Steve Rice. She eventually fell asleep or passed out

in Rice's apartment and did not awaken until 11 o'clock the next morning. It was only then that Colette learned of the murders and that Hardy expected her to provide an alibi for him for the previous night. The two discussed the matter of an alibi several times. Hardy denied committing the murders but later said he had been to the Morgan home on the night they occurred. Reilly told her that "the boy" (presumably Mitchell Morgan) was not supposed to be killed but he was in his mother's bed so he was killed. When Colette asked Hardy about the boy, he confirmed what Reilly had said.

While in jail, Hardy told Colette to have his brother, John Hardy, retrieve an M-1 carbine rifle from Steve Rice's apartment and dispose of it. Hardy told Colette that he obtained the rifle from Reilly and that because the rifle was stolen, they should neither show it to anyone nor handle it with their bare hands. (Cliff Morgan told police that an M-1 carbine rifle was one of the items stolen from his house.) Later, on hearing the police had discovered a footprint at the Morgan home, Hardy asked Colette to retrieve and destroy a certain pair of boots in his closet. She complied, throwing the boots in a garbage can.

Either Reilly or Hardy told Colette that while they were in jail awaiting trial, their insurance money was collecting interest. Hardy said Cliff Morgan was not worried because his money was earning 12¾ percent interest while he was in jail.

At Hardy's preliminary examination, Colette Mitchell testified that Hardy was with her the entire night and morning of May 20-21, 1981. This testimony was consistent with Hardy's statement to police. At trial, however, she admitted having lied at the earlier hearing in order to protect Hardy, whom she loved. She testified at trial that she no longer loved him. She admitted that she fell asleep or passed out around 2 a.m. on the night in question and thus did not know if Hardy was with her the entire night. Reilly later admitted to her, however, that he had left the apartment that night after she had passed out.

Although Hardy told Colette Mitchell that he was innocent, he told her inconsistent stories, often admitting several incriminating facts to her. For example, he once told her that he went to the Morgan home on the night in question and knew the victims were alive because he could hear them snoring. Another time, he told her that the victims were already dead when he arrived. He also reported that Reilly was in control of the crime. Once, when Colette spoke of the crime and assumed there was more than one killer, Hardy exclaimed, "Where do they get 'they'?" When Colette replied that she had heard there were two people involved, Hardy retorted, "No, I know for a fact it was one."

Ron Leahy, Colette Mitchell's brother, testified he lived with Colette and Hardy and met Reilly through them. Leahy visited Reilly in jail about 60 times, usually accompanying Colette while she spoke with Hardy. Although Reilly told Leahy several conflicting stories about the crime, Reilly admitted to him that he knew who killed the victims, that he participated in the crime by setting it up, and that he was supposed to make it look like a robbery. Reilly also said he had been promised $30,000 for his participation but was going to ask Morgan for twice that amount because he had been arrested and harassed.

Sean Fitzgerald was Reilly's friend. He testified that Reilly came to him in April 1981 and asked whether he, or anyone he knew, would be willing to kill someone for money. Reilly said he had met a man where he worked who wanted to kill his wife for the insurance money. Reilly said the hired killer would receive $30,000. Fitzgerald thought Reilly was crazy but referred him to Marc Costello, a coworker he believed had connections to the Mafia.

About six weeks later, Fitzgerald heard about the two slayings. Shortly thereafter, Reilly arrived at his home unannounced, appearing very nervous. Reilly admitted he was involved in the murders, told Fitzgerald where the Morgan home was located, and expressed concern about what he would tell police if questioned.

Around June 11, 1981, Reilly again unexpectedly appeared at Fitzgerald's home. He asked Fitzgerald to accompany him to Tip's Restaurant, where he said he would obtain some money from "the husband." The two men met Cliff Morgan at the restaurant and sat with him at the bar. Reilly and Morgan went to the restroom together and when they returned, Fitzgerald left with Reilly. As Reilly drove home he said, "Look at this" and produced a wad of money. Fitzgerald counted it; it was $2,500.

Sometime later, Fitzgerald joined Reilly at the Red Onion restaurant. Reilly said that it was difficult to kill the woman, that she had to be stabbed several times, and that the boy who was killed was trying to protect his mother. Reilly demonstrated how his accomplice grabbed the boy, kissed him on the forehead, said, "I'm sorry" and then killed him. Fitzgerald asked Reilly whether he was at the Morgan home when the boy was killed. Reilly first replied in the negative but later admitted he was there but stayed outside the house.

Harley Laughlin was president of Laughlin Truck Lines in Carson City, Nevada. He testified that on May 5, 1981, he hired Cliff Morgan as his general sales manager. Morgan asked Laughlin whether he would be willing

to consider him as a partner or investor in the firm. Laughlin thought this was odd as Morgan had previously said he had no money. Morgan replied that he would soon acquire a lot of money. On the afternoon of May 20, 1981, Morgan said he was feeling ill and would go home early. Laughlin observed that Morgan appeared "kind of green and clammy and sweaty."

Jack Parsons, the neighbor who discovered the bodies, testified that he chatted with Cliff Morgan about three weeks before the killings. When the conversation turned to the death of Parsons's wife, Morgan commented that when his own wife died, all his problems would be solved. When Parsons said Nancy would probably outlive Morgan, Morgan replied, "I've got a feeling that she is going to go before I do."

Judy Yockel, Nancy Morgan's sister, testified that at the time Cliff and Nancy married, Cliff often claimed he would retire at age 55. When she asked him how he could afford to retire early as he had not made any provision for such a plan, he simply replied that when the time came, provisions would be made. At Nancy Morgan's funeral, Cliff mentioned to Nancy's aunt that he would "be worth three-quarters of a million dollars and . . . [would not] have to work another day in [his] life." He also mentioned the amount of the anticipated insurance benefits to his mother-in-law.

Margaret Maddux was one of Nancy Morgan's best friends and spoke with her around Easter 1981. Nancy told Maddux that she and Cliff were having marital problems and were talking about getting a divorce. In April 1981, Maddux's family joined the Morgans on a camping trip. In front of everyone, Cliff Morgan remarked in a joking manner that due to an insurance policy, Nancy was worth more to him dead than alive. In a more private moment, Morgan asked whether Maddux ever had a fantasy about killing her husband. When she replied "no," he admitted that he had fantasized about killing Nancy. Then, on May 10, 1981, just 10 days before the killing, Nancy told Maddux that she was "really thinking of getting divorced" because Morgan had put their Van Nuys home up for sale without her knowledge.

Cliff Morgan was 56 years old at the time of trial and testified in his own defense. He denied mentioning anything about killing his wife for the insurance proceeds to Debbie Sportsman or Kim H. He stated he loved his wife and son. He admitted knowing Reilly but denied asking him to arrange the murders. He also denied giving Reilly his diamond ring as partial payment for the murder, claiming the ring was his most prized possession. He admitted Reilly introduced him to Marc Costello but denied helping Costello plan the killing. He also admitted meeting Reilly and Fitzgerald at Tip's Restaurant on June 11, 1981, but said he gave Reilly only $250 in cash,

not the $2,500 that Fitzgerald described. Morgan said he gave Reilly the money because Reilly asked him for it to make a car payment. He denied speaking to Margaret Maddux about killing Nancy.

Morgan testified that while both he and Reilly were in pretrial detention, Reilly admitted he attempted to find someone to kill Nancy, did not succeed, and eventually backed out of the endeavor. As far as Cliff Morgan knew, Hardy had nothing to do with the killings. He denied participating in a conspiracy to kill his wife and son.

Several witnesses testified in support of Cliff Morgan, including friends, neighbors, his ex-wife, and his other children. All, to varying degrees, described the apparently loving relationship between Cliff and Nancy Morgan, and between Cliff and his son, Mitchell.

Reilly produced four witnesses who testified that he was not a violent person. One defense expert witness stated that all that could be said with scientific confidence about the time of death was that the victims died sometime within the 18-hour period ending at 6 a.m. on May 21, 1981. Sharon Morgan testified that she had been to a baseball game on the night of May 20 with her boyfriend, Mike Mitchell. They returned to the Mitchell/Reilly apartment on Vose Street and she went to bed around 11:45 that night. She had trouble falling asleep because there was a lot of noise in the apartment. She recognized Reilly's voice in the apartment. When she took Mike Mitchell's car to work the next morning, it was parked in the same place they had left it the night before and there was no indication it had been used during the night.

Reilly did not testify. Hardy rested on the state of the evidence and did not present any witnesses at the guilt phase of the trial.

*Penalty Phase*

Three photographs depicting the two victims as they appeared when police discovered the bodies were admitted at the penalty phase over a defense objection. These photographs were not admitted at the guilt phase of the trial.

On August 6, 1980, Officers Hansen and Wicks responded to a report of a domestic disturbance. They found Hardy assuming a military marching pose holding a rifle. He appeared unaware of his surroundings. Although he complied with Hansen's request to put the rifle down, Hardy refused to move away from it. At Hansen's request, Hardy also removed two knives from his

waistband and placed them next to the rifle. Hardy then produced a nun-chaku[3] and assumed a fighting stance. Although Officer Hansen directed Hardy to place the nunchaku on the ground, Hardy remained in a fighting stance for five or ten minutes. He eventually agreed to put down his nunchaku if Officer Wicks put down his service revolver. When Wicks complied, Hardy surrendered peacefully and explained he had just been in a family quarrel. The rifle was not loaded. Hardy later pleaded guilty to misdemeanor possession of nunchakus and disturbing the peace; he was placed on probation.

Carolyn Hardy, Hardy's mother, testified that she telephoned police after Hardy punched his brother John and pulled a gold chain off John's neck. When Hardy realized his mother had called the police, he kicked down her door. Carolyn Hardy told police she was concerned that Hardy had ingested phencyclidine, otherwise known as PCP or angel dust. (See Health & Saf. Code, § 11383.)

Carolyn Hardy said the nunchaku Hardy brandished belonged to his other brother, Robert. She explained that Robert had told his family he intended to commit suicide but defendant Hardy did not believe him. When Robert carried out his threat, defendant blamed himself for Robert's death. The day after Robert's death, defendant threw himself off a mountain, broke both his legs, and was bedridden for six months. Carolyn Hardy believed defendant needed psychiatric help.

Carolyn Hardy testified that defendant Hardy had participated in a program called Outward Bound, which involved camping and hiking in Colorado. He was chosen for the program because of his high scholastic potential. Defendant Hardy presented no other affirmative mitigating evidence at the penalty phase.

Father Bonaventure Jezierski testified that he knew Reilly in Buffalo, New York, when the latter served as an altar boy. Father Jezierski stated that Reilly was well-behaved and well-liked as a child, that he was raised by his mother alone, and that she always brought Reilly to Mass on time, neatly dressed.

Joseph Dotterweich testified that he was a childhood friend of Reilly in Buffalo and that the two of them shared many interests. He never knew

---

[3]A "nunchaku" is defined as "an instrument consisting of two or more sticks, clubs, bars or rods to be used as handles, connected by a rope, cord, wire, or chain, in the design of a weapon used in connection with the practice of a system of self-defense such as karate." (§ 12020, subd. (c)(3).)

Reilly to be involved with any criminal activity and although he saw Reilly drink beer, he never saw him take drugs. In 1978, the pair moved from Buffalo to Los Angeles and Reilly enrolled at Los Angeles City College. Dotterweich returned to New York and the two corresponded. When Dotterweich was involved in a serious car accident, Reilly was very supportive. Dotterweich returned to Los Angeles for a visit in 1981 and Reilly was apparently the same caring, affable person Dotterweich had always known. Reilly was working and said he intended to return to school.

Although he was tried jointly with Hardy and Reilly, Cliff Morgan's penalty phase trial was severed from the other two defendants when it was discovered he suffered from incurable bone cancer. He died of natural causes before his penalty trial could be held.

## DISCUSSION

### Jury Issues

#### 1. Allocation of Peremptory Challenges

Prior to jury selection, the trial court ruled that, pursuant to former sections 1070 and 1070.5,[4] Reilly, Hardy, and Cliff Morgan would have 26 peremptory challenges among them which must be exercised jointly.[5] In addition, each would have five peremptory challenges that could be exercised individually. Also pursuant to statute, the court decided the prosecutor would have 41 total peremptory challenges (26 plus 15) at his disposal. All three defense attorneys eventually accepted the jury without exhausting their allotted challenges, explaining that although they were not satisfied with the jury composition, they decided that it was unwise to make further changes because the prosecutor had so many challenges at his disposal that he would essentially choose the jury himself after the defense had exhausted their

---

[4]Former section 1070.5 stated in pertinent part that, "when two or more defendants are jointly tried for [a felony], the state and the defendants shall be entitled to the number of challenges prescribed by Section 1070, which challenges on the part of the defendants must be exercised jointly. Each defendant shall also be entitled to five additional challenges which may be exercised separately; the state shall also be entitled to additional challenges equal to the number of all the additional separate challenges allowed the defendants." (See now, Code Civ. Proc., § 231, subd. (a).)

[5]We note that a recent amendment reduced the number of peremptory challenges granted a capital defendant from 26 to 20. (Stats. 1989, ch. 1416, § 9, No. 7 Deering's Adv. Legis. Service, p. 6096 [No. 11 West's Cal. Legis. Service, pp. 5322-5323].)

challenges. All three defense attorneys complained that the system was unfairly weighted in the prosecutor's favor.

■ Reilly argues that the statutory allocation of peremptory challenges violated his constitutional rights to due process, equal protection, and fundamental fairness. He relies almost entirely on the arguments raised on appeal by the defendant in *People* v. *Ainsworth* (1988) 45 Cal.3d 984 [248 Cal.Rptr. 568, 755 P.2d 1017], and appends a copy of a portion of the defendant's opening brief in that case. We rejected these contentions in *Ainsworth* and have declined to reconsider the matter in subsequent cases. (*People* v. *Webster* (1991) 54 Cal.3d 411, 439 [285 Cal.Rptr. 31, 814 P.2d 1273]; *People* v. *Johnson* (1989) 47 Cal.3d 1194, 1222-1223 [255 Cal.Rptr. 569, 767 P.2d 1047].)

Reilly claims *Ainsworth, supra,* 45 Cal.3d 984, is distinguishable because only two defendants were jointly tried in that case, implying that any possible unfairness was magnified in his case because it involved three defendants. Thus, the prosecutor here had not 36 but 41 total peremptory challenges. We disagree and find no significance in the sheer number of defendants jointly tried. (See *Webster, supra,* 54 Cal.3d at p. 439 [applying *Ainsworth* in a case involving four defendants].)

Reilly also argues it is fundamentally unfair to grant him only 5 challenges while the prosecutor has 41 challenges. We disagree with the premise because defendant overlooks the fact that he also possessed 26 additional challenges; the mere fact those challenges must be jointly exercised does not necessarily mean they were not reasonably available to him.

2. *Witherspoon/Witt Error*

■ After extensive voir dire, the prosecutor successfully challenged prospective juror Bracamonte for cause. Defendants contend that in granting the challenge, the trial court erred under the principles set forth in *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770]. ■ *Wainwright* v. *Witt* (1985) 469 U.S. 412 [83 L.Ed.2d 841, 105 S.Ct. 844] (*Witt*), however, supersedes *Witherspoon* and requires a trial court to determine "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" (*Witt, supra,* at p. 424 [83 L.Ed.2d at pp. 851-852].) "Under *Witt*, therefore, our duty is to 'examine the context surrounding [the juror's] exclusion to determine whether the trial court's decision that [the juror's] beliefs would "substantially impair the performance of [the juror's] duties . . ." was fairly supported by the record.'" (*People* v. *Miranda* (1987) 44

Cal.3d 57, 94 [241 Cal.Rptr. 594, 744 P.2d 1127], quoting *Darden* v. *Wainwright* (1986) 477 U.S. 168, 176 [91 L.Ed.2d 144, 154, 106 S.Ct. 2426].)[6] "[I]f the prospective juror's responses are equivocal . . . or conflicting, the trial court's determination of that juror's state of mind is binding [on an appellate court]." *(People v. Cooper* (1991) 53 Cal.3d 771, 809 [281 Cal.Rptr. 90, 809 P.2d 865].)

■ We find prospective juror Bracamonte's answers on voir dire demonstrated his views on capital punishment would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *(Witt, supra,* 469 U.S. at p. 424 [83 L.Ed.2d at pp. 851-852].) He several times expressed his opposition to the death penalty and three times stated his views would prevent him from being fair and impartial at the guilt phase. Although he was confused on occasion and rehabilitated by defense counsel to some extent, after much questioning and discussion he unequivocally stated he would not vote for the death penalty regardless of the facts presented. In short, we find no error.

### 3. *Restriction of Voir Dire*

■ Defendants argue the trial court improperly restricted their ability to question jurors during voir dire. The trial court decided to ask each prospective juror a set of four standard questions based on *Witherspoon* v. *Illinois, supra,* 391 U.S. 510 *(Witherspoon).* Defense counsel moved to add a fifth question (or modify the fourth question) to include the fact that one of the murder victims was an eight-year-old child. The prosecutor stated he had no objection, provided he would be able to also ask whether it would affect the prospective juror's decision if one of the accused did not actually participate in the killing (presumably because it was the prosecutor's theory that Cliff Morgan did not physically participate in the murders). The trial judge rejected both suggestions and said that both sides could ask individual questions during the general voir dire.

We find no error. Both sides had an opportunity to question the prospective jurors on particular subjects during the general voir dire. Although defendants claim their ability to excuse jurors was limited by the reduced number of peremptory challenges allocated to them by statute, that factor did not limit their ability to excuse jurors for cause. In any event, as we explained *ante*, at pages 128-129, the trial court's decision requiring defendants to jointly exercise 26 peremptory challenges was not error. Finding no

[6]Because *Witt, supra,* 469 U.S. 412, was decided after defendants' trial, they argue it would be fundamentally unfair to apply the *Witt* standard here. We have previously rejected that claim *(People v. Wharton* (1991) 53 Cal.3d 522, 587-588 [280 Cal.Rptr. 631, 809 P.2d 290]), and defendants fail to present persuasive reasons why we should reconsider that decision.

error, we decline to address defendants' claim that they suffered prejudice from the trial court's refusal to expand the *Witherspoon* voir dire proceedings.

### 4. *Failure to Reopen Witherspoon Voir Dire*

■ Following completion of the *Witherspoon* voir dire, prospective juror Brown sent a letter to the court, explaining that from the tenor of the general voir dire of other prospective jurors, it seemed unlikely to him that defense counsel would permit him to remain on the jury. Brown explained in the letter that his female cousin had been murdered in San Francisco and the killer never found. In addition, his nephew was slain in his presence at a party. The nephew shot and killed one of the assailants but the other man was never apprehended. Brown's aunt and uncle had also been murdered during a residential burglary. There too, the killers were never found. Finally, Brown was talking to a man in a bar when the man was murdered. Brown heard that the killer was found and sentenced to life imprisonment.

The parties went in chambers to discuss the letter. Both sides asked Brown several questions about how these incidents would affect his ability to remain impartial. Despite these incidents, Brown consistently affirmed his ability to remain impartial, to obey the court's instructions, and to vote for a verdict based on the evidence presented in court. Stone, counsel for Cliff Morgan, and Demby, Hardy's defense counsel, moved to reopen the *Witherspoon* voir dire for Brown; the court did not immediately rule on the motion, instead remarking, "Well, we are outside the presence of the other jurors."

After some additional questions, Richard Lasting, Reilly's trial counsel, asked Brown whether he would favor "one punishment over the other in a case where someone is convicted of multiple stabbings of two people." The prosecutor objected, saying, "That's Witherspoon again. I think we already covered that." The judge replied, "All right. He [Brown] has indicated he is going to be fair in the penalty phase." In response to additional questions, Brown reiterated that he did not favor one penalty over another, and that he could base his decision on the evidence presented and instructions given. He was later subjected to a searching inquiry in open court, including questions about the five killings that touched his life. None of the three defense lawyers challenged Brown for cause or with a peremptory challenge.

As this record makes clear, the trial court did not violate defendants' constitutional rights by refusing to reopen the *Witherspoon* voir dire. Contrary to defendants' arguments, the trial judge neither reserved the voir dire for himself nor failed to permit follow-up questions to ambiguous queries.

(See *People* v. *Bittaker* (1989) 48 Cal.3d 1046, 1083-1084 [259 Cal.Rptr. 630, 774 P.2d 659].) Brown was subjected to an extensive voir dire by the trial judge, the prosecutor, and defense counsel. Further, although defendants complain that they would not have passed the jury had they had more peremptory challenges at their disposal, we have rejected the basis of that contention, *ante*, at pages 128-129.

*Guilt Phase Issues*

### 5. Counsel's Alleged Conflict of Interest

Hardy was represented at his preliminary examination by Bardsley, a deputy public defender. Bardsley continued his representation until shortly after Hardy's arraignment. At that time, another public defender, Demby, was substituted as Hardy's trial attorney. During the pretrial proceedings in this case, Hardy complained that he was being denied his speedy trial rights because Demby sought numerous continuances in an effort to prepare for trial. Hardy apparently believed that Bardsley was more familiar with the case and would not have needed as many continuances.

The trial court treated Hardy's complaint as a *Marsden* motion (*People* v. *Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44], and appointed independent counsel to investigate the matter. Bermann, a private attorney, moved on behalf of Hardy to dismiss the case on speedy trial grounds. The trial court denied the motion on February 23, 1983.

On March 7, Hardy filed a pro se declaration of conflict of interest and asked for appointment of another attorney. The declaration stated that Demby "is failing to put [certain facts] before the court" and that Demby "failed to investigate [relevant] evidence." The trial court held a *Marsden* hearing and then denied the motion.

On March 14, the parties were in the process of selecting jurors. The trial court at this time became aware that Hardy had filed a pro se complaint in federal court alleging negligent legal representation and seeking $5 million in compensation. Because the lawsuit named Demby as one of the defendants, Hardy moved pro se to have him replaced due to an alleged conflict of interest. (Also named in the suit were Bardsley, Wilbur Littlefield, the Los Angeles County Public Defender, and the entire Los Angeles County Office of the Public Defender.) Demby asked the trial court to defer action on the motion until he read the federal complaint and conferred with his superiors. The trial court agreed and jury selection continued.

On March 17, the following discussion occurred in open court:

"MR. DEMBY: I have discussed with my office the matter of the lawsuit of Mr. Hardy. I have discussed it with Mr. Littlefield and with Mr. Bardsley. They feel that the facts of the lawsuit would not interfere with my diligent defense of Mr. Hardy. I also have that feeling and I believe it would be up to the court to make any ruling.

"THE COURT: I don't know if I have to make a ruling. I mean there is a civil suit pending, I don't think there is any action to be taken. [¶] You will be adequately represented, I assume. Mr. Hardy has filed this lawsuit. That is his prerogative.

"MR. DEMBY: I do not believe that the lawsuit will interfere with my representation of Mr. Hardy.

"THE COURT: Do you want to say anything, Mr. Hardy?

"DEFENDANT HARDY: I feel that it's in direct conflict with Mr. Demby and in direct conflict with the Public Defender's Office having this action against them.

"THE COURT: I understand that, sir. No. I think based on Mr. Demby's reputation, also his statement, I think he is going to afford you an adequate defense and your due process rights will not be impinged."

During the preparation of the record for this appeal, the parties stipulated that the trial court denied the motion to relieve Demby without having read the federal complaint.[7] ▆▆ Hardy now claims that he is entitled to reversal of his convictions because he was forced to go to trial with an attorney burdened by a conflict of interest.

Before addressing that issue, we first discuss motions filed with this court by both Hardy and the People, urging that we take judicial notice of the court file of the federal lawsuit.

a. *Judicial Notice*

▆▆ Both respondent and Hardy moved this court to take judicial notice of the contents of the court file in Hardy's lawsuit. In addition, Hardy also asks that we notice the contents of the court file in the appeal of that case as

---

[7]The stipulation states: "[I]n considering and eventually rejecting appellant Hardy's contention that a direct conflict of interest was created by the civil suit Hardy had filed against Demby in federal court, the trial court did not read the contents of the complaint filed in that lawsuit."

well as the court file in another lawsuit he filed and its accompanying appeal to the Ninth Circuit Court of Appeals. Although we granted both motions prior to oral argument, we deem it instructive to explain our reasons at this time.

Evidence Code section 452 states in pertinent part: "Judicial notice may be taken of the following matters . . . (d) Records of . . . (2) any court of record of the United States." Evidence Code section 459, subdivision (a), permits but does not require a reviewing court to take judicial notice of matters specified in Evidence Code section 452. Although judicial notice is thus permissible in this case, several courts have cautioned against judicially noticing matters that were not before the trial court. ▮ "[A]s a general rule the [appellate] court should not take . . . [judicial] notice if, upon examination of the entire record, it appears that the matter has not been presented to and considered by the trial court in the first instance." (*People v. Preslie* (1977) 70 Cal.App.3d 486, 493 [138 Cal.Rptr. 828]; *People v. Meza* (1984) 162 Cal.App.3d 25, 33 [208 Cal.Rptr. 576] [following *Preslie*]; *DeYoung v. Del Mar Thoroughbred Club* (1984) 159 Cal.App.3d 858, 863 [206 Cal.Rptr. 28] [same]; *People v. Hamilton* (1986) 191 Cal.App.3d Supp. 13, 21-22 [236 Cal.Rptr. 894] [following *Preslie*].) Such a rule prevents the unfairness that would flow from permitting one side to press an issue or theory on appeal that was not raised below. (*Hamilton, supra,* at p. Supp. 22.)

▮ Despite these authorities, several considerations led us to conclude that judicial notice was appropriate in this case. First, and foremost, both respondent and defendant Hardy ask that we judicially notice the federal lawsuit. Moreover, neither side opposes the other's motion. There should thus be no unfairness to either side.

Second, Evidence Code section 459, subdivision (d), provides certain procedural safeguards when a reviewing court takes judicial notice.[8] By providing for special rules for situations in which a party seeks judicial notice of information "not received in open court or not included in the record of the action" (Evid. Code, § 459, subd. (d)), the Evidence Code clearly contemplates that, at least in some situations, a reviewing court will grant judicial notice even when the information was not presented to the trial court. (See *People v. Belcher* (1974) 11 Cal.3d 91, 94, fn. 2 [113 Cal.Rptr. 1, 520 P.2d 385] [granting judicial notice of matters not made part of the record at trial].)

---

[8]That section states: "In determining the propriety of taking judicial notice of a matter specified in section 452 . . . , if the reviewing court resorts to any source of information not received in open court or not included in the record of the action, . . . the reviewing court shall afford each party reasonable opportunity to meet such evidence before judicial notice of the matter may be taken."

Third, the facts are not reasonably open to dispute; both motions for judicial notice append photocopies of certified copies of the pertinent court files.

Thus, although the general rule cautions against granting judicial notice of matters not presented to the trial court, other considerations present in this case suggested a contrary conclusion. Under these circumstances, judicial notice was appropriate despite the fact that the documents noticed were not presented to the trial court.

b. *Conflict of Interest*

■ We recently explained the general principles governing this issue in *People* v. *Jones* (1991) 53 Cal.3d 1115 [282 Cal.Rptr. 465, 811 P.2d 757]. "Under the federal and state Constitutions, a criminal defendant has the right to the assistance of counsel. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15.) These constitutional guarantees entitle a defendant 'not to some bare assistance but rather to *effective* assistance.' (*People* v. *Ledesma* (1987) 43 Cal.3d 171, 215 [233 Cal.Rptr. 404, 729 P.2d 839], italics in original.) That entitlement includes the right to representation that is free from conflicts of interest. (*Wood* v. *Georgia* (1981) 450 U.S. 261, 271 [67 L.Ed.2d 220, 230, 101 S.Ct. 1097]; *People* v. *Bonin* (1989) 47 Cal.3d 808, 834 [254 Cal.Rptr. 298, 765 P.2d 460].) It applies to a defendant who retains his own counsel as well as to a defendant who is represented by appointed counsel. (*People* v. *Bonin, supra,* at p. 834; *Cuyler* v. *Sullivan* (1980) 446 U.S. 335, 344-345 [64 L.Ed.2d 333, 344, 100 S.Ct. 1708].)

"[W]hen counsel is burdened by an actual conflict of interest, prejudice is presumed; the presumption arises, however, 'only if the defendant demonstrates that counsel "actively represented conflicting interests" and that "an actual conflict of interest adversely affected his lawyer's performance." ' (*Strickland* v. *Washington* (1983) 466 U.S. 668, 692 [80 L.Ed.2d 674, 696, 104 S.Ct. 2052], citing *Cuyler* v. *Sullivan, supra,* 446 U.S. at p. 348.)

"Conflicts of interest may arise in various factual settings. Broadly, they 'embrace all situations in which an attorney's loyalty to, or efforts on behalf of, a client are threatened by his responsibilities to another client or a third person *or by his own interests.*' (*People* v. *Bonin, supra,* 47 Cal.3d at p. 835.)" (*Jones, supra,* 53 Cal.3d at pp. 1133-1134, last italics added.)

Although "most conflicts of interest seen in criminal litigation arise out of a lawyer's dual representation of co-defendants, the constitutional principle is not narrowly confined to instances of that type." (*United States* v. *Hurt*

(D.C.Cir. 1976) 177 App.D.C. 15 [543 F.2d 162, 166], fn. omitted.) Thus, a conflict may exist "whenever counsel is so situated that the caliber of his services may be substantially diluted." (*Ibid.*, fn. omitted; *Smith* v. *Lockhart* (8th Cir. 1991) 923 F.2d 1314, 1320.)

 In this case, Hardy claims Demby was burdened by an actual conflict of interest because he was named as a defendant in Hardy's federal lawsuit. As a result, Hardy contends Demby provided ineffective assistance of counsel. We agree that being named as a defendant in a lawsuit by one's client can place an attorney in a situation where his or her loyalties are divided. For example, in *United States* v. *Hurt, supra*, 543 F.2d 162, appellate counsel alleged on appeal that trial counsel provided inadequate representation. When trial counsel sued appellate counsel for libel, the latter sought to be excused from the case due to a conflict of interest. The district court denied the motion but the circuit court of appeals vacated the judgment and remanded the case, explaining that although appellate counsel had little to fear from the libel suit because of a judicial proceeding privilege (cf. Civ. Code, § 47, subd. (b)), counsel sincerely believed he was at risk and the suit thus prevented him from actively representing his client on appeal. (*Hurt, supra*, at pp. 167-168.)

More directly on point is a recent decision by the Eighth Circuit Court of Appeals. In *Smith* v. *Lockhart, supra*, 923 F.2d 1314, a criminal defendant (Smith) in Arkansas state court filed a class action lawsuit in federal court naming as defendants his attorney (a part-time judge), the trial judge, and others. The lawsuit alleged the defendants conspired to deprive Smith and other criminal defendants of their rights to a speedy trial and to the effective assistance of counsel. Despite the pending lawsuit, the state trial judge refused to appoint new counsel and expressly found no conflict of interest existed, exclaiming that " 'I don't care who you've sued, Mr. Smith.' " (*Id.* at p. 1320.)

The district court denied a writ of habeas corpus but the appellate court reversed, stating, "A federal lawsuit pitting the defendant against his attorney certainly suggests divided loyalties and gives the attorney 'a personal interest in the way he conducted [Smith's] defense—an interest independent of, and in some respects in conflict with, [Smith's] interest in obtaining a judgment of acquittal.' " (*Smith* v. *Lockhart, supra*, 923 F.2d at p. 1321, quoting *Douglas* v. *United States* (D.C. 1985) 488 A.2d 121, 136.)

As explained in both *United States* v. *Hurt, supra*, 543 F.2d 162, and *Smith* v. *Lockhart, supra*, 923 F.2d 1314, an attorney may suffer a conflict of interest if the attorney's client names the attorney as a defendant in a

collateral lawsuit. Although there was thus a *possibility* of a conflict here, several factors lead us to conclude that no *actual* conflict existed in this case. First, unlike in the cases Hardy cites in support, Mr. Demby desired to continue his representation. He unequivocally stated on the record that he had reviewed the contents of the lawsuit with his superiors and believed that it would not inhibit his legal representation. The trial court, apparently aware of both Mr. Demby's reputation and the quality of his representation in the case to that point, accepted this explanation at face value.

By contrast, in *Smith* v. *Lockhart, supra,* 923 F.2d 1314, defense attorney Marquette expressed misgivings about continuing his representation of the defendant. (*Id.* at p. 1318.) Similarly, in *United States* v. *Hurt, supra,* 543 F.2d 162, the appellate attorney himself asked the court to relieve him, citing a conflict of interest. (*Id.* at p. 164 & fn. 7.) Indeed, although there was but a "tiny risk" that the attorney was vulnerable to a charge of libel, the reviewing court reversed and relied on the attorney's representations, noting, "There is no reason whatever to doubt counsel's sincerity." (*Id.* at p. 167, fn. omitted.)

The United States Supreme Court has addressed this point, noting that "trial courts necessarily rely in large measure upon the good faith and good judgment of defense counsel." (*Cuyler* v. *Sullivan* (1980) 446 U.S. 335, 347 [64 L.Ed.2d 333, 346, 100 S.Ct. 1708].) A criminal defense attorney " 'is in the best position professionally and ethically to determine when a conflict of interest exists or will probably develop in the course of a trial.' " (*Holloway* v. *Arkansas* (1978) 435 U.S. 475, 485 [55 L.Ed.2d 426, 435, 98 S.Ct. 1173], quoting *State* v. *Davis* (1973) 110 Ariz. 29, 31 [514 P.2d 1025, 1027].) Demby's considered opinion that the lawsuit would not prevent his full and active representation of Hardy is thus a significant factor when determining whether an actual conflict existed.

Second, our examination of the contents of the court files in Hardy's federal lawsuits reveals that they had no legitimate legal basis, thus validating Demby's evaluation that the suits would not impair his ability to defend Hardy. In the first lawsuit, Hardy alleged that Bardsley and Demby engaged in unprofessional and unethical conduct. In addition, although the complaint mentions due process of law and the right to effective counsel, the allegations were stated in conclusory terms. The complaint was received by the district court on March 10, 1983, and dismissed for lack of federal jurisdiction on March 15, 1983. When Hardy sought to appeal in forma pauperis, the district court denied the motion, noting the proposed appeal was not taken in good faith (see 28 U.S.C. § 1915(a)) and was frivolous (28 U.S.C. § 753(f)). The Ninth Circuit Court of Appeals denied Hardy's motion to file in forma

pauperis and eventually dismissed the appeal for failure to pay the docket fee to the district court. (U.S. Cir. Ct. Rules (9th Cir.), former rule 19(b).)

Hardy's second federal lawsuit, filed on May 5, 1983, alleged the same defendants violated his civil rights. The allegations were essentially the same as in the first suit, however, and the federal magistrate so found, recommending dismissal of the initial complaint as well as an amended complaint. The district court adopted the magistrate's finding. An appeal of this action met with the same end as did Hardy's first lawsuit, the district court again noting the suit was frivolous and taken in bad faith.

Viewing Demby's considered decision to continue with his representation of Hardy, as well as the lack of any merit in the collateral lawsuits filed by Hardy, it is not difficult to conclude there existed no actual conflict of interest here. ■■■ Although the possibility of a conflict was posed on these facts, we echo the sentiments of the Eighth Circuit Court of Appeals: "We recognize the danger of any holding implying that defendants can manufacture conflicts of interest by initiating lawsuits against their attorneys. [Citation.] *A patently frivolous lawsuit brought by a defendant against his or her counsel may not, alone, constitute cause for appointment of new counsel.* Trial judges must be wary of defendants who employ complaints about counsel as dilatory tactics or for some other invidious motive." (*Smith* v. *Lockhart, supra,* 923 F.2d at p. 1321, fn. 11, italics added; cf. *Holloway* v. *Arkansas, supra,* 435 U.S. at pp. 486-487 [55 L.Ed.2d at p. 436] [suggesting trial court need not grant relief where motion is made for dilatory purposes].)

■■■ The case at bar amply illustrates this point. Hardy made a *Marsden* motion and the trial court, solicitous of his rights, appointed private counsel to investigate the possible grounds for the motion. After Bermann's motion to dismiss was denied, Hardy raised pro se a second *Marsden* motion. After another hearing, that motion was also denied. Three days later, Hardy filed the first of his two frivolous federal lawsuits. Under the circumstances, it seems clear that Hardy was merely attempting to manufacture a possible conflict of interest to try and delay his trial. We conclude no actual conflict of interest is shown on these facts.

c. *Duty of Inquiry*

Hardy contends that even if he has failed to show an actual conflict of interest, there was sufficient evidence of a conflict to require the trial court to inquire into the basis of the potential problem. The record, however, shows the trial court was solicitous of Hardy's contention and inquired into its basis. We conclude any duty of inquiry was satisfied.

■ Finally, we reject Hardy's final basis for relief, namely, that reversal is required because of the appearance of impropriety. As explained, *ante*, at page 135, relief for a conflict of interest is premised on the showing of an actual conflict, not the mere appearance of a conflict.

### 6. *Coconspirator Exception to the Hearsay Rule*

As is clear, much of the evidence adduced against defendants at the guilt phase of their trial consisted of the testimony of persons who, at various times, were coconspirators. The trial court held a lengthy pretrial hearing to determine the admissibility of these statements under Evidence Code section 1223, the coconspirator exception to the hearsay rule. After the hearing, the court ruled the disputed statements were admissible, finding that Debbie Sportsman, Colette Mitchell, Ron Leahy, and Calvin Boyd were coconspirators. Defendants raise a number of challenges to the court's ruling. Before addressing the particular arguments, however, some background discussion is appropriate.

■ Hearsay evidence is of course generally inadmissible. (Evid. Code, § 1200.) Hearsay statements by coconspirators, however, may nevertheless be admitted against a party if, at the threshold, the offering party presents "independent evidence to establish prima facie the existence of . . . [a] conspiracy." (*People* v. *Leach* (1975) 15 Cal.3d 419, 430 [124 Cal.Rptr. 752, 541 P.2d 296], cert. den. *sub nom. Kramer* v. *California* (1976) 424 U.S. 926 [47 L.Ed.2d 335, 96 S.Ct. 1137]; see *People* v. *Steccone* (1950) 36 Cal.2d 234, 238 [223 P.2d 17] [prima facie evidence is sufficient]; see also, Evid. Code, § 1223, subd. (c).) Once independent proof of a conspiracy has been shown, three preliminary facts must be established: "(1) that the declarant was participating in a conspiracy at the time of the declaration; (2) that the declaration was in furtherance of the objective of that conspiracy; and (3) that at the time of the declaration the party against whom the evidence is offered was participating or would later participate in the conspiracy." (*Leach, supra,* at pp. 430-431, fn. 10.)

### a. *Existence of a Conspiracy to Commit Insurance Fraud*

The trial court held that there was prima facie evidence of a conspiracy to commit insurance fraud, and that the conspiracy was ongoing at the time of trial. This ruling permitted the prosecution to admit into evidence hearsay statements made by coconspirators uttered after the killings but before the trial. ■ Reilly first contends the trial court erred in concluding that

the People established a prima facie showing that there existed at the time of trial a conspiracy fraudulently to obtain insurance proceeds.[9]

It is undisputed that, five days after the slayings, Cliff Morgan filed a claim with the two insurance companies that insured the lives of the victims, seeking benefits allegedly owing under those insurance policies. Reilly claims, however, that there was nothing *fraudulent* in filing such a claim because Nancy and Mitchell Morgan were dead and the insurance companies were legally obligated to pay out the benefits to someone, either Cliff Morgan or the heirs of Nancy and Mitchell Morgan.

We disagree and instead find the People presented substantial evidence from which the trial court could have found a prima facie showing of insurance fraud. Former Insurance Code section 556, subdivision (a),[10] as it read at the time the murders were committed, provided: "It is unlawful to: [¶] (1) Knowingly present . . . any false or fraudulent claim for the payment of a loss under a contract of insurance." (Stats. 1979, ch. 557, § 1, pp. 1764-1765.) ▬ As a general rule, a beneficiary who unlawfully kills the insured cannot recover benefits under the policy. (*Beck* v. *West Coast Life Ins. Co.* (1952) 38 Cal.2d 643 [241 P.2d 544, 26 A.L.R.2d 979] (*Beck*); *Estate of Jeffers* (1982) 134 Cal.App.3d 729, 732 [182 Cal.Rptr. 300]; *Mize* v. *Reserve Life Ins. Co.* (1975) 48 Cal.App.3d 487, 491, fn. 2 [121 Cal.Rptr. 848]; see generally, Annot., Killing of Insured by Beneficiary as Affecting Life Insurance or Its Proceeds, 27 A.L.R.3d 794, 802-807, § 3, and cases cited [hereafter Annot., Killing of Insured].) ▬▬ By applying for benefits under the policies, Morgan knowingly and falsely represented himself as a person able to legally receive the benefits under the terms of the policy.

Reilly counterargues that although Cliff Morgan could not lawfully receive the insurance benefits, the insurance companies were nonetheless liable to pay "somebody," thereby negating the existence of fraud. Thus, "the insurer is not relieved of liability because of the disqualification of the principal beneficiary" (*Beck, supra,* 38 Cal.2d at p. 645), and "[u]nless the policy expressly provides otherwise, the insurer must still pay the proceeds in accordance with the contract of insurance as though the disqualified beneficiary had predeceased the insured or was otherwise incapable of taking or disqualified from taking the proceeds." (4 Couch on Insurance (2d

---

[9]He concedes, at least for this argument, that there was adequate evidence of the existence of a conspiracy to commit murder, but contends that conspiracy necessarily ended on the death of the victims. (See discussion, *post,* at pp. 143-145.)

[10]Former Insurance Code section 556 was repealed (see Stats. 1989, ch. 1119, § 1), and was recodified and renumbered. The substantive provisions are now found in Insurance Code section 1871.1.

ed. 1984) § 27:158, pp. 855-856 [hereafter Couch]; see Annot., Killing of Insured, *supra*, § 7[a], at p. 813.) This argument is nonsensical; merely because someone may be lawfully entitled to the proceeds of the insurance policy does not alter the fact that Morgan's application for benefits was fraudulent.

We also find Reilly's legal support for his theory wanting. For reasons of public policy, courts have distinguished between cases involving fraud in obtaining a life insurance policy, and cases where the beneficiary decides to murder the insured after purchasing the insurance. As explained by one commentator, "An exception to the rule that the liability of the insurer is not affected by the beneficiary's unlawfully killing the insured may arise when the beneficiary is also guilty of fraud with respect to the insurer. For example, *if it is established that the beneficiary conceived the idea of murdering the insured prior to the time the insurance was procured* and with that thought in mind the beneficiary himself procured the policy . . . so that the insurance policy was, in actual effect, at its inception, a contract between the beneficiary and the insurance company, as distinguished from a contract between the innocent insured and the company, the insurance company may defeat liability on the ground of fraud. Under this principle recovery is barred even by the estate of the insured." (Couch, *supra*, § 27:160, at p. 858, fn. omitted, italics added; see generally, Rest., Restitution, § 189(1), com. (e)(2) at p. 778.)

California has adopted the foregoing rule (see *West Coast L. Ins. Co.* v. *Crawford* (1943) 58 Cal.App.2d 771, 773 [138 P.2d 384]), as has virtually every jurisdiction that has considered the issue. (See, e.g., *New England Mut. Life Ins. Co.* v. *Calvert* (E.D.Mo. 1976) 410 F.Supp. 937, 940-941, and cases cited; *Chute* v. *Old American Ins. Co.* (1981) 6 Kan.App.2d 412 [629 P.2d 734, 738-739]; *Flood* v. *Fidelity & Guar. Life Ins. Co.* (La.App. 1981) 394 So.2d 1311, cert. den. 399 So.3d 608; Annot., Killing of Insured, *supra*, 27 A.L.R.3d, § 13[a], at pp. 825-826.)

 In this case, the evidence showed Cliff Morgan purchased a large amount of life insurance shortly after beginning work at Equitable Life Insurance Company. Experts opined it was an unwise investment due to the high premiums as compared to Morgan's annual salary. Evidence also showed that the victims were killed shortly before the second, and more substantial, premium installment was due. Also, Hardy told Colette Mitchell that he must kill the victims by June 1, 1981, or the insurance would expire. Thus, there was evidence that the timing of the killings was not coincidental. The premise of Reilly's argument is thus unsound: the facts establish that Cliff Morgan, *at the time he purchased the insurance policies* on their lives,

intended to kill his wife and son. If so, the insurance companies may have been absolved of the obligation to pay benefits to anyone.

In any case, even if we assume Reilly is correct and the insurance companies were obligated to pay benefits to someone, Morgan's involvement in the murders eliminated him as a potential beneficiary and his application for benefits was thus false and fraudulent.

In addition to fraudulent conduct on Morgan's part, there was also evidence from which the trial court could conclude that Reilly and Hardy participated in a conspiracy to commit that crime. For example, the admissions of both defendants reveal that they expected to receive several thousand dollars as a result of Morgan's life insurance policies. Reilly's actions in hiring first Costello, then Boyd, and then Hardy, demonstrate his active involvement in the criminal enterprise. Hardy exhibited knowledge of the intended insurance fraud by admitting to Colette Mitchell that the victims had to be killed before June 1, 1981, when the second premium payment was due. Most, if not all, of these statements were admissible hearsay, being admissions of the defendants themselves. (Evid. Code, § 1220.) Accordingly, we reject Reilly's contention that there lacked sufficient facts to demonstrate a prima facie showing of a conspiracy to commit insurance fraud.

b. *Insufficient Evidence of Insurance Fraud*

We also reject defendants' claim there was insufficient evidence to support the conviction for conspiracy to commit insurance fraud. Viewing the facts in a light most favorable to the respondent (see *People* v. *Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255]), we conclude a rational trier of fact could have found beyond a reasonable doubt the essential elements of that crime. Defendants strongly argue there was no evidence showing a false or fraudulent application for benefits, as required by former Insurance Code section 556, subdivision (a). As discussed above, however, there was ample evidence showing Cliff Morgan, knowing he was ineligible to collect the benefits under the policies because of his involvement with the murders, concealed that fact when applying for the benefits. There was thus sufficient evidence to support the conviction.

Defendants also argue that Reilly cannot be guilty of conspiracy because he was not acquainted with Cliff Morgan at the time the latter procured the policies in question. We disagree. That Morgan formed the idea of killing his wife before he met Reilly is irrelevant because there was no conspiracy until Morgan and Reilly—the two original members of the conspiracy—agreed to

kill Nancy Morgan for the insurance money. Moreover, after this agreement, Reilly actively participated in the scheme, soliciting first Marc Costello, then Calvin Boyd, and finally Hardy to perform the killing.

Defendants also argue there were several insurance policies covering the lives of the victims and there was no showing that Morgan procured these other policies with fraudulent intent. That point is irrelevant, however, because the evidence showed he made a false and fraudulent application to the companies listed in the information. We conclude there was sufficient evidence supporting the conviction for conspiracy to commit insurance fraud.

### c. *Continuing Conspiracy*

Defendants next argue that, assuming there existed a conspiracy to commit insurance fraud, the trial court erred by finding that the conspiracy was ongoing at the time of trial. In so ruling, defendants claim, the trial court improperly prolonged the life of the conspiracy and, concomitantly, the ability of the prosecution to rely on the coconspirator exception to the hearsay rule. Defendants urge us to find the conspiracy ended with the death of the victims.

The general rule is that a "conspiracy usually comes to an end when the substantive crime for which the coconspirators are being tried is either attained or defeated." (*People* v. *Saling* (1972) 7 Cal.3d 844, 852 [103 Cal.Rptr. 698, 500 P.2d 610].) "[An] insurance conspiracy would normally . . . terminate[] upon the receipt of the insurance proceeds." (*Leach, supra,* 15 Cal.3d at p. 436.) "It is for the trier of fact—considering the unique circumstances and the nature and purpose of the conspiracy of each case—to determine precisely when the conspiracy has ended." (*Saling, supra,* at p. 852; *People* v. *Humphries* (1986) 185 Cal.App.3d 1315, 1334 [230 Cal.Rptr. 536].)

The evidence in this case reveals that *the primary goal* of the conspiracy was the acquisition of money through the receipt of the insurance benefits. This case is thus unlike *Leach, supra,* 15 Cal.3d 419, in which we cautioned that a conspiracy *to commit murder* does not "necessarily entail[] a second conspiracy to collect the insurance proceeds which will be paid as a matter of course upon the successful commission of the contemplated offense." (*Id.* at p. 435.) Instead, the evidence (and reasonable inferences drawn therefrom) reveals Cliff Morgan, Reilly, Hardy, and others embarked on an intricate plan *to defraud* two insurance companies. (See *Humphries, supra,* 185 Cal.App.3d at p. 1333 ["the objective was monetary gain, not the removal of another person"].)

After holding a hearing pursuant to Evidence Code section 403, the trial court concluded the evidence demonstrated prima facie a conspiracy to commit insurance fraud. In addition, it found that the conspiracy to defraud the insurance companies was a continuing one.[11] We agree. The conspiracy did not, as defendants argue, end with the death of the insureds. Instead, for purposes of this case, it continued until the coconspirators received the insurance proceeds (*Leach, supra,* 15 Cal.3d at p. 436), or Morgan was convicted of unjustifiable homicide of the victims, thus disabling him from legally collecting the insurance proceeds. (*Saling, supra,* 7 Cal.3d at p. 852 [conspiracy ends when substantive crime is defeated].)[12] Because the insurance companies had not yet paid out at the time of trial, the conspiracy was a continuing one, permitting the introduction of hearsay statements made during the time between the crime and the trial, pursuant to Evidence Code section 1223.

In so holding, we decline to accept defendants' invitation to find the trial court improperly extended the life of the conspiracy to permit the introduction of their coconspirators' hearsay statements against them. We are fully cognizant of Justice Jackson's eloquent admonition that "the looseness and pliability of the doctrine [of conspiracy] present inherent dangers which should be in the background of judicial thought wherever it is sought to extend the doctrine to meet the exigencies of a particular case." (*Krulewitch v. United States* (1949) 336 U.S. 440, 449 [93 L.Ed. 790, 797, 69 S.Ct. 716] [conc. opn. of Jackson, J.], quoted with approval in *Leach, supra,* 15 Cal.3d at p. 435.) Considering the independent evidence presented at trial of a conspiracy to defraud the insurance companies, however, we conclude that

---

[11]The court stated: "It would appear to me, if a person indicates or the purpose of the conspiracy is 'Kill my wife, then we'll collect the insurance,' is much different than 'Kill my wife for the insurance.' [¶] It seems to set the tone for the conspiracy, if you will, as to what the objective and purpose of that conspiracy is."

After noting the fact that Cliff Morgan bought the insurance while a trainee and that there was evidence that the insurance was an unwise investment considering his income level, the court continued: "It would appear to this Court—again, the termination date is obviously critical—but for purposes of this particular hearing . . . , that there was a conspiracy in existence at the time of the murders of Nancy Carol Morgan and Mitchell Raymond Morgan. The primary objective of that conspiracy, as I have heard the testimony here, and further, with Leach and Saling and all the cases cited, in mind, that there is sufficient independent evidence of that conspiracy, the objective of that conspiracy, was not for the murder of [the victims] but was for the explicit purpose of obtaining the insurance proceeds."

Finally, the court ruled that, "Inasmuch as this Court finds that the objective and the purpose of this conspiracy was to obtain the insurance proceeds, and that is not yet a fait accompli[ ], I feel this conspiracy is still in existence."

[12]Reilly does not now contend that anyone attempted to voluntarily withdraw from the conspiracy (see *People* v. *Lowery* (1988) 200 Cal.App.3d 1207, 1220 [246 Cal.Rptr. 443]; 1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Elements of Crime, § 180, pp. 200-201), although his defense at trial was that he withdrew from the conspiracy.

no improper inflation of conspiracy liability occurred here. We also note that a conspiracy theory was not pressed in this case solely to provide a "vehicle for using otherwise inadmissible hearsay evidence against a defendant." (*Leach, supra,* 15 Cal.3d at p. 435.) Instead, both Reilly and Hardy were charged with and convicted of the substantive offense of conspiracy under section 182.

### d. *Statements Made "in Furtherance" of the Conspiracy*

Reilly apparently also contends that certain hearsay statements admitted at trial—principally, but not exclusively, those statements made after Hardy and Reilly were in pretrial detention—were not made "in furtherance of the objective" of the conspiracy. (Evid. Code, § 1223, subd. (a).) Instead, he claims the statements were made only *to conceal* the coconspirators' involvement in the conspiracy. He thus characterizes his case as one in which the trial court improperly found an implied "secondary conspiracy" to conceal, which existed after the primary conspiracy ended.

Not every conspiracy to achieve a criminal objective is necessarily followed by a secondary conspiracy to conceal the first conspiracy. Thus, in *People* v. *Leach, supra,* 15 Cal.3d 419, we explained that, "conspiracies are not to be deemed still operative merely because the conspirators act in concert to avoid 'detection and punishment.' " (*Id.* at p. 431, quoting in part *Saling, supra,* 7 Cal.3d at p. 853; see also *Krulewitch* v. *United States, supra,* 336 U.S. at p. 443 [93 L.Ed. at p. 794].)

Reilly's claim that the trial court admitted the challenged statements on the proscribed "implied secondary conspiracy" theory is meritless, however, because it is based on his assumption that the primary conspiracy ended with the death of the victims. As we explained, *ante,* at pages 143-145, the primary goal of the conspiracy was the fraudulent collection of insurance proceeds, not the death of the victims. Thus, the hearsay statements Reilly now challenges were made pursuant to the primary conspiracy that was ongoing at the time the statements were made, not an implied secondary conspiracy to conceal the first crime.

Hardy contends numerous hearsay statements were erroneously admitted at trial because the statements were not made "in furtherance of the objective" of the criminal conspiracy. (Evid. Code, § 1223.) In support, he describes several individual statements Reilly made to Mr. and Mrs. Sportsman, Debbie Sportsman, Kim H., and Calvin Boyd. For example, both James and Sonja Sportsman testified that when Reilly was in their home, he mentioned a man named Cliff Morgan who wanted to have his wife killed in

order to collect the insurance proceeds. Mrs. Sportsman also testified that Reilly intended to speak to a "kick-boxer" about the killing. Debbie Sportsman related numerous and damaging admissions by Reilly attesting to his involvement in the scheme, including his admission that he was at the Morgan home the night of the killings and heard Nancy Morgan crying and pleading for her life. Kim H. testified Debbie told her that Reilly had admitted his complicity to her. Boyd testified that Reilly had approached him about participating in the killing, and that after the slaying Reilly admitted that he and Hardy had committed the murders.

In many cases, a statement of a coconspirator made after apprehension "does not in any sense further the criminal enterprise, but rather frustrates it." (*People* v. *Luker* (1965) 63 Cal.2d 464, 476 [47 Cal.Rptr. 209 [407 P.2d 9].) Such statements are often the antithesis of "furthering" or "advancing" the criminal objective because they reveal secret actions by coconspirators which law enforcement can use to prevent the conspirators from realizing their criminal objective. We reemphasize, however, that no rigid rules exist in this area and that whether statements made are in furtherance of a conspiracy depends on an analysis of the totality of the facts and circumstances in the case. (See *Saling, supra*, 7 Cal.3d at p. 852 [whether conspiracy has ended depends on the "unique circumstances" of the case]; *Humphries, supra*, 185 Cal.App.3d at p. 1334 [same].) Accordingly, "[a]lthough it has been held that statements which merely narrate past events are not to be deemed as made in furtherance of a conspiracy [citations], such a rule cannot be applied mechanically." (*Saling, supra*, 7 Cal.3d at p. 852, fn. 8.)

In this case, the conspiracy to commit insurance fraud hinged on Cliff Morgan's ability to avoid being blamed for the killings because of the rule precluding a beneficiary who murders the insured from collecting on the policy. The evidence showed Hardy and Reilly's payment for killing the victims was dependent on Cliff Morgan's ability to collect the insurance proceeds. Should Morgan's complicity in the killings be revealed before the insurance company paid the policy proceeds, the criminal objective of the entire conspiracy—insurance fraud—would be thwarted. If either Reilly or Hardy's guilt was revealed, disclosure of Cliff Morgan's involvement would surely follow because their complicity was fatally intertwined with Morgan's. Thus, statements Reilly made to Debbie Sportsman, Calvin Boyd, and Kim H. (all found to be coconspirators) in an attempt to maintain secrecy and avoid discovery of the conspiracy furthered their criminal objective, namely, enabling Cliff Morgan to collect on the insurance policies. (See *Saling, supra*, 7 Cal.3d at p. 852, fn. 8.)

This case is thus distinguishable from cases like *People* v. *Leach, supra*, 15 Cal.3d 419, in which statements were made *after the termination* of the

criminal objective of the conspiracy. In such cases, the criminal objective—killing the victim—had been achieved and the conspiracy ended. Statements made in an attempt to avoid apprehension thus could not have furthered the criminal objective, it having already been accomplished. (*Saling, supra,* 7 Cal.3d at p. 853.) Because the conspiracy was ongoing when Reilly uttered most of the statements Hardy now challenges, and because the insurance companies had not yet paid, we conclude most of the statements Hardy challenges were made in an attempt to maintain the secrecy and thus the integrity of the criminal enterprise. So viewed, it follows that they were made in furtherance of the conspiracy within the meaning of Evidence Code section 1223, subdivision (a).

■ We agree, however, that one of the challenged statements was not made in furtherance of the conspiracy. Thus, unlike Reilly's conversations with Debbie Sportsman in which they attempted to coordinate their alibis, or his solicitation of Calvin Boyd to kill the victims, Reilly's gratuitous ramblings to James and Sonja Sportsman about Cliff Morgan's desire to find a hit man cannot be deemed "in furtherance of" the conspiracy.

Because this evidence did not directly implicate Hardy, we need not apply the *Chapman* standard of review. (*Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065]; see *Leach, supra,* 15 Cal.3d at p. 446.) Instead, in order to determine whether admission of this statement was harmless, we must decide whether it is reasonably probable that Hardy would have achieved a different result in the absence of the error. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]; *Leach, supra,* 15 Cal.3d at p. 445 [applying *Watson*].)

We conclude the admission of Reilly's statements to the Sportsmans was harmless in light of the numerous times Hardy implicated himself in the killings to Colette Mitchell. For example, Hardy told her that he used bolt cutters to gain entry into the Morgan home, a fact not made public by the investigating officers. In addition, Hardy admitted to Colette (i) that he had been to the Morgan home the night of the killing, (ii) that he could hear Nancy Morgan snoring, (iii) that the killing had to occur before June 1, 1981, because the life insurance would expire, and (iv) that Colette should dispose of an M-1 rifle and some boots in his apartment because it could link him to the crime. Strong circumstantial evidence also linked Hardy to the crimes, such as the facts that he was with Reilly just before and after the killing, and that Reilly told Mike Mitchell that Hardy had agreed to commit the murders. In a statement clearly in furtherance of the conspiracy, Reilly told Debbie Sportsman to speak to Hardy so they could coordinate their alibis.

 Reilly also challenges the admission of "an enormous number of extrajudicial statements" on the ground that they were not made "in furtherance of the objective of [the] conspiracy." (Evid. Code, § 1223, subd. (a).) He cites two that he describes as "illustrative." First, he challenges his own statement to one Joe Dempsey that "I can get [Hardy] to do it." This statement was properly introduced against Reilly as an admission. (*Id.*, § 1220.) Second, he complains the court should not have admitted Hardy's comment to Colette Mitchell that Reilly was in charge of the operation. Because the coconspirators were attempting to coordinate their alibis, however, we conclude this statement can be fairly characterized as made in furtherance of the conspiracy. To the extent Reilly intends to challenge other individual statements that he fails to enumerate, we reject the argument. Even if we assume some hearsay statements were erroneously admitted against him, most of the evidence against him took the form of his own admissions, which were clearly admissible. The erroneous introduction of additional hearsay statements was thus manifestly harmless. (*Watson, supra,* 46 Cal.2d at p. 836.)

Defendants provide a list of 42 individual statements or acts which they claim were improperly admitted or, at least, could have been excluded pursuant to Evidence Code section 352. They claim the statements and acts all occurred after the arrests but before trial, a period they claim was after the conspiracy had terminated. We have reviewed the list and find no error. Some of the statements were uttered by either Hardy or Reilly and were thus admissions as to them. Other acts, such as Colette Mitchell's false testimony at the preliminary hearing, Morgan's filing of the insurance claims, and Hardy's attempt to dispose of the rifle allegedly "stolen" from Morgan, were clearly probative of guilt irrespective of the coconspirator status of the actor. Still others, such as Mike Mitchell's move to New York and Cliff Morgan's failure to pay for the victims' funeral expenses, were of marginal relevance and clearly harmless even if improperly admitted.

Finally, even if we assume the trial court would have excluded some of the listed statements and acts pursuant to Evidence Code section 352, defendants failed to object on that ground and thus waived the claim for appeal.

### e. *Coconspirator Status*

 Reilly contends the trial court erred when, after holding a hearing on the subject, it declared Debbie Sportsman, Colette Mitchell, Ron Leahy, and Calvin Boyd were coconspirators. In support, he argues there was no evidence showing any of the four intended to kill the victims. "To sustain a conviction for conspiracy to commit a particular offense, the

prosecution must show not only that the conspirators intended to agree but also that they intended to commit the elements of that offense." (*People* v. *Horn* (1974) 12 Cal.3d 290, 296 [115 Cal.Rptr. 516, 524 P.2d 1300].)

■■■ By arguing that none of the above mentioned coconspirators intended to kill, Reilly again loses sight of the fact that the objective of the conspiracy was not to kill but to commit insurance fraud. Thus, the intent to kill is irrelevant in this context. The true inquiry is whether Debbie Sportsman, Colette Mitchell, Ron Leahy, or Calvin Boyd intended to commit insurance fraud.

We begin with Debbie Sportsman. Although not a member of the conspiracy from the outset, she willingly joined and contributed to its success. For example, she advised Reilly on how to carry out the crime, suggesting that he use Mike Mitchell's car instead of one that could be more easily linked to him. She helped Reilly cash a check so he would have money to buy the bolt cutters. On one occasion, she engaged Nancy Morgan in conversation to allow Cliff Morgan and Reilly to go to another room and discuss some details of the planned killing. After the murders, she collaborated with Reilly to coordinate his alibi story with the other coconspirators. Most important, she intended to share in the proceeds: Reilly promised her that when he received his share of the insurance proceeds, he would buy her a new car and take her to either Hawaii or Tahiti. We thus conclude there was ample evidence to find Debbie Sportsman was a coconspirator.

We reach the same conclusion when we consider Colette Mitchell. Like Debbie Sportsman, there is no evidence Colette was an original member of the conspiracy. Her main contribution to the conspiracy came later when she attempted to prevent police from discovering evidence that could have implicated Reilly or Hardy. Thus, she testified falsely at Hardy's preliminary examination, supporting his alibi that he was at home with her the entire night of the killings. After Hardy's arrest, she complied with his instructions and disposed of the rifle and boots that could have linked him to the murders. In addition, she acted with Ron Leahy to attempt to persuade Calvin Boyd and Debbie Sportsman to stop talking about the crime, going so far as to threaten them with physical harm. She thus clearly assisted the other conspirators to keep the police from learning the true nature of the conspiracy. Unlike Debbie Sportsman, there was no direct evidence Colette intended to personally share in the fraudulently obtained insurance benefits as a result of her involvement. Nevertheless, the trial court could reasonably infer from the depth of her involvement that she expected to share in the profits from the criminal enterprise through her boyfriend, defendant Hardy, and that she thus shared the criminal intent of the other coconspirators to commit insurance fraud.

Calvin Boyd was an early member of the conspiracy, agreeing to kill the victims for $1,000 and some cocaine. At one point, Boyd received a rifle (provided by Cliff Morgan) as partial payment. Boyd ultimately backed out when Cliff Morgan and Reilly could not raise the $1,000, apparently because they had spent all their money trying to hire a "Mafia hit man" through Marc Costello. After the killing, Boyd promised not to reveal what he knew if Reilly promised not to reveal that Boyd was a fugitive from justice. Reilly later promised to give Boyd a car (or sell it to him at a low price) in return for his silence. We conclude there was sufficient evidence showing Boyd was a coconspirator.

The evidence showing Ron Leahy was a coconspirator is more problematic. There is no indication he knew of Morgan, Reilly, and Hardy's plan to commit insurance fraud. Leahy's participation consisted mostly of helping Reilly maintain the secrecy of the criminal plot by destroying evidence or threatening witnesses. Unlike Debbie Sportsman or Leahy's sister Colette, however, there is no evidence from which we may infer he intended to share in the profits resulting from a successful insurance scam. His actions consisted mainly of helping the defendants avoid a conviction for murder. Whether Ron Leahy shared the intent to commit insurance fraud is thus a close question.

Even if we assume Leahy was erroneously considered a coconspirator, however, defendants would not be entitled to relief unless the admission of Leahy's hearsay statements prejudiced them. Most of the evidence from Leahy, however, consisted of his recounting what Reilly and Hardy *told him*. Such hearsay statements were properly introduced against the defendants as admissions. (Evid. Code, § 1220.) Nothing *Leahy* said was particularly damaging and we thus conclude that even if the trial court erred in ruling Leahy was a coconspirator, the error was harmless.

### f. *Right to Due Process and Confrontation*

Reilly briefly argues that admission of hearsay statements against him by way of the coconspirator exception in Evidence Code section 1223 violates his state and federal right to due process. (U.S. Const., Amend. XIV; Cal. Const., art. I, § 7, subd. (a).) Other than a brief mention of the argument, however, he does not expand on the issue with either argument or citation to relevant authority. We thus decline to address the issue. (*Wharton, supra*, 53 Cal.3d at p. 563; *People* v. *Blankenship* (1989) 213 Cal.App.3d 992, 995-996 [262 Cal.Rptr. 141].)

 Both Hardy and Reilly also contend the admission of hearsay evidence under Evidence Code section 1223 violates their right to confront

the witnesses against them. (U.S. Const., Amends. VI, XIV; Cal. Const., art. I, § 15.) Both this court and the United States Supreme Court have rejected this argument (*People* v. *Brawley* (1969) 1 Cal.3d 277, 286-291 [82 Cal.Rptr. 161, 461 P.2d 361], cert. den. *sub nom. Baker* v. *California* 400 U.S. 993 [27 L.Ed.2d 441, 91 S.Ct. 462]; *Bourjaily* v. *United States* (1987) 483 U.S. 171, 183 [97 L.Ed.2d 144, 157-158, 107 S.Ct. 2775]), and neither defendant presents any reason why we should reexamine the issue. We therefore reject this argument as well.

g. *Jury Instructions*

(i) *CALJIC No. 3.16*

The jury was instructed with a variation of CALJIC No. 3.16: "If the crimes listed in the information were committed by anyone, the witnesses named below were an accomplice as a matter of law and their testimony is subject to the rule requiring corroboration: Debbie Sportsman, Colette Mitchell, Ron Leahy, John Hardy, Calvin Boyd, Sean Fitzgerald, and Marc Costello." ▮ Defendants contend this instruction created an irrebuttable presumption that a conspiracy existed. They reason that murder was a crime "listed in the information," that it was obvious that the victims were murdered, and thus the named persons were accomplices. Since, in this context, accomplices are essentially identical to coconspirators, the named persons were coconspirators. Therefore, defendants claim, a conspiracy must have existed.

Even were we to agree that the instruction, viewed in isolation, could be interpreted in this manner, we conclude no reasonable juror would have so interpreted the instruction in light of the other instructions. For example, the jury was specifically instructed that "Each defendant . . . is individually entitled to, and must receive, your determination whether he was a member of the alleged conspiracy. As to each defendant you must determine whether he was a conspirator by deciding whether he willfully, intentionally and knowingly joined with any other or others in the alleged conspiracy." In light of this direct and specific instruction, we conclude no reasonable juror would have interpreted CALJIC No. 3.16 in the manner now argued by defendants. (*Wharton, supra,* 53 Cal.3d at p. 574 [court interprets instruction as would a reasonable juror].)

By parity of reasoning, we also reject the argument—apparently based on the Fifth Amendment—that CALJIC No. 3.16 "stripped" defendants of the presumption of innocence. We note that the jury was specifically instructed that criminal defendants "are presumed to be innocent until the contrary is

proved." Similarly, we perceive no Sixth Amendment violation, despite defendants' argument that CALJIC No. 3.16 removed a portion of the jury's factfinding function and thereby infringed on their right to a jury trial.

■ Reilly also argues CALJIC No. 3.16 left the jury with "little, if any, alternative but to convict the named defendants," apparently because the seven persons named could not be "accomplices" unless at least one of the charged defendants was the actual perpetrator of a charged crime. In his reply brief, he also complains that there was insufficient evidence to conclude as a matter of law that Fitzgerald, John Hardy, or Costello were accomplices.

The record shows, however, that Reilly's trial attorney, Lasting, specifically requested the challenged instruction, presumably so he could argue the testimony of the named persons should be viewed with distrust. (See CALJIC No. 3.18.) Indeed, Lasting made this precise argument in his closing statement. Because it is manifest that Lasting had a legitimate tactical reason for requesting this instruction, we conclude any error was invited and Reilly is precluded from challenging the correctness of the instruction on appeal. (*People* v. *Hernandez* (1988) 47 Cal.3d 315, 353 [253 Cal.Rptr. 199, 763 P.2d 1289].)

(ii) *Termination of the Conspiracy*

■ Defendants also argue the trial court erred by failing to instruct the jury sua sponte to determine when the conspiracy ended. Had the jury been provided with such an instruction, they claim, it might have concluded that the charge of conspiracy to commit insurance fraud was not proved, and that many of the statements made by alleged coconspirators could not be considered. We reject this argument because the jury instructions clearly gave the jury the choice of finding the conspiracy charge untrue. Further, the jury was told that, "No act or declaration of a conspirator that is committed or made after the conspiracy has been terminated is binding upon his coconspirators and they are not criminally liable for any such act." The jury was thus given the option of finding that the conspiracy had ended and that the statements made after such termination could not be held against the former conspirators.

Defendants next contend the trial court should have determined as a matter of law, and instructed the jury, that the conspiracy ended no later than the day of Cliff Morgan's arrest. They argue it is "constitutionally offensive" to hold that a conspiracy can be ongoing at the time of trial, but refer us to no authority so holding. We reiterate that the conspiracy continued until its

criminal objective (receipt of the insurance proceeds) was attained, or the goal was defeated. (*Leach, supra,* 15 Cal.3d at p. 436; *Saling, supra,* 7 Cal.3d at p. 852.) Defendants admit that at the time of Morgan's arrest, "a determination had been made that the insurance proceeds would not be paid to him unless and until the issue of whether he was an intentional killer was resolved." Implicit in this statement is the possibility that the decision whether to pay was still pending. Thus, the conspiracy had not yet been defeated or permanently frustrated at the time of trial.

### (iii) Elements of Conspiracy to Commit Insurance Fraud

The instruction on conspiracy to commit insurance fraud provided that in order to prove insurance fraud, the People must show: "1. That a person presented or caused to be presented a false or fraudulent claim for payment of a loss covered by insurance, and [¶] 2. That such person acted with the specific intent to defraud." ▓▓▓ Defendants argue that this instruction is defective because it does not include the legal definition, and precise elements, of the terms "fraud" and "specific intent to defraud." There are two answers to this claim. First, the terms defendants challenge are words in common use and of common knowledge; thus, their definition is not necessary. (See *People* v. *Taylor* (1953) 116 Cal.App.2d 802, 806-807 [254 P.2d 179] [not necessary to define "fraud," "artifice," "trick," and "device" for jury].) Second, because the instruction given was correct, it was incumbent on defendants to request clarifying language. Their failure to do so waived the issue. (*People* v. *Sully* (1991) 53 Cal.3d 1195, 1235 [283 Cal.Rptr. 144, 812 P.2d 163].)

### h. Summary

We thus conclude the trial court correctly ruled that Reilly, Hardy, Cliff Morgan, and others engaged in a conspiracy to commit insurance fraud, that the conspiracy was a continuing one that did not end with the death of the victims, and that statements by coconspirators made after the killings but before trial could be admitted at trial pursuant to Evidence Code section 1223 to the extent the statements were made in furtherance of the conspiracy. Although one statement was admitted that was not uttered in furtherance of the conspiracy, its admission was harmless. Finally, even if we assume the trial court erred in finding Ron Leahy was a coconspirator, that error was harmless.

### 7. Griffin Error

▓▓▓ It is a bedrock principle in our jurisprudence that one accused of a crime cannot be compelled to testify against oneself. (U.S. Const., Amend.

V; Cal. Const., art. I, § 15.) In order that an accused not be penalized for his invocation of this fundamental right, the prosecutor may neither comment on a defendant's failure to testify nor urge the jury to infer guilt from such silence. (*Griffin* v. *California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229] (*Griffin*); *People* v. *Hovey* (1988) 44 Cal.3d 543, 572 [244 Cal.Rptr. 121, 749 P.2d 776].) ▮ Defendants contend the prosecutor committed Griffin error during closing argument.

During trial, both Colette Mitchell and Ron Leahy testified that Reilly told them he knew the identity of the true murderers and he would reveal that information when the time was right. During closing argument, the prosecutor referred to this testimony and suggested that if Reilly was not the actual killer, he would have already revealed his information to save himself. The prosecutor continued: "Ladies and gentlemen, . . . ask yourself the question, why doesn't [Reilly] just come out and say, I didn't do it, it was Cliff."

This comment was clearly *Griffin* error as defendant was constitutionally entitled to be free of such adverse comment. ▮ Such error requires reversal unless we can conclude it was harmless beyond a reasonable doubt. (*United States* v. *Hasting* (1983) 461 U.S. 499, 507-509 [76 L.Ed.2d 96, 105-106, 103 S.Ct. 1974]; *Chapman* v. *California, supra,* 386 U.S. 18; *Hovey, supra,* 44 Cal.3d at p. 572.) To paraphrase the high court, we ask whether, absent the prosecutor's reference to Reilly's failure to testify, is it clear beyond a reasonable doubt that the jury would have returned a verdict of guilty? (*Hasting, supra,* 461 U.S. at pp. 510-511 [76 L.Ed.2d at p. 107].)

▮ We conclude the error was harmless beyond a reasonable doubt. The evidence of Reilly's guilt was overwhelming, consisting of an interlocking web of admissions from numerous persons, including evidence of Reilly's own admissions. The evidence of Reilly's comments to Debbie Sportsman—essentially a confession—was particularly strong. There was evidence that Reilly used bolt cutters to gain entry to the victims' home, that he knew the type of weapon used in the slayings (a fish knife), and that he had human blood on his shoe when arrested. Sean Fitzgerald accompanied Reilly to the restaurant where Cliff Morgan gave Reilly some of the promised money. We also note that the trial court instructed the jury at the guilt phase of the trial not to draw any adverse inference of guilt from the fact that Reilly did not testify. Under these circumstances, it is clear that the jury would have convicted Reilly even had the prosecutor refrained from the prohibited argument. (By so concluding, we need not reach the argument by defendants that Reilly did not waive the issue by failing to object, and that if he did, defense counsel provided constitutionally ineffective assistance of counsel by failing to object.)

## 8. *Comment by Codefendant's Counsel on Defendants' Failure to Testify*

Defendants contend their Fifth Amendment rights were violated when counsel for codefendant Morgan commented on their silence during trial.

### a. *Facts*

Jack Stone represented codefendant Cliff Morgan at trial. During closing argument, Stone emphasized the circumstantial nature of the evidence against Morgan. He then stated, "All those witnesses that got up there, Debbie, Calvin, Costello, they were accusers not only of Cliff [Morgan] but they accused [Reilly]. Mr. Lasting [Reilly's counsel] got up, had a chance to cross-examine every one of them—." At that point, Mr. Lasting objected and, out of the jury's presence, opined, "There is the clear implication that [Reilly] has not testified, that Cliff didn't have the opportunity to cross-examine [him]. I think it's improper. I think it's an implication, it refers to . . . the fact that I didn't call him as a witness." Lasting, joined immediately by Demby, then moved for a mistrial.

The prosecutor, Mr. Jonas, stated he believed that it was improper for anyone to comment on a defendant's silence. Stone indicated he did not intend to pursue the line of argument but he disagreed with the prosecutor, saying case law supported his right to comment on a codefendant's failure to testify.[13] The trial court sided with the prosecutor and, impliedly, directed Stone to refrain from commenting on Reilly and Hardy's failure to testify. It then denied the mistrial motion and further denied Demby's request that the jury be admonished, saying the jury instructions adequately covered the point.

Later in Stone's closing argument, he described the testimony concerning a lunchtime meeting between Morgan and Reilly in which the two allegedly discussed the killing. Morgan testified he told Reilly how much insurance he had purchased for his family and Reilly then said something to the effect, "One could kill his wife for that amount of money." The gist of Stone's argument was that Morgan did not initiate the idea of the killings, but that

---

[13]"And when the time comes, I believe that the case law supports me that I can comment, and supports me about not only inferences but it supports me I think in the sense that the law has always been, has always been, that you can comment on a defendant not taking the witness stand until *Griffin* came along and made the only change in the law which says the prosecutor or the court could not comment on it. [¶] It never said anything about cases where one attorney couldn't comment in the defense of his own client. And not only that, but I have researched and Shepardized *Griffin* through the federal courts as well as the state's, and I have never found a case in this state or any federal jurisdiction that says I cannot comment. [¶] So for them to say that it's improper, I believe Mr. Jonas is right when he says it's improper but it's not [*sic*] improper for a prosecutor, but it's definitely not improper for me to comment."

the idea originated with Reilly. Stone continued: "During that lunch time conversation, we weren't there. There were only two people there. Cliff Morgan and Buck Reilly. [¶] Cliff Morgan got up on the witness stand and told you what his side of it was. We have to guess at what Mr. Reilly's side of that conversation was other than the fact that we know that he initiated the thought of knocking off Nancy Morgan for the insurance money." There was no immediate objection.

Still later, Stone remarked: "All we know is what Cliff told us. [¶] If you know a man has nothing to hide, he gets up on that witness stand and he tells you what's in his mind. And that's what Cliff did. He got up there, he let Mr. Jonas whack away at him for three days, the other two attorneys whacked away at him for three days, and then he bared his soul in front of you, and that's the soul of a man who's been in jail for two years for a crime he did not commit; he has wasted away physically and mentally, and he is frustrated. But he can't get the one person that's accusing him to tell him what went on. That's why Mr. Morgan looks the way he does."[14] As before, there was no immediate objection. Soon thereafter, the proceeding was adjourned for lunch.

On resumption of the proceedings a few hours later, both Lasting and Demby renewed their mistrial motion, claiming Stone improperly commented on their respective clients' right to remain silent. In particular, they cited Stone's comment that, "If you know a man has nothing to hide, he gets up on that witness stand and he tells you what is in his mind and that is what Cliff did." The trial court disagreed, explaining that the "nothing to hide" comment was not "an innuendo that Mr. Reilly or Mr. Hardy did not testify. All he is saying is that Mr. Morgan has nothing to hide and that's why he got up on the witness stand and testified." The court denied the mistrial motions, reiterating its belief that it would be *Griffin* error for anyone—prosecutor, trial judge, or codefendant's counsel—to comment on a defendant's failure to testify.

b. *Waiver*

 The People first assert that neither Hardy nor Reilly adequately objected to the alleged *Griffin* error and thus waived the issue for appeal. (*People* v. *Ratliff* (1986) 41 Cal.3d 675, 691 [224 Cal.Rptr. 705, 715 P.2d 665].) We disagree. Counsel for both Hardy and Reilly objected and moved for a mistrial when Stone vaguely alluded to their silence by implying that he was not able to cross-examine Morgan's true accusers. The issue of

---

[14]Cliff Morgan had apparently lost about 30 pounds in the 3 or 4 weeks prior to Mr. Stone's argument.

whether *Griffin, supra,* 380 U.S. 609, applied to comment by an attorney for a codefendant was thoroughly discussed at that time, the trial court ultimately siding with the views of Hardy, Reilly, and the prosecutor. Stone did not immediately return to the subject. Although subsequent, allegedly improper, comments did not provoke prompt objections, the matter was taken up shortly thereafter in chambers and the defendants renewed their mistrial motions. From the record, it is thus clear that Hardy and Reilly objected to Stone's remarks via their mistrial motion upon resumption of the proceedings after the lunch break. Under the particular circumstances of this case, we find defendants adequately preserved the issue for appeal.

c. *Comment on a Defendant's Silence by Other Than a Prosecutor*

■ As we discussed, *ante,* at pages 153-154, a prosecutor may not comment on a defendant's failure to testify. (*Griffin, supra,* 380 U.S. 609.) Defendants argue, and the People concede, that the rule is not limited to prosecutorial comment. Thus, in a joint trial of multiple codefendants, comment by an attorney representing one defendant on the silence of a codefendant violates the codefendant's constitutional right to freedom from adverse comment on his silence at trial. (*People* v. *Jones* (1970) 10 Cal.App.3d 237, 243-244 [88 Cal.Rptr. 871] [affirming trial court ruling prohibiting defendant from commenting on codefendant's silence]; *People* v. *Haldeen* (1968) 267 Cal.App.2d 478, 481 [73 Cal.Rptr. 102] [affirming grant of new trial on this ground]; *U.S.* v. *Castro* (9th Cir. 1989) 887 F.2d 988, 997 [harmless error]; *U.S.* v. *Mena* (11th Cir. 1989) 863 F.2d 1522, 1533-1534 [same]; *U.S.* v. *Patterson* (9th Cir. 1987) 819 F.2d 1495, 1506 [same]; *United States* v. *Moreno-Nunez* (9th Cir. 1979) 595 F.2d 1186, 1187 [same]; *United States* v. *Alpern* (7th Cir. 1977) 564 F.2d 755, 761 [same]; *De Luna* v. *United States* (5th Cir. 1962) 308 F.2d 140 [pre-*Griffin;* reversible error]; 75A Am.Jur.2d (rev.) Trial, § 586, pp. 180-181; but see *U.S.* v. *Anderson* (8th Cir. 1989) 879 F.2d 369, 379, fn. 4 [declining to resolve issue].)

When improper comment on a defendant's silence occurs, the error requires reversal of the judgment unless a reviewing court concludes the error was harmless beyond a reasonable doubt. (*United States* v. *Hasting, supra,* 461 U.S. at pp. 507-509 [76 L.Ed.2d at pp. 105-106]; *Hovey, supra,* 44 Cal.3d at p. 572.) Although it is error for either the prosecutor or counsel for a codefendant to comment on a defendant's silence, we recognize that the identity of the speaker can make a difference when determining whether an improper remark was harmless beyond a reasonable doubt. Thus, a comment alluding to the silence of a defendant that would require reversal if made by a prosecutor may be deemed harmless—or even not error—if made by a codefendant's attorney. Two factors convince us to recognize this difference.

First, although a defendant has a Fifth Amendment right to freedom from adverse comment on his silence, a codefendant has a concurrent Sixth Amendment right to a full and vigorous defense. Courts balancing these two rights have thus concluded that "oblique" or "indirect" references by a codefendant to a defendant's silence, while improper, do not require reversal. (*U.S.* v. *Castro, supra,* 887 F.2d at p. 997 ["indirect" reference deemed harmless]; *U.S.* v. *Patterson, supra,* 819 F.2d at p. 1506 ["statements only indirectly referred to defendants' failure to testify"; error deemed harmless]; *United States* v. *Alpern, supra,* 564 F.2d at p. 761 ["isolated and oblique reference to his codefendants' failure to take the stand"]); *United States* v. *Shuford* (4th Cir. 1971) 454 F.2d 772, 779 [oblique references may be harmless].) In other words, "[improper comment] by counsel for codefendant does not constitute reversible error where the reference is indirect and the defendants' positions are not antagonistic, or where there is substantial incriminating evidence against all defendants." (75A Am.Jur.2d (rev.) Trial, § 586, p. 180, fns. omitted.)

Thus, the rule permits a codefendant to emphasize to the jury that *his* credibility is strong because he took the stand and submitted to cross-examination. In addition, if such argument indirectly or obliquely refers to a codefendant's silence, the error is generally found harmless. For example, in *U.S.* v. *Patterson, supra,* 819 F.2d 1495, counsel for defendant Patterson, who testified, argued: " '[Patterson] is different than the other defendants in this case. He's different for one reason among many, but the one reason is that he has taken the stand and faced his accusers. He's allowed himself to be cross-examined. He has no obligation to do that in this country. [¶] . . . [¶] The point that I am making is that when you gauge . . . [Patterson's] testimony and his courage in taking the stand, and any nervousness that you may have seen, you have to put him in the context in which he is testifying. He has no protection. He is totally exposed and he is at the mercy of you 12 people.' " (*Id.* at p. 1506.)

The *Patterson* court ruled that while counsel's comments were improper, "they did not cross the line of reversible error. The statements only indirectly referred to the [other] defendants' failure to testify. They do not benefit Patterson at the expense of the other defendants. Nor do they stress any inference that the defendants were guilty because they chose to remain silent." (*U.S.* v. *Patterson, supra,* 819 F.2d at p. 1506.) After noting the jury was properly instructed not to infer guilt from the failure to testify, the court concluded the error was harmless.

A second reason why comment by a codefendant's counsel on a defendant's silence is different from comment by a prosecutor is the unique role a

prosecutor plays in a criminal trial. "Given the prosecutor's institutional role, when the prosecutor merely 'comments' on the failure of an accused to testify, the reference is in all likelihood calculated to encourage the jury to equate silence with guilt; reasonable judicial economy thus permits a finding of reversible error. When the 'comment' comes from an actor (such as counsel for a codefendant) without an institutional interest in the defendant's guilt, however, it would be inappropriate to find reversible error as a matter of course. Instead, the court should ask whether the comment *actually* or *implicitly* invited the jury to infer guilt from silence." (*U.S.* v. *Mena, supra,* 863 F.2d at p. 1534, italics in original.)

 We agree with the *Mena* court's assessment and apply those principles to Stone's comments in this case. The first comment ("Mr. Lasting got up, had a chance to cross-examine everyone of them—") was arguably aimed at insinuating that codefendant Morgan was disadvantaged because he was unable to question Reilly, one of his principal accusers. Lasting's objection, however, prevented Stone from finishing the thought and in the subsequent discussion in chambers, the trial court made clear that Stone was prohibited from commenting on Hardy's and Reilly's silence. Under any standards, then, the first challenged statement did not run afoul of *Griffin, supra,* 380 U.S. 609.

Stone's next questionable remark concerned his inability to know Reilly's version of the lunchtime conversation with Morgan. Although the comment ("We have to guess at what Mr. Reilly's side of that conversation was . . . .") arguably alluded to the fact that Reilly did not testify, the reference is clearly tangential and indirect. We conclude that, even if improper, the comment does not require reversal of Reilly's conviction. Moreover, because Hardy was not mentioned at all, this remark does not implicate his rights under *Griffin, supra,* 380 U.S. 609, and its progeny.

The most troublesome statement Stone made in his closing argument was this: "If you know a man has nothing to hide, he gets up on that witness stand and he tells you what's on his mind. . . . But [Morgan] can't get the one person that's accusing him to tell him what went on." This statement most clearly illustrates the difference between prosecutorial comment and comment by another defense attorney. If the challenged statement was made by the prosecutor, it might constitute reversible error as to Reilly[15] because, coming from a prosecutor, the probable meaning of the statement is a call to the jury to improperly infer guilt from Reilly's silence. Coming from a prosecutor, it might be difficult to conclude the error was harmless beyond a reasonable doubt.

---

[15]Because the statement in question refers to "the *one person* that's accusing [Morgan]" (italics added), it seems clear that Stone's comments refer to Reilly only and not to Hardy.

The remark here, however, was uttered by a lawyer for a codefendant. We thus cannot be so quick to conclude Stone necessarily intended the prohibited inference. Instead, the comment is subject to the equally plausible interpretation that the jury should believe Morgan's testimony because he took the stand and subjected himself to cross-examination. Indeed, that is how the trial court interpreted the remark.

Under such circumstances, "[we] should ask whether the comment *actually* or *implicitly* invited the jury to infer guilt from silence." (*U.S.* v. *Mena, supra,* 863 F.2d at p. 1534, italics in original.) It is clear Stone did not *actually* ask the jury to infer Reilly was guilty because of his silence. Instead, he said "If you know a man has nothing to hide, he gets up on that witness stand and he tells you what's in his mind. *And that's what Cliff did.*" (Italics added.) After emphasizing that Morgan was cross-examined by the prosecutor, Stone continued: "that's the soul of a man who's been in jail for two years for a crime he did not commit; he has wasted away physically and mentally, and he is frustrated. *But he can't get the one person that's accusing him to tell him what went on. That's why Mr. Morgan looks the way he does.*" (Italics added.) Thus, rather than urging the jury to infer Reilly was guilty because he declined to testify, Stone instead used Reilly's silence to embellish his point that Morgan was frustrated and that was why he looked drawn and haggard.

Nor can we conclude Stone's comments *implicitly* invited the jury to draw prohibited inferences. Although the "nothing to hide" comment conceivably could be construed as an improper comment on Reilly's silence, the interpretation is a tenuous one. Moreover, we are not privy to Stone's vocal inflections or gestures. As a result, we must rely on the interpretation of the trial judge, who was present and better able to discern the true meaning of a statement which appears ambiguous on the face of the cold record. (Cf. *People* v. *Sanders* (1990) 51 Cal.3d 471, 501 [273 Cal.Rptr. 537, 797 P.2d 561] [when ruling on a motion to quash the jury venire, we grant "considerable deference" to trial judges because of " 'their powers of observation, their understanding of trial techniques, and their broad judicial experience' "].) Significantly, the trial judge—who was sensitive to defendants' *Griffin* claim and directed Stone not to comment on their silence—found Stone was not insinuating defendants were guilty because they remained silent. Instead, the court concluded: "All he is saying is that Mr. Morgan has nothing to hide and that's why he got up on the witness stand and testified." We agree and conclude the challenged statement did not *implicitly* urge the jury to draw a prohibited inference. On these facts, then, we find no *Griffin* error.

Even were we to find some impropriety, any misstep in this regard must be considered harmless beyond a reasonable doubt. (*United States* v. *Hasting,*

*supra*, 461 U.S. at pp. 507-509 [76 L.Ed.2d at pp. 105-106].) To paraphrase the high court, we ask whether, absent Stone's allusion to Hardy and Reilly's failure to testify, is it clear beyond a reasonable doubt that the jury would have returned a verdict of guilty? (*Id.* at pp. 510-511 [76 L.Ed.2d at p. 107].) We must answer that question in the affirmative. As we explained, *ante*, at page 154, the evidence of guilt was overwhelming, consisting of the testimony of numerous witnesses who, by and large, complemented each other, reinforcing their credibility. Both Hardy and Reilly admitted their guilt to others. There was physical evidence that was consistent with the stories of the various persons involved (fish knife, blood on the shoe, bolt cutters, coin collection, diamonds from the ring, rifle), evidence of opportunity (Hardy's alibi was undercut when Colette Mitchell changed her story), evidence of intent (several people knew of the insurance policies, the first attempt with Marc Costello), and payment (Sean Fitzgerald counted out $2,500 that Morgan gave Reilly). Significantly, the trial court instructed the jury at the guilt phase of the trial not to draw any adverse inference of guilt from the fact that neither Hardy nor Reilly testified. (See *United States* v. *Patterson, supra*, 819 F.2d at p. 1506 [citing trial court's admonishment on this point in support of its conclusion the error was harmless].) Under these circumstances, we find any error harmless.

Because we find it certain beyond a reasonable doubt that the jury would have convicted defendants even absent the *Griffin* error committed by the prosecutor and any error in admitting Stone's comments, we also conclude that, considered together, any error was harmless. We also reject Hardy's further contentions that the challenged remarks violated his right to a fair trial under the Sixth Amendment and the due process clause of the Fourteenth Amendment, and his right to a reliable penalty determination under the Eighth Amendment.

9. *Lying in Wait*

a. *Jury Instructions*

The jury was presented with two theories of first degree murder: (1) premeditated and deliberate murder, and (2) murder perpetrated by lying in wait. Prior to deliberating, it was instructed according to CALJIC No. 8.25 (4th ed.), which defines the concept of lying in wait.[16] ▮ Both Hardy and Reilly contend this jury instruction was deficient because it did not also

---

[16]The instruction reads: "Murder which is immediately preceded by lying in wait is murder of the first degree. [¶] The term 'lying in wait' is defined as a waiting and watching for an opportune time to act, together with a concealment by ambush or some other secret design to take the other person by surprise. The lying in wait need not continue for any particular period

require the jury to find they premeditated and deliberated the killing. As a result, they contend the instruction denied them their due process right to have the jury determine every element of the crime. (*In re Winship* (1970) 397 U.S. 358, 364 [25 L.Ed.2d 368, 375, 90 S.Ct. 1068].)

In support of their thesis, defendants rely on the wording of section 189. That section, as it read at the time the crimes were committed, stated in pertinent part: "All murder which is perpetrated by means of a destructive device or explosive, poison, lying in wait, torture, *or by any other kind of willful, deliberate, and premeditated killing,* . . . is murder of the first degree." (Stats. 1970, ch. 771, § 3, pp. 1456-1457, italics added.) Defendants claim that a proper construction of the highlighted language reveals lying in wait as a "kind" or subset of premeditated and deliberate murder, not as a substitute for it. Thus, they claim proof that the killing was committed by lying in wait does not relieve the People of independently proving premeditation and deliberation.

This precise theory has been adopted by a noted authority on criminal law, who contends that lying in wait is not a substitute for proving premeditation and deliberation, but is merely "employed as a specific illustration of 'wilful, deliberate and premeditated' murder." (Perkins & Boyce, Criminal Law (3d ed. 1982) p. 128, fn. omitted.) This court, however, rejected this interpretation and instead views lying in wait "as the functional equivalent of proof of premeditation, deliberation and intent to kill." (*People* v. *Ruiz* (1988) 44 Cal.3d 589, 614 [244 Cal.Rptr. 200, 749 P.2d 854], and cases cited.) Thus, a showing of lying in wait obviates the necessity of separately proving premeditation and deliberation, and "imposition of a requirement of independent proof of premeditation, deliberation or intent to kill would be a matter for legislative consideration." (*Ibid.*) Defendants present no persuasive argument why *Ruiz* was incorrectly decided and we thus reject their first argument.

Defendant Hardy contends CALJIC No. 8.25 fails to accurately set forth the law. The key portion of the instruction to which he objects provides, "lying in wait need not continue for any particular period of time provided that its duration is such as to show a state of mind equivalent to premeditation *or* deliberation." (Italics added.) Claiming the words "premeditation" and "deliberation" have different meanings, Hardy claims the instruction should not have been phrased in the disjunctive.

---

of time provided that its duration is such as to show *a state of mind equivalent to premeditation or deliberation.* (Italics added.)

"To constitute murder by means of lying in wait there must be, in addition to the aforesaid conduct by the defendant, an intentional infliction upon the person killed of bodily harm involving a high degree of probability that it will result in death and which shows a wanton disregard for human life."

This point was similarly rejected in *Ruiz, supra,* 44 Cal.3d 589. As in that case, "We think it is unlikely the phrasing could have misled the jury . . . . [In addition,] the Legislature in adopting the lying-in-wait provision only required that the defendant be shown to have exhibited a state of mind which is 'equivalent to,' and not identical to, premeditation or deliberation. Thus, the disjunctive phraseology in CALJIC No. 8.25 was neither inappropriate nor misleading." (*Id.* at p. 615.)

Hardy submits that *Ruiz* be reexamined on this point, arguing we erred in concluding "the Legislature" required a defendant need harbor only an intent which was the "equivalent" to premeditation and deliberation. Instead, Hardy claims this notion originated with the drafters of the CALJIC instruction he is now challenging. In support, he notes that section 189 states, "All murder which is perpetrated by means of . . . lying in wait, . . . or by any other kind of willful, deliberate *and* premeditated killing, . . . is murder of the first degree." (Italics added.) Although it is true that it was not technically "the Legislature" that directed a defendant need only have a mental state that is equivalent (and not identical) to premeditation and deliberation, courts have consistently interpreted section 189 in this manner (see *Ruiz, supra,* 44 Cal.3d at p. 614, and cases cited) and the Legislature has not amended the statute to reflect its disagreement in the interim despite other recent amendments to section 189. Under these circumstances, we conclude the Legislature has acquiesced in the above interpretation.

b. *Sufficiency of the Evidence of Lying in Wait*

Defendants contend CALJIC No. 8.25 should not have been given because there was insufficient evidence of lying in wait. Murder perpetrated by lying in wait requires an intentional murder "committed under circumstances which include (1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage . . . ." (*People* v. *Morales* (1989) 48 Cal.3d 527, 557 [257 Cal.Rptr. 64 770 P.2d 244].)

Defendants argue the facts of this case fail to demonstrate any period of watching and waiting. Instead, they claim the evidence at most reveals a plan to kill the victims at a prearranged time and place, and that it is not reasonably inferable from the evidence that they waited and watched the victims before their fatal knife attack.

We disagree. The evidence shows defendants drove to the Morgan home in the early morning hours, parking on a side street so as to avoid drawing

attention to their activities. The jury could reasonably infer that they chose this time of night because it could be expected the victims would be asleep. The defendants used a key obtained from Cliff Morgan to silently gain access, cutting the chain door lock with bolt cutters. In addition, they rotated the light bulb in the porch light to break the connection. Thus cloaked in darkness, they traversed the hallway to the bedrooms and killed the victims. From this evidence, the jury could reasonably conclude defendants concealed their murderous intention and struck from a position of surprise and advantage, factors which are the hallmark of a murder by lying in wait. Insisting on a showing that defendants actually watched the victims sleeping and waited a moment before attacking reads the law in too literal a fashion.

*People* v. *Ruiz, supra,* 44 Cal.3d 589, is illustrative. In that case, the defendant's wife and stepson were found buried in the yard. They were clothed in bedclothes and wrapped in bedding. Both were shot in the head from close range. The defendant claimed on appeal that there was insufficient evidence "indicating a secret or concealed watchful waiting of the sort required by the statute." (*Id.* at p. 615.) We rejected the claim, noting, "From such evidence, the jury reasonably could infer that defendant watched and waited until his victims were sleeping and helpless before executing them." (*Ibid.*; see also *People* v. *McDermand* (1984) 162 Cal.App.3d 770 [211 Cal.Rptr. 773] [defendant killed victims while they slept; lying in wait sustained].) *Ruiz* and *McDermand* are indistinguishable from the present case. We therefore conclude there was sufficient evidence to support reading CALJIC No. 8.25 to the jury, and further conclude there was substantial evidence to support the jury's verdict in this regard to the extent it relied on this theory to convict defendants of first degree murder.

### 10. *Hitch/Trombetta*

Reilly was arrested and booked on May 26, 1981. At that time, police noticed what appeared to be a bloodstain on his left shoe. Reilly explained that the stain was caused by animal blood that dripped from a package of meat he purchased. Police confiscated and tested the shoes. Lee Mann, a police criminalist, found the stain was caused by human blood but he was unable to determine the type of blood (i.e., A, B, or O) because "the stain was not concentrated enough to give a result that could be interpreted." Mann testified at the hearing on Reilly's motion to suppress that, in general, a blood sample would be better preserved if it is refrigerated and "frozen would be better yet." When asked whether the shoes had been refrigerated in the police property locker, Mann replied, "Not to my knowledge." (He noted that the shoes probably were not frozen because the department did not yet have a freezer unit.)

On cross-examination, Mann went on to note that the delay between confiscation (May 26) and testing (July 9) was not so long as to preclude successful blood typing, and that "some of the enzymes should still be good in a two-month period." He admitted, however, that had tests been performed immediately after police seized the shoes, the likelihood of determining the blood type "might have been increased." On redirect examination, Mann opined that even with a long delay, he probably could have determined the stain was human blood. After hearing the evidence, the trial court denied Reilly's motion to suppress evidence of the bloodstain.

■■■ Reilly contends his federal due process rights were violated when the police failed to adequately preserve the blood sample on his shoe. In support, he relies largely on *People* v. *Hitch* (1974) 12 Cal.3d 641 [117 Cal.Rptr. 9, 527 P.2d 361] (hereafter *Hitch*), and its progeny. In *Hitch*, we held the People violate a criminal defendant's right to federal due process if they fail to adequately preserve evidence in their possession when there exists a "reasonable possibility" the evidence would have been material and favorable to the defendant. To redress the constitutional violation, the results of the test could be excluded. (*People* v. *Moore* (1983) 34 Cal.3d 215, 223-224 [193 Cal.Rptr. 404, 666 P.2d 419].)

■■■ After we decided *Hitch*, the United States Supreme Court addressed the same due process issue and formulated a different test. Contrary to our decision in *Hitch*, the high court opined that in order to gain relief, a defendant must show the "evidence . . . possess[ed] an exculpatory value that was apparent before the evidence was destroyed, and . . . [was] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." (*California* v. *Trombetta* (1984) 467 U.S. 479, 489 [81 L.Ed.2d 413, 422, 104 S.Ct. 2528] [hereafter *Trombetta*].) *Trombetta* supersedes *Hitch* (*People* v. *Douglas* (1990) 50 Cal.3d 468, 512-530 [268 Cal.Rptr. 126, 788 P.2d 640]), and applies even to cases—like the present one—where the crime occurred prior to the enactment of the so-called "Truth-in-Evidence" provision of our state Constitution. (Cal. Const., art. I, § 28, subd. (d); see, e.g., *Johnson, supra,* 47 Cal.3d at p. 1234 [*Trombetta* applies in 1980 case].)

■■■ Application of *Trombetta* to this case defeats Reilly's claim in two ways. First, it is not clear that failure to refrigerate the sample from May 26 (when it was seized) to July 9 (when it was tested) actually resulted in denigration of the quality of the blood sample so as to prevent blood-typing. Mann testified that he failed to obtain results because the stain was not "concentrated enough," and that if it were sufficiently concentrated, a blood type could be determined even two months later. The most Mann could say

is that had the test been performed immediately after the shoe was seized, the likelihood of getting a successful test *"might* have been increased." (Italics added.) Thus, the evidence that police negligently destroyed evidence was extremely thin.[17]

Even if we assume police negligently compromised the integrity of the bloodstain by failing to refrigerate or freeze the shoe, there is no evidence police should have realized the bloodstain "possess[ed] an exculpatory value" before the bloodstain was destroyed. (*Trombetta, supra,* 467 U.S. at p. 489 [81 L.Ed.2d at p. 422].) To the contrary, it no doubt appeared to police that, if anything, the bloodstain would provide additional evidence *against* Reilly.

Reilly disagrees, claiming that had the shoe been refrigerated, it might have been possible to determine the blood type. This is important, he claims, because his blood is type O. Nancy Morgan's blood type was type B; Mitchell Morgan's was type O. There was no type O blood found at the crime scene, however, only type B. Reilly argues that had he been able to establish the stain on his shoe was type O, he could have argued that he was not at the crime scene or, at least, he waited outside, a story consistent with some of his extrajudicial statements. Reilly's convoluted argument fails to consider that because Mitchell Morgan's blood was type O, evidence that the stain was type O would not have been particularly exculpatory. In any case, we cannot say Reilly's theory, based as it is on the mere possibility that the stain was type O blood, imbued the bloodstained shoe with an exculpatory value that was apparent before police storage procedures allegedly compromised the integrity of the stain. He thus fails to satisfy the *Trombetta* test. We conclude the trial court correctly denied the motion to suppress the bloodstain evidence.[18]

---

[17]If the stain was contaminated or degraded to a point where determining the blood type was impossible, however, the most logical inference is that it occurred while Reilly was still in possession of the shoes. If we assume the stain was deposited on the night of the killings, May 21, we may conclude Reilly was in possession of the shoes from that day until his arrest four days later. Mann testified at trial that contamination of the bloodstain by dirt or bacteria could have degraded the components which are responsible for obtaining blood type results. It is thus quite possible that environmental contaminants affected the quality of the sample before police took possession of the shoe.

[18]The high court recently modified the test set forth in *Trombetta, supra,* 467 U.S. 479. In *Arizona* v. *Youngblood* (1988) 488 U.S. 51 [102 L.Ed.2d 281, 109 S.Ct. 333], the court held "that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." (*Id.* at p. 58 [102 L.Ed.2d at p. 289].) Because defendant Reilly's claim fails under *Trombetta, supra,* which was more favorable to the defense than current law, there is no need to consider the impact of *Youngblood, supra,* to this case.

## 11. *Severance*

Prior to trial, all three defendants (Reilly, Hardy, Cliff Morgan) moved to sever their respective trials from the others. Because the trial court was concerned that the three defendants would rely on conflicting or antagonistic defenses, it held in camera hearings wherein each defense counsel, separately, informed the trial judge of their expected defense theory. After initially granting Morgan a separate jury, but not a separate trial, the court reversed itself and ruled a single joint trial would be held for all three defendants.

Reilly contends the trial court abused its discretion by denying his severance motion. As a result, he claims he was forced to endure a trial which was fundamentally unfair under both state law and the federal Constitution. As we explain below, Reilly's contention is meritless.

We begin with section 1098, which states that, "When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they *must* be tried jointly, unless the court order separate trials." (Italics added.) Our Legislature has thus "expressed a preference for joint trials." (*People* v. *Boyde* (1988) 46 Cal.3d 212, 231 [250 Cal.Rptr. 83, 758 P.2d 25], affd. on other grounds *sub nom. Boyde* v. *California* (1990) 494 U.S. 370 [108 L.Ed.2d 316, 110 S.Ct. 1190].) Separate trials are permitted in the discretion of the trial court, however, and whether a trial court's denial of a severance motion constitutes an abuse of that discretion is judged on the facts as they appeared at the time the court ruled on the motion. (*People* v. *Boyde, supra,* at p. 232; *People* v. *Turner* (1984) 37 Cal.3d 302, 312 [208 Cal.Rptr. 196, 690 P.2d 669].)

A trial court's discretion to order separate trials is guided by principles first set down in *People* v. *Massie* (1967) 66 Cal.2d 899 [59 Cal.Rptr. 733, 428 P.2d 869]. Thus, "The court should separate the trial of codefendants 'in the face of an incriminating confession, prejudicial association with codefendants, likely confusion resulting from evidence on multiple counts, conflicting defenses, or the possibility that at a separate trial a codefendant would give exonerating testimony.'" (*Turner, supra,* 37 Cal.3d at p. 312, quoting *Massie, supra,* at p. 917, fns. omitted.)

Of these considerations, Reilly relies solely on the fact that it was anticipated that all three defendants would present antagonistic and conflicting defenses. At the aforementioned in camera hearings, counsel for Reilly stated he would present the defense that Reilly withdrew from the conspiracy. Hardy's counsel opined that he would argue that Hardy was not present

at the crime scene, did not participate in the conspiracy, and that Reilly and Morgan must have committed the murders. Morgan's counsel stated that he would argue that Reilly and some unknown third person killed the victims in order to blackmail Morgan.

Because defendants were charged with having committed "common crimes involving common events and victims" (*People* v. *Keenan* (1988) 46 Cal.3d 478, 500 [250 Cal.Rptr. 550, 758 P.2d 1081]), this was a "classic case" for a joint trial. Although there was some evidence before the trial court that defendants would present different and possibly conflicting defenses, a joint trial under such conditions is not necessarily unfair. (*Ibid.*) "Although several California decisions have stated that the existence of conflicting defenses may compel severance of codefendants' trials, *none has found an abuse of discretion or reversed a conviction on this basis.*" (*People* v. *Boyde, supra,* 46 Cal.3d at p. 232, italics added.) If the fact of conflicting or antagonistic defenses *alone* required separate trials, it would negate the legislative preference for joint trials and separate trials "would appear to be mandatory in almost every case." (*Turner, supra,* 37 Cal.3d at pp. 312-313.)

Moreover, although it appears no California case has discussed at length what constitutes an "antagonistic defense," the federal courts have almost uniformly construed that doctrine very narrowly. Thus, "[a]ntagonistic defenses do not *per se* require severance, even if the defendants are hostile or attempt to cast the blame on each other." (*United States* v. *Becker* (4th Cir. 1978) 585 F.2d 703, 707, cert. den. 439 U.S. 1080 [59 L.Ed.2d 50, 99 S.Ct. 862].) "Rather, to obtain severance on the ground of conflicting defenses, it must be demonstrated that the conflict is so prejudicial that [the] defenses are irreconcilable, and the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty." (*United States* v. *Davis* (1st Cir. 1980) 623 F.2d 188, 194-195; see also, *United States* v. *Ehrlichman* (D.C.Cir. 1976) 546 F.2d 910, 929 [39 A.L.R.Fed. 604], cert. den. 429 U.S. 1120 [51 L.Ed.2d 570, 97 S.Ct. 1155].) Stated another way, " 'mutual antagonism' only exists where the acceptance of one party's defense will preclude the acquittal of the other." (*United States* v. *Ziperstein* (7th Cir. 1979) 601 F.2d 281, 285, cert. den. 444 U.S. 1031 [62 L.Ed.2d 667, 100 S.Ct. 701]; see generally, 1 Wright, Federal Practice and Procedure: Criminal (2d ed. 1982) § 223, pp. 799-802 & fn. 15, and cases cited.)

Here, although their expected defenses were technically "conflicting" in that all three defendants denied culpability and speculated that one or both of the other defendants was responsible, their defenses were not particularly "antagonistic," as that term is used in the federal courts. For example, it is perfectly consistent that Reilly withdrew from a conspiracy involving others

but that Hardy was not one of the coconspirators. Morgan's reliance on his alibi that he was in Carson City when the murders occurred and that Reilly and an unknown third person committed the crimes is not fatally contrary to Reilly's claim that he withdrew from the conspiracy; because Morgan claims not to have been present, he could not know if Reilly actually withdrew from the conspiracy and left before the crimes were committed. Morgan claims not to have known of Hardy's involvement; their defenses were thus not antagonistic at all.

Moreover, despite the specter of conflicting defenses, there also existed "realistic benefits from a consolidated trial." (*Keenan, supra,* 46 Cal.3d at p. 500.) The trial court ruled that the three defendants, as well as Debbie Sportsman, Colette Mitchell, and others, were coconspirators. As a result, their respective statements were admissible against the others whether joint or separate trials were held. The evidence thus presented in the joint trial would largely mirror that presented in separate trials. (The lone exception was photographs of the crime scene. Although admissible against Hardy and Reilly, this evidence was held inadmissible against Cliff Morgan because the manner of killing was not relevant to his guilt.)

In light of these facts, we conclude the potential for jury confusion was low. Each defendant presented a theory of the case that absolved himself of guilt and focussed blame on the others. The jury was thus presented with a straightforward choice regarding the credibility of the various defendants.[19] Significantly, no defendant confessed and implicated another defendant. (*Massie, supra,* 66 Cal.2d at p. 919 [one defendant's confession implicated second defendant; failure to sever trials ruled prejudicial]; see *People* v. *Aranda* (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265].) Nor did one defendant present a defense that necessarily implicated another defendant. (See *People* v. *Wheeler* (1973) 32 Cal.App.3d 455 [108 Cal.Rptr. 26] [one defendant claimed second defendant forced him to participate in crime; erroneous failure to sever cases harmless].) Considering all the circumstances of this case, we conclude the trial court did not abuse its discretion by denying Reilly's severance motion.

 Reilly's alternate reliance on the federal Constitution is similarly unavailing. In support, he cites *Panzavecchia* v. *Wainwright* (5th Cir. 1981)

---

[19]As the Supreme Court of Kentucky opined: "[N]either antagonistic defenses nor the fact that . . . one defendant incriminates the other amounts, by itself, to unfair prejudice. . . . That different defendants alleged to have been involved in the same transaction have conflicting versions of what took place, or the extent to which they participated in it, vel non, is a reason for rather than *against* a joint trial. If one is lying, it is easier for the truth to be determined if all are required to be tried together." (*Ware* v. *Commonwealth* (Ky. 1976) 537 S.W.2d 174, 177 [italics added], quoted in Dawson, *Joint Trials of Defendants in Criminal Cases: An Analysis of Efficiencies and Prejudices* (1979) 77 Mich. L.Rev. 1379, 1423.)

658 F.2d 337, and *Abbott* v. *Wainwright* (5th Cir. 1980) 616 F.2d 889.[20] Both cases affirm issuance of a writ of habeas corpus because a state court's failure to grant severance resulted in a fundamentally unfair trial. In *Panzavecchia, supra*, 658 F.2d 337, a case involving joinder of charges, the prejudice flowed from the fact that the joint trial enabled to jury to learn about a prior felony conviction that would have been inadmissible in a separate trial. In *Abbott, supra*, 616 F.2d 889, the joint trial was deemed unfair because a joined codefendant would have given exculpatory testimony in a separate trial but invoked his right not to testify in a joint trial. Thus, in both cases, the evidence that would have been presented in separate trials was demonstrably different than that presented in the joint trial.

By contrast, in the present case, most of the evidence was admissible against all three defendants as a result of the conspiracy charge. The federal cases Reilly cites are thus distinguishable and we conclude his rights to due process and a fair trial under the Fourteenth Amendment were not compromised by the trial court's denial of his severance motion.

Reilly disagrees, citing much evidence which he claims was irrelevant to his guilt but prejudicial to his defense. We fail to perceive how the jury's receipt of this irrelevant information undermined his case. For example, evidence of Morgan's character flaws and of Hardy's lifestyle could not have influenced the jury to unfairly reject Reilly's defense that he withdrew from the conspiracy. Moreover, evidence of Morgan's business dealings and details of the insurance policies was probably relevant to prove the criminal conspiracy. Other evidence on which Reilly relies, such as Nancy Morgan's medical history and some hearsay statements she made, were too trivial to be prejudicial. Moreover, there was no defense objection to such evidence.

Finally, Reilly also contends several of his federal constitutional rights were violated because the joint nature of the trial (i) reduced the number of his peremptory challenges, (ii) prevented his defense counsel from rebutting the arguments of counsel for codefendants, (iii) permitted Morgan's counsel to comment on Reilly's silence at trial, and (iv) reinforced the prosecutor's

---

[20]The rule regarding severance for trials in federal court is similar to our state rule. Thus, "It is within the sound discretion of the trial judge as to whether the defendants should be tried together or severally" (*Opper* v. *United States* (1954) 348 U.S. 84, 95 [99 L.Ed. 101, 109, 75 S.Ct. 158, 45 A.L.R.2d 1308]; see generally, Fed. Rules Crim.Proc., rule 14, 18 U.S.C.), and "a conviction will be reversed only if the refusal of the trial court to grant relief was a clear abuse of discretion." (Wright, Federal Practice and Procedure: Criminal, *supra*, § 227, at p. 854, and cases cited.) When a federal district court denies severance, a criminal defendant seeking reversal on appeal must show that the initial joinder was sufficiently prejudicial that his right to a fair trial outweighed the paramount concern of judicial economy. (*U.S.* v. *Vaccaro* (9th Cir. 1987) 816 F.2d 443, 449.)

reliance on the allegedly improper theory that the conspiracy was ongoing at the time of trial. We discuss these issues in other parts of this opinion.

We conclude that the trial court did not abuse its discretion in denying the motion to sever and that the court's decision in this regard did not violate Reilly's rights under the federal Constitution.

### 12. *Alleged Prosecutorial Misconduct*

During the questioning of various prosecution witnesses, the prosecutor affirmatively elicited from them facts that could have been used by the defense to impeach their testimony. For example, the prosecutor had Colette Mitchell reveal on direct examination that she lied at the preliminary hearing when she said she had been with Hardy the entire night of the crime. Also, when Debbie Sportsman could not remember something Reilly had told her, the prosecutor had her refresh her recollection by referring to a transcript of her preliminary hearing testimony. In these and other instances, Reilly claims the prosecutor committed misconduct by personally vouching for the credibility of the witnesses. (See *Sully, supra*, 53 Cal.3d at p. 1235; *People* v. *Perez* (1962) 58 Cal.2d 229, 245-246 [23 Cal.Rptr. 569, 373 P.2d 617, 3 A.L.R.3d 946].)

Reilly failed to object to the alleged misconduct or seek a curative admonition. Under such circumstances, he waived the issue for appeal. (*Wharton, supra*, 53 Cal.3d at p. 566; *People* v. *Green* (1980) 27 Cal.3d 1, 34 [164 Cal.Rptr. 1, 609 P.2d 468].) Reilly contends we should overlook his failure to object because (1) there was "plain error" on the face of the record, i.e., "highly prejudicial error that affects substantial rights" (*United States* v. *Lancellotti* (9th Cir. 1985) 761 F.2d 1363, 1367), and (2) his counsel provided ineffective assistance by failing to object (see *People* v. *Ledesma* (1987) 43 Cal.3d 171, 215-216 [233 Cal.Rptr. 404, 729 P.2d 839]; *People* v. *Jennings* (1991) 53 Cal.3d 334, 357 [279 Cal.Rptr. 780, 807 P.2d 1009).

Reilly's first claim is foreclosed by *Green, supra*, 27 Cal.3d 1, and its progeny. Moreover, the claim of ineffective counsel is baseless. In this case, the prosecutor never even approached an improper expression of his personal opinion as to the credibility of the various witnesses. Instead, he merely pointed out inconsistencies in the witnesses' testimony to prevent the defense from impeaching the witnesses with the same information. This was clearly permissible. (See *People* v. *Washington* (1969) 71 Cal.2d 1061, 1086 [80 Cal.Rptr. 567, 458 P.2d 479].) We conclude the issue was waived and that counsel was not deficient because there was no misconduct.

Defendants raise 32 separate instances of alleged prosecutorial misconduct that they claim require reversal. We have reviewed their claims

and find that the prosecutor sometimes engaged in questionable behavior. For example, he occasionally asked improper leading questions and disobeyed the trial court's order to refrain from such conduct. He also insinuated at various times his own interpretation of the evidence when questioning witnesses, suggesting that he was not able to present all the evidence that existed. On some occasions, he subtly denigrated defense counsel by claiming it was their duty to obfuscate the truth. Another time the prosecutor interrupted a defense cross-examination of Colette Mitchell to ask in open court whether he would be allowed to ask Colette whether she thought Hardy was guilty.

In many of these instances, one or more of the defendants moved for a mistrial. The motions were denied but the trial court repeatedly admonished the prosecutor, one time cautioning him: "This is twice. Third strike, you may be out." In another instance, when the prosecutor spoke out of order in asking that certain documents be admitted, the trial court granted Lasting's motion to exclude the evidence pursuant to Evidence Code section 352. We agree the prosecutor was periodically overzealous in attempting to prove defendants' guilt.

Most claims of prosecutorial misconduct, however, are not borne out by the record. For example, contrary to defendants' assertion, Colette Mitchell was not questioned in a way that suggested she had undergone a polygraph test. In addition, the prosecutor did not commit misconduct in opposing the severance motion by claiming severance would make his theory of the case impossible to prove. Hardy presents several claims that the prosecutor, in closing argument, questioned the honesty of the three defense counsel. The record, however, reveals that these statements amount to little more than an exploration of the inconsistencies in the testimony of various witnesses.

In other instances, there was no defense objection to the claimed misconduct. For example, defendants argue the prosecutor committed misconduct when he played a song from the musical, "The Best Little Whorehouse in Texas," to illustrate his point that defense counsel were being less than honest. There was, however, no objection to the playing of the recording, thus waiving the point for appeal. (*Green, supra,* 27 Cal.3d at p. 34.) The same may be said for the prosecutor's criticism of a defense expert and the prosecutor's praise for the work ethic of the investigating police officers. Most of the 29 additional claims of prosecutorial misconduct raised in Hardy's supplemental reply brief fall into this category.[21]

We do not attempt to catalog here the plethora of misconduct claims defendants raise. Considering them together, we conclude the prosecutor

---

[21] In his supplemental brief and at oral argument, counsel for Hardy argued that the prosecutor committed misconduct by referring to the fact that at various times, Ron Leahy

many times pushed the limits of proper advocacy, occasionally crossing that line, such as when he improperly attempted to inflame the passions of the jury by repeatedly asking Debbie Sportsman whether she knew that Mitchell Morgan would have been 10 years old that day. Although the prosecutor's performance was not a model of restraint, we nevertheless conclude any misconduct that occurred could not have contributed to the verdict and was thus harmless in light of the overwhelming evidence of defendants' guilt.[22]

In addition, none of the alleged misconduct is of such severity, alone or together, that we can conclude it resulted in an unfair trial in contravention of defendants' state and federal constitutional right to due process of law (*Donnelly* v. *DeChristoforo* (1974) 416 U.S. 637, 642-643 [40 L.Ed.2d 431, 436, 94 S.Ct. 1868]; *People* v. *Harris* (1989) 47 Cal.3d 1047, 1084 [255 Cal.Rptr. 352, 767 P.2d 619]), or their right to confrontation, counsel, a fair and impartial jury, or self-representation.

### 13. *Alleged Juror Misconduct*

#### a. *Juror's Gift to a Witness*

During Cliff Morgan's testimony, it came to light that one of the jurors, Lipman, gave a gift of some fruit cocktail to Detective Bobbitt, one of the investigating police officers and a prosecution witness. Lasting, Reilly's trial counsel, moved to have Lipman replaced with an alternate juror. Counsel for Morgan (Stone) and Hardy (Demby) joined the motion. The trial court stated it believed the act was an innocent one, prompted by Bobbitt's attractiveness and not by any intent on Lipman's part to show favoritism to the prosecution.

The prosecutor, Jonas, opposed the motion, noting that the gift was done in open court right next to Demby. In addition, Jonas stated, "there was no conversation [between Lipman and Detective Bobbitt] that I'm aware of." Later, he said, "There have been no statements made. There has been no

and Mike Mitchell sought the advice of an attorney. The prosecutor also mentioned that Mike Mitchell advised Reilly at one point to consult an attorney. It appears from the record, however, that the prosecutor was merely reiterating testimony that was admitted without objection during the trial. In any case, even if we assume for argument's sake that the comment was improper (see *United States* v. *McDonald* (5th Cir 1980) 620 F.2d 559 [finding such comment reversible error]), and that it was properly preserved for appeal, we fail to perceive how such comment affected *Hardy's* right to be free of comment on the exercise of his Sixth Amendment rights since there was no prosecutorial comment on *his* exercise of his right to counsel. We thus reject the point.

[22]Significantly, the jury was instructed that "Statements made by the attorneys during the trial are not evidence," and "You must never assume to be true any insinuation suggested by a question asked a witness."

conversation, and I can personally indicate to the court that this jury has gone out of its way not to discuss things or make comments or contacts with anybody and I think the defense attorneys would agree with that." None of the three defense attorneys contradicted Jonas's assertion. The trial court eventually denied the motion, noting, "Had there been a personal contact with Miss Bobbitt[,] that would have been a different situation." The court later readmonished the jury of its duty to avoid "any contact with any of the attorneys, defendants, or witnesses in this matter."

Reilly contends Lipman's actions constituted juror misconduct requiring the trial court to conduct an inquiry and question Juror Lipman. **(47)** He is mistaken. As we recently held in *People* v. *Hedgecock* (1990) 51 Cal.3d 395 [272 Cal.Rptr. 803, 795 P.2d 1260], "when a criminal defendant moves for a new trial based on allegations of jury misconduct,[23] the trial court has discretion to conduct an evidentiary hearing to determine the truth of the allegations. We stress, however, that the defendant is not entitled to such a hearing as a matter of right. Rather, such a hearing should be held only when the trial court, in its discretion, concludes that an evidentiary hearing is necessary to resolve material, disputed issues of fact." (*Id.* at p. 415.) Also, a hearing "should be only held when the defense has come forward with evidence demonstrating a strong possibility that prejudicial misconduct has occurred. Even upon such a showing, an evidentiary hearing will generally be unnecessary unless the parties' evidence presents a material conflict that can only be resolved at such a hearing." (*Id.* at p. 419.)

Applying *Hedgecock, supra*, 51 Cal.3d 395, to the facts of this case reveals Reilly's position is meritless. Because no material factual dispute was presented to the trial court, it did not abuse its discretion in declining to hold a hearing to question Lipman. Moreover, only the mere speculation that Lipman expressed a pro-prosecution bias by giving Detective Bobbitt the fruit cocktail informed the defense contention. Because this falls short of the "strong possibility" of "prejudicial misconduct" required by *Hedgecock, supra*, at page 419, we accordingly find no abuse of discretion.

Reilly also contends he is entitled to reversal because the jury misconduct raised a presumption of prejudice that was left unrebutted by the prosecution. (See, e.g., *Miranda, supra*, 44 Cal.3d at p. 117.) We disagree. The presumption of prejudice may be rebutted, inter alia, by a reviewing court's determination, upon examining the entire record, that there is no substantial likelihood that the complaining party suffered actual harm. (*Ibid.*; *People* v. *Holloway* (1990) 50 Cal.3d 1098, 1108-1110 [269 Cal.Rptr. 530,

---

[23]In his motion for a new trial, Reilly relied in part on the trial court's failure to replace Juror Lipman with an alternate. The motion was denied.

790 P.2d 1327].) Although Juror Lipman's unauthorized contact with Detective Bobbitt was improper, his misconduct was de minimis under the circumstances of this case. There was no evidence that Lipman even spoke to Bobbitt or that the fruit cocktail was from him. As the trial court astutely discerned, this would be a different case had there been evidence of any "personal contact" between Lipman and Detective Bobbitt. Considering the trivial nature of the misconduct, we conclude the presumption of prejudice was amply rebutted on this record.

### b. *Newspaper Articles*

Shortly after the jurors and alternates were sworn, three newspaper articles were published referring to "cases and jury selections." A Los Angeles Times article assertedly made the following comment: "For example, Judge Robert D. Fratianne is now entering the sixth week of jury selection for a Van Nuys trial of three men accused of two murders nearly two years ago. Fratianne started with 300 jurors. 180 have been eliminated. The judge has personally questioned 120 jurors, but the trial is perhaps a month away. Fratianne is convinced at least two or three weeks could be shaved off lengthy trials if the jury selection process is reformed. [¶] 'But you still have to take into account the overall picture of due process and a fair trial,' Fratianne said. 'In deference to the prosecution and the defense, you have to give them a chance to make sure the jury is composed of rational jurors.' "

In addition, the jurors and attorneys were apparently aware of two articles that appeared in the Los Angeles Daily News.[24] Both articles present the opinion of several commentators that court reform was necessary, although neither article refers to defendants' trial or crime. Significantly, Judge Fratianne, the judge presiding over defendants' trial, is quoted in the first article. It reads: " 'Even with the number of problems and the magnitude of the problems, in the long run justice is done,' said Judge Robert D. Fratianne of Van Nuys Superior Court. 'And, that's the problem. It would be better if justice were done in the short run. [¶] But the problems are not insurmountable,' Fratianne said." In addition, Judge Fratianne's picture appears in the first article. The second article does not quote Judge Fratianne or refer to defendants' trial.

The trial judge explained that he was led to believe that his remarks would not be published for six months. Moreover, he stated without contradiction

---

[24]Unlike the Los Angeles Times article, however, these articles were not read into the record on appeal or otherwise made part of the appellate record. Defendants have, however, provided this court with photocopies of the articles. We grant defendants' motion to take judicial notice of these articles under Evidence Code sections 452, subdivision (h), and 459.

that he did not mention anything to reporters about the present trial, which was then pending. The judge then conducted a voir dire of the jury and discovered that 10 of 12 jurors (and all 6 of the alternate jurors) had either read or had heard of the articles. Three jurors expressed general concerns that the judicial system was too slow. Defense counsel moved for a mistrial due to juror misconduct, for removal of one of the jurors for cause, and for dismissal due to the alleged politicization of the criminal justice system by the district attorney's office. All the motions were denied. One prospective alternate (Katz) was then challenged peremptorily, apparently due to her having read the article in question.

 "It is well settled that it is misconduct for a juror to read newspaper accounts of a case on which he is sitting." (*People* v. *Holloway, supra*, 50 Cal.3d at p. 1108.) "It is equally well settled that such juror misconduct raises a presumption of prejudice that may be rebutted by proof that no prejudice actually resulted." (*Ibid.*) Such is the case here. None of the newspaper articles in question contained accounts of defendants' trial, nor anything else of a prejudicial nature. At most, the articles presented generalized arguments concerning the criminal justice system as a whole. We conclude that even if we assume a presumption of prejudice arose, it was amply rebutted by the evidence. Accordingly, we find the actions of the jurors did not violate defendants' rights under the Sixth, Eighth, and Fourteenth Amendments to the federal Constitution.

Because there is no evidence in the record that Judge Fratianne spoke to reporters about defendants' case, we similarly reject the claim that we must reverse the judgment for judicial misconduct. (See Cal. Code Jud. Conduct, canon 3A(6) [judges prohibited from commenting on pending cases, but not prohibited from "explaining for public information the procedures of the court"].)

c. *Jury View of the Crime Scene*

During trial, the prosecution moved to have the jury view the crime scene. The relevance of the view was disputed because the Morgan home had been vacant for two years and the conditions had changed. The trial court nevertheless granted the motion, noting that the jury would be told how the scene had changed in the intervening years. (Parsons, the neighbor that discovered the bodies, had already testified that the front door had been sanded to prevent it from sticking.) In addition, the court ordered that there would be no talking, testimony, questions, or physical demonstrations; the jury would merely silently view the premises to gain a better understanding of the circumstances of the crime.

 Defendants present three arguments arising from the jury view procedure. First, they claim reversal is required because an alternate juror violated the trial court's order that no talking was allowed at the jury view. During the view, an alternate juror asked to see the back side of the front door. The trial judge closed the door and the juror commented, "The sun must have warped it," or words to that effect. Although technically violating the court's order that no questions or talking would be allowed, the violation was de minimis and no prejudice resulted.

For similar reasons, we reject defendants' claim that the trial court was obligated to hold a hearing on the matter; the court's decision not to hold a hearing was well within its discretion. (*Hedgecock, supra,* 51 Cal.3d at pp. 415-416.)

Second, defendants object to what they characterize as an improper "experiment." Because one juror was allowed to observe the back side of the front door, as well as seeing the door opened and closed, it was agreed by the defense attorneys that all the jurors would be permitted to do so. Defendants complain that this gave the jury a false sense of how well the door fit in the door jamb, a potentially important issue in the case.[25] The jury, however, had already heard testimony that the door had been sanded since the killings, and it clearly knew two full years had passed since the crime. On examining the entire record, we find no reasonable probability defendants suffered actual prejudice (*Miranda, supra,* 44 Cal.3d at p. 117), even if we assume defendants adequately preserved the issue for appeal.

Third, the jury observed a handprint on the wall and a stain on the carpet in the bedroom. Defendants argue that these stains were possibly made with blood and prejudicially inflamed the passions of the jury. Because Detective Jamieson later testified, however, that the handprint and the carpet stain were not "a result of the crime scene at the time of the murders," we assume the jury disregarded the evidence. Moreover, the jury was later permitted to see actual photographs of the victims in the bedroom. It is thus extremely unlikely that viewing the handprint and carpet stain was prejudicial.

14. *Right to Presence*

 Reilly contends his constitutional right to be personally present at trial was violated and alleges three violations. First, Reilly was absent from

---

[25]Reilly speculated that Morgan drove down from Carson City and committed the murders himself. It was suggested that the front door stuck and emitted a noise when opened, possibly loud enough to wake the victims. Reilly thus speculated that Nancy Morgan must have known her killer because she stayed in the bedroom when the door opened.

a six-minute session of preliminary voir dire on February 14, 1983. Second, Reilly was again absent from an 18-minute session during preliminary voir dire on February 17, 1983. (Both sessions involved routine processing of hardship excusals.) Third, he was absent during two days of conferences while counsel and the trial judge discussed guilt phase instructions. Reilly did not execute a written waiver of his presence (see § 977) but did purport to orally waive his right to be present for the afternoon of February 16, 1983.

We have addressed this issue several times in recent years and additional explication is unnecessary. For his absences, Reilly fails to explain how he was prejudiced by his failure to personally observe the presentation of hardship excuses. We perceive no prejudice.[26] (*People* v. *Medina* (1990) 51 Cal.3d 870, 902-903 [274 Cal.Rptr. 849, 799 P.2d 1282.) Although Reilly strenuously argues he never validly executed a written waiver of his right to be present, we may find any error harmless even without a waiver. (*Ibid.*) As to the third claim, the conference involved legal issues only and thus had no impact on Reilly's ability to defend against the charges. (*Wharton, supra,* 53 Cal.3d at p. 602.)

### 15. *Alleged Discovery Violations*

■ Defendants next contend reversal is required because the prosecution failed on three occasions to comply with a standing discovery order to produce material, potentially exculpatory, evidence. In addition, they claim the failure to comply with the discovery order violated their constitutional rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution. Defendants, however, have the burden of demonstrating noncompliance with the discovery order was prejudicial. (*People* v. *Sewell* (1978) 20 Cal.3d 639, 646 [143 Cal.Rptr. 879, 574 P.2d 1231].)

In the first cited instance, the prosecution failed to reveal it had taken possession of an appointment book from a racquetball club. The book indicated that although Marc Costello had a nine o'clock reservation for a racquetball court the night of the murders, he did not show up. This evidence could have been used to impeach Costello's alibi that he and his girlfriend, Nancy Purvis, played racquetball the night of the murders.

The trial court denied both Hardy's and Reilly's mistrial motion, marked the appointment book as evidence, and said it would permit counsel to

---

[26]Reilly also raises the related claim that reversal is required because his defense counsel, Lasting, was absent from this brief proceeding. Although the claim is characterized as a denial of Reilly's constitutional right to counsel requiring application of a per se reversal standard, the claim is more akin to one of ineffective assistance of counsel because there was no state action in preventing Lasting's appearance. Instead, he apparently chose to be absent. Under the circumstances, even if we assume Lasting provided deficient representation by absenting himself from the proceeding, we find no prejudice resulted.

reopen cross-examination of Costello and Purvis. (See *People* v. *Reyes* (1974) 12 Cal.3d 486, 502 [116 Cal.Rptr. 217, 526 P.2d 225].) In addition, although clearly displeased with the prosecutor's conduct, the court ruled that the prosecutor did not intentionally withhold the evidence of the appointment book, and that because expert evidence showed the crime occurred between 1 and 5:30 a.m., the question whether Costello played racquetball at 9 (or even 10) o'clock was not particularly relevant. We agree. Because defendants were given an opportunity to address the evidence, which was not particularly probative in any event, we find the failure to comply with the discovery order was harmless. (*Sewell, supra*, 20 Cal.3d at p. 646.)

In the second instance, the prosecutor questioned Joe Dempsey about information he had regarding an alleged argument between Hardy and a Black man over use of a gun in the planned murders. Defense counsel objected, claiming this information had not been previously disclosed. The information, however, had been disclosed for the first time to the prosecutor just minutes before. Although the prosecutor should then have disclosed the information to defense counsel before calling Dempsey to the stand, defense objections avoided any prejudice. By the time Dempsey was called, defendants had their discovery. The trial court properly denied a mistrial motion, and no prejudice resulted from this technical violation of the continuing discovery order.

Finally, defendants complain the prosecution should have revealed the contents of some notes Detective Jamieson used to refresh his recollection when testifying. The prosecutor objected, claiming the notes were his work product. The detective, however, replied that he had prepared the notes himself prior to testifying at the preliminary examination. Reilly's motions for a mistrial and to recuse the prosecutor were denied, as was the prosecutor's motion to admit the document as evidence.

Defendants claim the notes would have shown "that the witness's memory of certain key events may have been altered or influenced by the prosecutor." Detective Jamieson testified, however, that he prepared the notes himself. Under these circumstances, we assume the jury was aware that the detective was referring to his notes. Counsel was thus free to use that fact in closing argument in an attempt to diminish Jamieson's credibility. In short, even if there was a violation of the discovery order, the misstep was harmless.

16. *Shackling*

As discussed *ante*, at page 176, the prosecution moved to permit the jury to view the crime scene. Both defendants stated that if the motion was

granted, they would exercise their right to personally attend the viewing. Although neither defendant had been shackled during trial, the court ruled that they would be handcuffed during the jury view of the crime scene. Both Lasting and Demby objected and claimed shackling was unnecessary. In the alternative, Lasting suggested either additional sheriffs could be called in, or that Reilly should be handcuffed during transport, but that the shackles could be removed on arrival. Demby suggested Hardy travel in a car separate from the jurors. Stone suggested a videotape of the premises could be made in lieu of a jury view. The court stated Reilly could remain free of restraints if he travelled to the crime scene but remained inside the sheriff's van while the jury viewed the scene. Counsel rejected these alternatives. The court took the matter under submission.

The trial court later granted the People's motion for a jury view, and ruled Reilly would be handcuffed in front of his body during the viewing. The court commented that although Reilly had not been restrained in court, the danger of flight would be greater at the crime scene. At a later date, the court apparently ordered Reilly handcuffed behind his body instead of in front. There was no hearing on this latter decision. Both defendants appeared at the jury view in shackles.

 Defendants argue the shackling violated their due process rights. We disagree. Although Reilly had no history of violence (see *Medina, supra,* 51 Cal.3d at p. 897), the trial court did not abuse its discretion in concluding the danger of flight or escape was greater outside the courtroom. Moreover, there is no indication the court failed to consider less drastic alternatives. (*Ibid.*) Lasting and Stone suggested options and the trial court took the matter under submission. We can thus assume the trial court considered the matter before ruling.

We also reject the claim that the decision to handcuff Reilly in back rather than in front violated his right to due process. The change was de minimis and, if anything, worked to Reilly's benefit by rendering the restraints less noticeable to the jury. Indeed, the trial judge commented that the restraints were so innocuous that "it looked like [the defendants] did not have [hand]cuffs on." Finally, we reject defendants' argument, based on the Eighth Amendment, that their shackling during the jury view of the crime scene resulted in an inherently unfair penalty phase trial.

17. *Jail Cell Search*

Reilly, granted cocounsel status at trial, moved to dismiss because some legal papers in his cell had been viewed by jail officials during a lockdown

and search. In a declaration accompanying the motion, Reilly states that he and others were forced to vacate their cells for 50 minutes. On his return, he found his legal papers strewn about his cell. He claimed this action by jail authorities violated his right to due process, equal protection, and "self-representation."

The trial judge informed Reilly that he had spoken with someone in the sheriff's department about the matter and asked Reilly, "would you take my word for what he told me?" Reilly replied, "Sure." The judge then related that there was an emergency, that the sheriffs were looking for a suspect (who had since been found and placed in a discipline module) and that was the reason for the lockdown. The judge then asked Reilly, "Were any of your private papers taken out of the cell, removed?" Reilly said he was unsure.

At this point, Lasting asked to have the witness testify to make a record documenting the circumstances of the lockdown. The judge replied, "Just a moment. This is not your motion. It is Mr. Reilly's motion. . . . He has accepted my statement that the officer here checked with the [sergeant at the jail]." The judge then denied the motion.

 Reilly now argues he was deprived of his rights under the federal Sixth and Fourteenth Amendments by the warrantless search of his jail cell. As the evidence shows, however, the search of his cell was made for reasons of institutional security, a concern that outweighs an inmate's right to privacy. (*Hudson* v. *Palmer* (1984) 468 U.S. 517 [82 L.Ed.2d 393, 104 S.Ct. 3194]; *People* v. *Burgener* (1986) 41 Cal.3d 505, 530 [224 Cal.Rptr. 112, 714 P.2d 1251].) Reilly admitted he did not know if any of his papers were missing. Significantly, there was no evidence the search was instigated by the prosecutor, or otherwise designed to enhance the prosecution's case. (See *United States* v. *Cohen* (2nd Cir. 1986) 796 F.2d 20, cert. den. 479 U.S. 854 [93 L.Ed.2d 122, 107 S.Ct. 189] [pretrial detainee may raise Fourth Amendment objection to jail search instigated by prosecutor].) Under these circumstances, we find no constitutional violation.[27]

18. *Alleged Improper Admission of Evidence*

 Defendants contend their trial was marred by the erroneous admission of certain evidence. First, they contend evidence showing their bad character, such as their drug use and dissolute lifestyle, was inadmissible character evidence. Second, they contend evidence of uncharged bad acts

---

[27]Although Reilly argues the trial court precluded him from making an adequate record to support the claim, as noted above, defendant—acting in his capacity as cocounsel—indicated he would accept the trial court's statement of the purpose of the lockdown and jail search.

was erroneously admitted. Third, they argue the trial court erroneously admitted hearsay evidence on a variety of topics, including Nancy Morgan's unhappiness over Cliff Morgan's extramarital affairs. Finally, defendants point to evidence portraying the victims in a sympathetic light, and assert that evidence constituted improper good character evidence. Defendants direct our attention to dozens of allegedly improper pieces of evidence that were admitted at trial.

We need not resolve these issues, however, because the record reveals that neither of the three defense attorneys at trial objected to any of the evidence now challenged. The issues are thus waived for appeal. (Evid. Code, § 353, subd. (a).) Moreover, even if we assume the issues were preserved for appellate review, it appears that very little of the evidence was prejudicial in light of the strong evidence of guilt. Accordingly, we reject defendants' claim that the trial court violated their rights under the Fifth, Sixth, and Fourteenth Amendments to the federal Constitution. Because there was no objection, we also reject their claim the trial court should have excluded the challenged evidence pursuant to Evidence Code section 352. For the same reason, we reject their suggestion the prosecutor committed misconduct by eliciting the evidence defendants now challenge. (*Wharton, supra*, 53 Cal.3d at p. 566.)

19. *Alleged Instructional Errors*

Defendants contend numerous instructional errors occurred at trial.

a. *Instructions on Diminished Capacity, Voluntary Intoxication, and Lesser Included Offenses*

Defendants contend the trial court erroneously failed to instruct, sua sponte, on the lesser included offenses of second degree murder and voluntary manslaughter, as well as the defenses of diminished capacity and voluntary intoxication.[28] In support, they point to evidence adduced at trial indicating both Reilly and Hardy drank beer and snorted cocaine the night of the murders. (They apparently used a "beer bong," described as a funnel-type device which enables the user to pour beer directly down his throat and into his stomach.) Even if we assume there was sufficient evidence to support such instructions, we reject the contention because the record reveals defendants' trial attorneys each made a tactical decision to forgo these

---

[28]The crimes in this case occurred before the Legislature abolished the defense of diminished capacity in this state. (See Stats. 1981, ch. 404, § 2, p. 1592 [rewriting Pen. Code, § 22, regarding voluntary intoxication]; Stats. 1981, ch. 404, § 4, p. 1592 [enacting Pen. Code, § 28, abolishing diminished capacity based on mental disease or defect].)

instructions because they were inconsistent with the defense on which defendants relied.[29]

■■ ■■ ■■ During trial, counsel met in chambers with the trial judge to discuss jury instructions for the guilt phase.[30] ■■ During these discussions, neither Lasting nor Demby requested instructions on either diminished capacity or voluntary intoxication, or on the lesser forms of criminal homicide (second degree murder, voluntary manslaughter) that could result should the jury be convinced defendants acted without the requisite criminal intent because of their intoxication. Both attorneys conceded that the defenses of diminished capacity and voluntary intoxication were inconsistent with the defenses on which their clients relied.

---

[29]Defendants both claimed they did not participate in the murders: Reilly alleged he withdrew from the conspiracy, while Hardy proffered a general denial. Under the circumstances, the only possible way the jury could find they were guilty of an unlawful killing other than first degree murder was to find either diminished capacity or voluntary intoxication negated the formation of malice. Consequently, the question whether the trial court should have instructed on these defenses is treated together with the question whether it should have instructed on lesser included forms of homicide.

[30]These proceedings were not recorded but the meeting was reconstructed and described in a settled statement made part of the record on appeal by order of this court on May 7, 1990. Defendants argue the settled statement is improper because its conclusions regarding Lasting's and Demby's thoughts and trial strategy were beyond the purview of our May 7th order. Moreover, they claim counsel's strategy is not properly included in a settled statement under rule 36(b), California Rules of Court. Although defendants opposed settlement of the record prior to the hearing below, they did not seek to correct the record in this court after the trial court filed its statement here. (See Cal. Rules, of Court, rule 12(b).) Therefore, the settled statement is now properly part of the appellate record. (*People* v. *Williams* (1988) 44 Cal.3d 883, 921-922 [245 Cal.Rptr. 336, 751 P.2d 395].)

In addition, defendants argue the settled statement is incorrect, inaccurate, not supported by substantial evidence, and generally unfair (and violative of due process) because the memories of the parties involved had faded with time. They also contend the record cannot be settled because the parties disagree over what occurred. We reject these claims. The trial judge appointed to settle the record could have concluded it was impossible to produce a settled statement but did not choose that option. (*People* v. *Gzikowski* (1982) 32 Cal.3d 580, 584-585, fn. 2 [186 Cal.Rptr. 339, 651 P.2d 1145].) By choosing to settle the record, the court necessarily concluded it was possible to reconstruct the proceeding.

A court has "broad discretion to accept or reject counsel's representations in its assessment of their credibility" and settlement of the record "is primarily a question of fact to be resolved by the trial court." (*People* v. *Beardslee* (1991) 53 Cal.3d 68, 116 [279 Cal.Rptr. 276, 806 P.2d 1311.) There being no showing the trial judge acted arbitrarily (*Pollard* v. *Saxe & Yolles Dev. Co.* (1974) 12 Cal.3d 374, 376, fn. 1 [115 Cal.Rptr. 648, 525 P.2d 88]), the trial court's ruling is final. Although defendants disagree and cite *In re Armstrong* (1981) 126 Cal.App.3d 565 [178 Cal.Rptr. 902] in support, that case is distinguishable because in *Armstrong* the entire trial was unreported.

We also reject the claim that trial counsel provided constitutionally deficient representation because he allegedly could not accurately remember the details of the in-chambers conference in question.

At this same in-chambers conference, according to the settled statement, "Mr. Lasting was thinking about what instructions should be given to the jury, [and] he wanted the jury to be instructed in accordance with his theory of the case. Mr. Lasting did not think it would be the most effective way to argue the case to argue inconsistent defenses to the jury. *He made a tactical decision in this respect.*" (Italics added.) Finally, "During the in-chambers discussions on guilt phase jury instructions, it was agreed between Judge Fratianne, Mr. Lasting and Mr. Demby that no jury instructions would be given on diminished capacity [or] voluntary intoxication."

 "The trial court has a sua sponte duty to instruct on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present and there is evidence that would justify a conviction of such a lesser offense." (*Cooper, supra,* 53 Cal.3d at p. 827.) A trial court need not deliver the instruction, however, where a defendant expresses a deliberate tactical purpose for objecting to the instruction. (*Ibid.; People* v. *Gallego* (1990) 52 Cal.3d 115, 182-183 [276 Cal.Rptr. 679, 802 P.2d 169].) The record clearly shows such a waiver as to Reilly, whose counsel unequivocally indicated that he did not want instructions on diminished capacity or voluntary intoxication because those defenses were inconsistent with Reilly's proffered defense in the guilt phase.

Reilly argues the settled statement merely shows Lasting acquiesced to the omission of the additional instructions, but does not show he *actually* objected to them. Such a rigid requirement would elevate form over substance. The record, fairly read, reveals that Lasting debated the issue and decided he did not want the instructions on lesser included offenses, explaining the tactical reason for his position. As we stated in *People* v. *Avalos* (1984) 37 Cal.3d 216, 229 [207 Cal.Rptr. 549, 689 P.2d 121]: "Here defense counsel's actions taken as a whole . . . show that his lack of objection to the proposed instruction was more than mere unconsidered acquiescence." Contrary to Reilly's argument, this is not a case where counsel silently accepted the decision to omit the instruction.

Although the evidence of Demby's purpose in objecting to the instructions is less straightforward, we nevertheless reach the same conclusion with regard to Hardy. The settled statement reveals that at the conference in chambers, Judge Fratianne and Demby agreed that "no jury instructions would be given on diminished capacity [or] voluntary intoxication." Because *the pros and cons of whether to give the disputed instructions had just been* thoroughly discussed by all parties present (Judge Fratianne, Demby, and particularly Lasting), we conclude Demby's acquiescence to the omission of

the instructions indicated his agreement with Lasting's tactical assessment of the situation. Under the circumstances, we are confident that Demby's agreement to the omission of the instructions was "for tactical reasons and not out of ignorance or mistake." (*People* v. *Wickersham* (1982) 32 Cal.3d 307, 330 [185 Cal.Rptr. 436, 650 P.2d 311].)

Defendants also argue that despite counsels' objections, *Beck* v. *Alabama* (1980) 447 U.S. 625 [65 L.Ed.2d 392, 100 S.Ct. 2382] nevertheless required the trial court to give lesser included offense instructions. *Beck* is distinguishable, however, because it involved an Alabama statute that *prohibited* lesser included offense instructions in capital cases. Moreover, *Beck* does not prohibit a criminal defendant from choosing to forgo such instructions for strategic reasons, as was the case here. (*U.S.* v. *Lopez Andino* (1st Cir. 1987) 831 F.2d 1164, 1171, cert. den. 486 U.S. 1034 [100 L.Ed.2d 605, 108 S.Ct. 2018]; *Look* v. *Amaral* (1st Cir. 1984) 725 F.2d 4, 9.)

Although Reilly did not personally waive his right to the instructions on lesser included offenses, such a personal waiver was not required. (*Cooper, supra*, 53 Cal.3d at p. 827.) Reilly argues *Cooper* did not address the question "in the capital-case context as a matter of federal law." *Cooper,* however, was a capital case.

On this record, we conclude both Reilly and Hardy expressed a deliberate, tactical decision to forgo jury instructions on diminished capacity and voluntary intoxication. As a result, they waived their right to have the trial court deliver such instructions to the jury. In addition, because the only way the jury could convict defendants of second degree murder or voluntary manslaughter was to find their intoxication negated the formation of either express malice, premeditation, or an awareness that their acts involved a high degree of probability that death would result, we also find the trial court correctly declined to instruct the jury as to these crimes. Finally, we find no violation of defendants' constitutional rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution.

b. *CALJIC Nos. 3.00, 3.01*

 To enable it to understand aiding and abetting liability, the jury was instructed with former CALJIC Nos. 3.00 and 3.01. We have held these instructions are defective because, although they inform a jury an aider and abetter must act with *knowledge* of the perpetrator's intent, the instructions fail to require the jury to determine whether the aider himself also harbored the "*intent* or *purpose* of committing, encouraging, or facilitating the commission of the offense." (*People* v. *Beeman* (1984) 35 Cal.3d 547, 561 [199

Cal.Rptr. 60, 674 P.2d 1318], italics added.) Contrary to Reilly's argument, however, the error does not automatically require reversal; instead, we must determine whether the misstep was harmless beyond a reasonable doubt. (*People* v. *Dyer* (1988) 45 Cal.3d 26, 64 [246 Cal.Rptr. 209, 753 P.2d 1]; see *Chapman* v. *California, supra,* 386 U.S. at p. 24 [17 L.Ed.2d at pp. 710-711].)

The record clearly reveals the flawed instructions were harmless beyond a reasonable doubt. In addition to convicting Reilly of first degree murder, the jury convicted him of conspiracy to commit murder. It was expressly instructed that in order to find a conspiracy, it must find Reilly "entered into [an agreement with one] or more persons *with the specific intent* to . . . commit a public offense." (Italics added.) The jury was later unequivocally instructed that one of the public offenses alleged as a goal of the conspiracy was murder. By convicting Reilly of conspiracy to commit murder, the jury thus necessarily concluded that he entertained *the specific intent to commit murder.*

This is consistent with the facts of the crime, which reveal that Reilly planned the crime, solicited Hardy's participation, accompanied his partner-in-crime to Morgan's home, and either actually assisted Hardy in the slaying, or waited outside while Hardy alone committed the actual murders. The jury thus necessarily rejected Reilly's proffered defense—on which it was specifically instructed—that Reilly withdrew from the conspiracy before the victims were killed. Under either scenario, then, it is clear that Reilly must have intended to kill the victims. Accordingly, we conclude the *Beeman* error was harmless beyond a reasonable doubt. (*Dyer, supra,* 45 Cal.3d at p. 64.)

c. *CALJIC No. 2.27*

The jury was instructed in pertinent part that, "Testimony which you believe given by one witness is sufficient for the proof of any fact." (See CALJIC No. 2.27.) It was also instructed, "A defendant cannot be found guilty based upon the testimony of an accomplice unless such testimony is corroborated by other evidence which tends to connect such defendant with the commission of the offense." (CALJIC No. 3.11.) Defendants contend the inconsistency between these two instructions requires reversal.

We have addressed this issue a number of times in recent years. (E.g., *Douglas, supra,* 50 Cal.3d at pp. 507-508; *People* v. *Andrews* (1989) 49 Cal.3d 200, 216-217 [260 Cal.Rptr. 583, 776 P.2d 285], and cases cited; *People* v. *Moore* (1988) 47 Cal.3d 63, 86-89 [252 Cal.Rptr. 494, 762 P.2d 1218].) Although the two instructions raise a technical inconsistency, we

have invariably found the error harmless after considering the instructions as a whole, reasoning that a reasonable juror would recognize CALJIC No. 2.27 sets forth the general rule and the instruction on accomplice testimony sets forth an exception to it. (*Douglas, supra*, 50 Cal.3d at p. 508.)

We reach the same conclusion here. In addition to the instructions set forth above, the court also instructed: that seven named witnesses were accomplices as a matter of law (CALJIC No. 3.16), that others could be adjudged accomplices, that evidence of corroboration must connect the defendant with the commission of the crime (CALJIC No. 3.12), that corroboration could not come from other accomplices (CALJIC No. 3.13), and that the testimony of accomplices should be viewed with distrust (CALJIC No. 3.18). Thus, "The emphasis placed on the need for corroboration and the caution with which the jury should consider accomplice testimony amply demonstrates that the jury was adequately instructed on how to evaluate [the testimony of the various accomplices]." (*Moore, supra*, 47 Cal.3d at p. 87; see also *People v. Chavez* (1985) 39 Cal.3d 823, 831 [218 Cal.Rptr. 49, 705 P.2d 372] [also finding this factor important].)

In addition, the prosecutor mentioned the need for corroboration several times in his closing argument. (*Moore, supra*, 47 Cal.3d at pp. 87-88.) For example, the prosecutor argued a gun (presumably Cliff Morgan's M-1 carbine rifle, which Hardy received from Reilly) served to corroborate the testimony of some accomplices. In addition, he pointed to "property" (presumably Morgan's coin collection and the diamond ring) that corroborated Marc Costello's testimony regarding the first unsuccessful attempt to hire a hit man through Costello's alleged Mafia connection.

Defendants disagree and claim the prosecutor informed the jury in closing argument that the admission of a coconspirator that a conspiracy existed was alone sufficient to show a conspiracy existed. While that is true, the prosecutor limited that comment to proving the existence of a conspiracy, of which there was ample evidence. By contrast, the prosecutor on numerous occasions argued that the testimony of various accomplices was adequately corroborated. Viewing the argument as a whole, a reasonable juror would have understood that accomplice testimony required corroboration.

Hardy contends we should discount the prosecutor's argument because at several points the prosecutor improperly urged the jury to find an accomplice's testimony was corroborated by the testimony of another accomplice. He is mistaken; the prosecutor was merely highlighting the fact that on several important points, the testimony of several accomplices was the same, underscoring his argument that—if proper corroboration was found—their

credibility was enhanced because it was consistent with other witnesses. Under these circumstances, we find any error was harmless.

### d. *CALJIC No. 6.11*

 The jury was instructed pursuant to CALJIC No. 6.11, which explains that a conspirator is vicariously liable for the unintended acts by coconspirators if such acts are in furtherance of the object of the conspiracy, or are the reasonable and natural consequence of the object of the conspiracy.[31] Reilly contends this instruction improperly extended his liability to acts by coconspirators of which he was unaware, as well as acts that he had not personally authorized. He identifies two such actions: Colette Mitchell's perjury at his preliminary examination, and defendant Hardy's instructions to Colette to have his brother, John Hardy, retrieve and dispose of the M-1 carbine rifle that Reilly gave him.

The challenged instruction correctly states the long-settled law of conspiracy. (*People* v. *Garewal* (1985) 173 Cal.App.3d 285, 299 [218 Cal.Rptr. 690]; see also 1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Elements of Crime, § 181, p. 202.) As we explained regarding the analogous situation of aiding and abetting liability in *People* v. *Croy* (1985) 41 Cal.3d 1 [221 Cal.Rptr. 592 [710 P.2d 392]: "a defendant whose liability is predicated on his status as an aider and abettor need not have intended to encourage or facilitate the particular offense ultimately committed by the perpetrator. His knowledge that an act which is criminal was intended, and his action taken with the intent that the act be encouraged or facilitated, are sufficient to impose liability on him for any reasonably foreseeable offense committed as a consequence by the perpetrator. It is the intent to encourage and bring about conduct that is criminal, *not the specific intent that is an element of the target offense*, which . . . must be found by the jury." (*Id.* at p. 12, fn. 5, italics added; see *People* v. *Luparello* (1986) 187 Cal.App.3d 410, 441 [231 Cal.Rptr. 832] [quoting *Croy* in a conspiracy case].)

Reilly cites two cases in support but neither case is persuasive. In *People* v. *Garewal, supra,* 173 Cal.App.3d 285, the trial court instructed the jury with CALJIC No. 6.11 but embellished the pattern instruction to permit

---

[31]CALJIC No. 6.11 provides: "Each member of a criminal conspiracy is liable for each act and bound by each declaration of every other member of the conspiracy if said act or said declaration is in furtherance of the object of the conspiracy. [¶] The act of one conspirator pursuant to or in furtherance of the common design of the conspiracy is the act of all conspirators. Every conspirator is legally responsible for an act of a conspirator that follows as one of the probable and natural consequences of the object of the conspiracy even though it was not intended as a part of the original plan and even though he was not present at the time of the commission of such act."

liability for a coconspirator's acts in furtherance of the conspiracy even if the act was "actually forbidden as part of the original agreement." (173 Cal.App.3d at p. 299, italics omitted.) The *Garewal* court held that this addition was an incorrect statement of the law and reversed, asking, "how can one anticipate as a 'probable and natural consequence[] of the object of the conspiracy' an act which was 'actually forbidden as part of the agreement'? Worse, [the addition to the instruction] extends a relatively mild form of vicarious liability, one which is at least limited by the reasonable contemplation of the defendant . . . , to acts which are specifically *not* contemplated, much less intended." (*Id.* at pp. 299-300.) Because the addition to the instruction in *Garewal* was not given in the present case, *Garewal* is inapposite.

Reilly also relies on *People* v. *Terry* (1970) 2 Cal.3d 362 [85 Cal.Rptr. 409 466 P.2d 961], but that case is similarly inapposite. In *Terry*, the defendant claimed the trial court erred by refusing to give a proposed instruction that provided a coconspirator is not responsible for an act "which is neither in furtherance of the object of the conspiracy . . . nor the natural and probable consequence of an attempt to attain that object . . . ." (*Id.* at p. 402, fn. 18.) We found the instruction correctly stated the law but affirmed the trial court's refusal to give it, reasoning there were insufficient facts to support the instruction. As is obvious, *Terry* does not aid Reilly's cause because he is complaining about acts by coconspirators of which he was allegedly unaware, although the acts *were clearly in furtherance of the conspiracy*. We conclude the trial court correctly instructed the jury regarding the vicarious liability of conspirators.

 Thus, so long as (1) Reilly intended his coconspirators act to achieve the object of the conspiracy, and (2) such acts were "the natural and probable consequences of any act of a co-conspirator to further the object of the conspiracy" (CALJIC No. 6.11), it is irrelevant that he was unaware of some particular act they committed in furtherance of the conspiracy. Because the object of the conspiracy, insurance fraud, had not been accomplished, it was probable that coconspirators would act to conceal the plot in order that the criminal goal could be achieved. We thus conclude the trial court correctly instructed the jury with CALJIC No. 6.11.

e. *CALJIC No. 2.11.5*

 The jury was instructed that, "There has been evidence in this case indicating that a person other than a defendant was or may have been involved in the crime for which the defendants are on trial. [¶] You must not discuss or give any consideration as to why the other person is not being

prosecuted in this trial or whether he has been or will be prosecuted." (CALJIC No. 2.11.5.) Defendants correctly argue that giving this instruction was error because it could have prevented the jury from considering the incentive the various coconspirators had to lie. (*People* v. *Carrera* (1989) 49 Cal.3d 291, 312-313 [261 Cal.Rptr. 348, 777 P.2d 121], and cases cited; Use Note to CALJIC No. 2.11.5 (4th ed. 1979 rev.) ["This instruction is not to be used if the other person is a witness for either the prosecution or the defense"].)

As in *Carrera, supra*, 49 Cal.3d 291, however, "The potential for such a misunderstanding . . . appears minimal." (*Id.* at p. 313.) The jury was instructed to consider the instructions as a whole and it was instructed to consider "[t]he existence or nonexistence of bias, interest, or other motive" when evaluating the credibility of a witness. (CALJIC No. 2.20.) The jury was also instructed to view accomplice testimony with distrust (CALJIC No. 3.18) and that such testimony must be corroborated. (CALJIC No. 3.11.)

Defendants point to a passage in the prosecutor's closing argument where he allegedly suggests the jury should not consider the possible bias or motive of the various witnesses.[32] The statement is confusing and contradictory but, read in context, the prosecutor was apparently trying to say that while the jury should consider "the involvement of these people" (i.e., their role in the conspiracy), it should not consider whether or not these coconspirators will themselves be later prosecuted. In any case, we cannot conclude this solitary, ambiguous statement, embedded within a lengthy closing argument, was sufficient to undermine the direct jury instructions cautioning the jury to consider the bias of the witnesses and to view accomplice testimony with distrust.

To the extent defendants claim CALJIC No. 2.11.5 prevented the jury's consideration of the fact that certain witnesses were granted immunity, we note the prosecutor himself mentioned that fact.

Moreover, defense counsel Lasting expressly invited the jury to consider the possibility of bias or motive when evaluating the credibility of witnesses. For example, at one point in closing argument, Lasting argued that in evaluating Marc Costello's testimony, "you have to keep in mind that he does have some bias and interest in this case, and that is avoiding his own prosecution." In describing Colette Mitchell's trustworthiness, Lasting also

---

[32]"And the court's going to give you an instruction with regard to whether you should or should not utilize your judgment against the police or the district attorney in seeing if they made a correct determination. What I'm saying is that the instruction said you are not to consider the involvement of the other 15 or 20 or 25 people. You are to consider the involvement of these people and what their responsibility is legally in this matter."

said, "She has made numerous conflicting statements. She wanted to get rid of police pressure. She wanted to protect herself." In short, although it was error to instruct the jury with CALJIC No. 2.11.5, we conclude the error was harmless.

### 20. *Additional Closing Argument*

During trial, Stone, defense counsel for Cliff Morgan, questioned witnesses in a manner suggesting Marc Costello was the killer. At closing argument, however, Stone argued that defendants were the killers. Defendants argued to the trial court that Stone acted as a second prosecutor and that they lacked notice he intended to accuse them. When their motion for a mistrial was denied, defendants requested the trial court correct certain misstatements Stone made in his closing argument. The request was apparently denied.

 Defendants now contend that they moved for additional closing argument to correct perceived factual errors Stone made in his closing argument, and that the trial court's denial of such motion violated their constitutional right to a fair trial. The record, however, fails to reveal either Lasting or Demby made such a motion. Indeed, the record suggests Lasting believed he had no such right. We thus reject the claim.

*Special Circumstance Issues*

### 21. *Lying-in-wait Special Circumstance*

Defendants assert the jury's decision sustaining the lying-in-wait special-circumstance allegation (§ 190.2, subd. (a)(15)) is flawed because of instructional error and because there were insufficient facts to support the finding. These claims are identical to those we have rejected *ante,* at pages 161-164. For the reasons there stated, we also reject the present arguments.

Defendants also claim the lying-in-wait special circumstance "fails to provide notice, guidance or any principled method to identify a class of murderers that are more deserving of death" in violation of the Eighth and Fourteenth Amendments to the federal Constitution. We addressed and rejected this precise issue in *People* v. *Morales, supra,* 48 Cal.3d at page 557, and defendants provide no persuasive reason to overturn that decision.

### 22. *Multiple-murder Special Circumstances*

#### a. *Excessive Special-circumstance Allegations*

 Defendants argue, and the People concede, that we should strike one of the two multiple-murder special-circumstance findings for each defendant as duplicative. We agree. (*Jennings, supra,* 53 Cal.3d at p. 388.)

b. *Intent to Kill*

 The jury was instructed that, "To find the special circumstance, referred to in these instructions as multiple murder convictions, is true, it must be proved: [¶] That the defendants in this case have been convicted of more than one offense of murder in the first or second degree." Reilly contends this instruction was flawed because it failed to require a finding that he intended to kill if he only aided in the murder. We agree the instruction improperly omitted the intent-to-kill element, but find the error harmless.

There was some evidence suggesting that Reilly accompanied Hardy to the Morgan home, helped him enter, but then stayed outside while Hardy committed the murders. When there is evidence from which a jury could base its verdict on the theory that a defendant was a mere aider and abettor to a murder, the trial court must instruct the jury that it must find the defendant, if not the actual killer, nevertheless intended to kill. (*People* v. *Garrison* (1989) 47 Cal.3d 746, 789 [254 Cal.Rptr. 257, 765 P.2d 419]; *People* v. *Anderson* (1987) 43 Cal.3d 1104, 1149-1150 [240 Cal.Rptr. 585, 742 P.2d 1306].) Failure to so instruct, however, does not require reversal if a reviewing court concludes, as we do here, that the error is harmless beyond a reasonable doubt. (*Garrison, supra,* at p. 789; see *Chapman* v. *California, supra,* 386 U.S. at p. 24 [17 L.Ed.2d at pp. 710-711].)

 The jury was instructed in this case that, "If defendant Morgan, Reilly or Hardy was not the actual killer, it must be proved beyond a reasonable doubt that he *intentionally aided* [and] abetted . . . the actual killer in the commission of the murder in the first degree." (Italics added.) The jury also sustained the financial-gain special circumstance (§ 190.2, subd. (a)(1)), a finding which expressly required the jury to find the killing was "intentional." Considered in combination, these instructions required the jury to find either that Reilly himself was the actual killer, or that he intentionally aided the actual killer in an intentional killing. The latter finding renders any error in this case harmless beyond a reasonable doubt.

*People* v. *Garrison, supra,* 47 Cal.3d 746, illustrates this point. In that case, the trial court committed an identical error, i.e., a failure to instruct the jury that a multiple-murder special-circumstance finding for an aider and abettor requires a showing of the intent to kill. The jury, however, sustained the witness-killing special circumstance (§ 190.2, subd. (a)(10)), finding the victim was intentionally killed because she was a witness to a crime. "In convicting the defendant as an accomplice to an intentional killing, the jury must necessarily have found that he committed the 'aiding' act and that he

did so with knowledge of the perpetrator's criminal purpose, i.e., to kill for the purpose of preventing the victim's testimony. Because of the manner in which defendant defended the case—denial that he in any way aided in the killing—there is no way for the jury to find that he 'aided' the killing only 'accidentally' or 'unintentionally.' " (47 Cal.3d at p. 790.) We thus concluded in *Garrison* that the failure to instruct on intent to kill was harmless. (*Id.* at pp. 790-791.)

We reach the same result here. If the jury found Reilly was one of two or more actual killers, the failure to instruct on intent to kill was not error. If the jury found he was an aider and abettor, however, it necessarily found he intentionally aided and abetted the actual killer, who was himself motivated by the intent to kill. Because Reilly claimed he withdrew from the conspiracy and thus was not present at the Morgan home when the victims were killed, "there is no way for the jury to find that he 'aided' the killing only 'accidentally' or 'unintentionally.' " (*Garrison, supra,* 47 Cal.3d at p. 790.) Under these circumstances, we may confidently conclude the jury necessarily found Reilly intended to kill. We thus reject his attack on the validity of the remaining multiple-murder special-circumstance finding.

*Penalty Phase Issues*

1. *Faretta*

After the jury returned its guilt phase verdicts, but seven days before the start of the penalty phase, Hardy moved to have his trial counsel, Demby, relieved and a new attorney appointed. When the trial court denied that motion, Hardy stated he wished to exercise his right of self-representation at the penalty phase. After some discussion, that motion was also denied. ▮▮▮▮ Hardy now contends the trial court's denial of his motion to represent himself at the penalty phase was erroneous and requires reversal.

▮▮▮▮ A criminal defendant has a federal constitutional right to represent himself without an attorney if he voluntarily and intelligently so chooses. (*Faretta* v. *California* (1975) 422 U.S. 806 [45 L.Ed.2d 562 [95 S.Ct. 2525] [hereafter *Faretta*]; *Moore, supra,* 47 Cal.3d at p. 79.) In *People* v. *Windham* (1977) 19 Cal.3d 121 [137 Cal.Rptr. 8, 560 P.2d 1187], this court held that, "in order to invoke the constitutionally mandated unconditional right of self-representation a defendant in a criminal trial should make an unequivocal assertion of that right within a reasonable time prior to the commencement of trial." (*Id.* at pp. 127-128.) "However, once a defendant has chosen to proceed to trial represented by counsel, demands by such defendant that he be permitted to discharge his attorney and assume the defense himself

shall be addressed to the sound discretion of the court." (*Id.* at p. 128; *People v. Bloom* (1989) 48 Cal.3d 1194, 1220 [259 Cal.Rptr. 669, 774 P.2d 698].) A motion for self-representation made during guilt phase deliberations in a capital trial is untimely. (*People v. Hamilton* (1988) 45 Cal.3d 351, 369 [247 Cal.Rptr. 31, 753 P.2d 1109].) It follows a fortiori that Hardy's motion, made *after* the guilt phase verdicts had been returned, was also untimely.

Hardy is "mindful" of our decision in *Hamilton* but argues that case was wrongly decided because it is inconsistent with *Bullington v. Missouri* (1981) 451 U.S. 430 [68 L.Ed.2d 270, 101 S.Ct. 1852] (*Bullington*). In *Bullington*, a criminal defendant faced a possible death sentence but the jury chose a life sentence as the appropriate penalty. When the trial judge granted the defendant's motion for a new trial, the prosecutor announced he intended to again seek the death penalty. The high court ruled the double jeopardy clause of the federal Constitution precluded the prosecutor from seeking the death penalty on retrial because the Missouri "presentence hearing," apparently similar to our penalty phase, "was itself a trial on the issue of punishment." (*Id.* at p. 438 [68 L.Ed.2d at p. 279].) Thus, the presentence hearing "was like the trial on the question of guilt or innocence [and] the protection afforded by the Double Jeopardy Clause to one acquitted by a jury also is available to [the defendant]." (*Id.* at p. 446 [68 L.Ed.2d at p. 284].)

That the penalty phase of a capital trial may be a "separate trial" for purposes of the double jeopardy clause, however, does not necessarily require that we conclude Hardy's post-guilt-phase *Faretta* motion was made, "within a reasonable time prior to the commencement of trial." (*Windham, supra,* 19 Cal.3d at pp. 127-128.) The high court in *Bullington* was swayed by the fact that, in the Missouri penalty phase, the jury was given a choice of only two verdicts (*Bullington, supra,* 451 U.S. at p. 438 [68 L.Ed.2d at pp. 278-279]), that the hearing was governed by the reasonable doubt standard (*id.* at p. 441 [68 L.Ed.2d at p. 280]), and that the jury's initial verdict of life was the functional equivalent of an "acquittal" for the defendant of the greater penalty (*id.* at pp. 441-446 [68 L.Ed.2d at pp. 280-283]). None of these considerations is particularly relevant to determining the timeliness of a *Faretta* motion.

By contrast, several reasons support our decision in *People v. Hamilton, supra,* 45 Cal.3d at page 369, that a *Faretta* motion is untimely if made in the middle of the guilt phase of the trial. "First, . . . the penalty phase has no separate formal existence but is merely a stage in a unitary capital trial. Second and more important, the connection between the phases of a capital trial is substantial and not merely formal." (*Hamilton, supra,* at p. 369.) For

example, the same jury that determines guilt must determine penalty (§ 190.4, subd. (c)), and the evidence presented at the guilt phase will be considered by the jury at the penalty phase. (§§ 190.3, factor (a), 190.4, subd. (d).) We conclude *Bullington* is not on point.[33]

Because Hardy's *Faretta* motion was untimely, whether to grant the motion was within the sound discretion of the trial court. (*Hamilton, supra,* 45 Cal.3d at p. 369; *Windham, supra,* 19 Cal.3d at p. 128.) Under such circumstances, the trial court should inquire into the defendant's reasons for the request. ▓▓▓ "Among other factors to be considered by the court in assessing such requests made after the commencement of trial are the quality of counsel's representation of the defendant, the defendant's prior proclivity to substitute counsel, the reasons for the request, the length and stage of the proceedings, and the disruption or delay which might reasonably be expected to follow the granting of such a motion." (*Windham, supra,* at p. 128, quoted with approval in *Hamilton, supra,* at pp. 368-369.)

▓▓▓ We apply these considerations here. First, we note the trial court expressed its opinion on the quality of Demby's advocacy, saying, "the court has observed Mr. Demby. Mr. Demby has been very forceful in your defense. He has made . . . the proper motions. He has been very forceful in bringing forth to the jury all aspects that could possibly be in your favor and in your defense. Obviously, he has conducted this defense in an adequate manner."

Hardy disputes the trial court's characterization of Demby's representation, saying Demby "presented no evidence whatsoever at either the guilt or penalty phases" of the trial. Although true, Hardy's defense was one of simple denial, and Demby's strategy was to undermine the credibility of the People's witnesses. In addition, although he failed to call Hardy's mother as a penalty phase witness, this is explainable by the fact that the prosecutor called her first, asking her to verify the details of defendant Hardy's prior confrontation with police. Hardy also claims Demby's cross-examination merely consisted of repeating the prosecutor's questions. In the absence of

---

[33]Hardy also cites *Grandison v. Maryland* (1986) 479 U.S. 873 [93 L.Ed.2d 174, 107 S.Ct. 38] (opinion by Marshall, J.) in support. In *Grandison,* Justice Marshall relies on *Bullington, supra,* 451 U.S. 430, to conclude a capital defendant's exercise of his *Faretta* rights at the guilt phase does not necessarily imply a waiver of counsel at the sentencing phase of trial. That "decision," however, was merely a dissent from the denial of certiorari, written by Justice Marshall and joined by Justice Brennan. A denial of certiorari is not a decision on the merits and thus has no precedential value. (*Teague v. Lane* (1989) 489 U.S. 288, 296 [103 L.Ed.2d 334, 109 S.Ct. 1060]; see also *Maryland v. Baltimore Radio Show* (1950) 338 U.S. 912 [94 L.Ed. 562, 70 S.Ct. 252] [opn. by Frankfurter, J.].) In addition, "opinions accompanying the denial of certiorari cannot have the same effect as decisions on the merits." (*Teague v. Lane, supra,* at p. 296 [103 L.Ed.2d at p. 346].) We thus find *Grandison v. Maryland, supra,* is not controlling and instead adhere to our decision in *Hamilton, supra.*

any direct exculpatory evidence, however, we assume Demby was attempting to probe for inconsistencies in the stories of the various witnesses. Given the number of coconspirators in this case, we cannot say this strategy was deficient. Under these circumstances, we defer to the trial court's clear statement that Demby "conducted this defense in an adequate manner."

Second, the court commented on "the stage of the proceedings," noting they were about to begin the phase of the trial to determine whether to impose the death penalty on defendant. Hardy disagrees this was an important consideration, correctly contending a *Faretta* motion cannot be denied because of the seriousness of the charge. (See *People v. Joseph* (1983) 34 Cal.3d 936, 944-945 [196 Cal.Rptr. 339, 671 P.2d 843] [involving a timely *Faretta* motion].) Although the record suggests the trial court was concerned about the possibility that Hardy would receive the death penalty,[34] the court was also concerned that Hardy was making his *Faretta* motion very late in the trial and that his attorney had already been given time to prepare for the penalty phase. We interpret the trial court's comments as meaning the trial had progressed too far to make a change, with all the delay such a change would engender. Such a decision was well within the trial court's broad discretion in ruling on a motion for self-representation which is not raised in timely fashion.

This interpretation is supported by the court's references to the numerous times Hardy attempted to delay trial, twice filing lawsuits in federal court

---

[34]The record is not entirely clear on this point. When the trial court denied Hardy's motion to relieve Demby, he asked to represent himself. The following colloquy occurred:

"The Court: Very quickly, Mr. Hardy, you understand that what we are going into is a penalty phase where you face either life imprisonment without the possibility of parole or the death penalty? You understand that, sir?

"Defendant Hardy: Yes.

"The Court: And obviously at this stage of the proceedings you have been advised of your [*Faretta*] rights. Do you understand what your [*Faretta*] rights are?

"Defendant Hardy: Yes.

"The Court: You have gone through that many times; is that correct?

"Defendant Hardy: Yes.

"The Court: Obviously, at many stages of the proceedings. [¶] We have got a situation here which obviously you must appreciate. It is a very serious situation. I feel that if you did represent yourself—there is a strong possibility that you might face the death penalty. I think because of that and your lack, obviously, of technical knowledge as to how to argue to the jury, what to present to the jury, you would be placing yourself in such a dangerous position that it would not really be fair to you to act in your own behalf. You obviously have got to appreciate the situation. [¶] All right. That motion is denied.

"Defendant Hardy: I ask the court to stay the proceedings until I can appeal the issue of self-representation.

"The Court: No. Denied. No stay. The matter is set. We have given the attorneys an opportunity to prepare adequately for your defense at the penalty phase. I don't think a stay would enable you to prepare adequately."

naming Demby as a defendant, and several times asking that Demby be relieved. Indeed, in one instance, the trial court went so far as to appoint separate counsel for Hardy to make a motion to dismiss on speedy trial grounds.

Hardy relies on *Silagy* v. *Peters* (7th Cir. 1990) 905 F.2d 986, an out-of-state case in which the trial court granted a capital defendant's post-guilt-phase *Faretta* motion. That a trial court retains the discretion to grant such motion, however, does not undermine our conclusion in this case that, considering the totality of circumstances, the trial court did not abuse its discretion by denying Hardy's untimely *Faretta* motion.

### 2. *Morgan's Absence From the Penalty Phase*

Prior to holding the penalty phase, the trial court was informed that Cliff Morgan was too ill to continue. It ruled that the penalty phase would proceed without Morgan and if he did not regain his health before the end of the penalty trial for Hardy and Reilly, the jury would be allowed to return its verdict as to them and would then be dismissed as to Morgan. Neither defendant objected. At the beginning of the penalty phase, the trial court instructed the jury that Morgan would not attend due to medical reasons and that it should not permit his absence to affect their deliberations in any way.

Defendants contend they were denied their constitutional right to a fair and reliable penalty determination because Cliff Morgan was absent from the penalty phase of the trial. They speculate that the jury would naturally be upset that it could not punish Morgan, the alleged mastermind of the conspiracy. As a consequence, they claim, the jury would be likely to impose more severe punishment on them.

We reject the argument at the threshold because the record reveals no objection or motion for a mistrial based on this ground. Accordingly, the issue was not preserved for appellate review. Assuming the issue was preserved, however, we find defendants' speculation unfounded; the jury was instructed not to consider Morgan's absence in their penalty determination and we assume the jury followed that instruction. (*People* v. *Bonin* (1988) 46 Cal.3d 659, 699 [250 Cal.Rptr. 687, 758 P.2d 1217].) In addition, the prosecutor echoed that thought in his closing argument. We thus reject defendants' argument as pure speculation.

We likewise reject defendants' related claim that Morgan's absence at the penalty phase, coupled with the prosecutor's closing argument, violated their constitutional right under the Eighth Amendment to an individualized penalty determination. Although they rely on the prosecutor's comments during

closing argument describing the involvement in the crime of all three defendants, the prosecutor never asked the jury to impose a harsher penalty on Hardy or Reilly because of Morgan's actions. Instead, the prosecutor merely described the circumstances of the crime (§ 190.3, factor (a)), a crime that included the participation of Morgan.

### 3. *Lasting's Absence From Some Proceedings*

 Reilly contends reversal is required because his trial counsel, Lasting, did not attend four penalty phase proceedings. Reilly alleges these absences left him with no "viable representation" at these proceedings in violation of his right to counsel under the Sixth Amendment to the federal Constitution. Because the four proceedings Lasting missed were of no consequence to Reilly's defense, we find no violation of his right to counsel.

The first three proceedings of which Reilly complains were actually one hearing, occurring on September 19, 1983. At that hearing, attorneys for Morgan (Stone) and Hardy (Demby), the prosecutor, and the trial court discussed whether Cliff Morgan should be severed from the penalty phase due to his medical condition. The parties neither presented evidence nor argued the point; the hearing was apparently merely an informational meeting. Although Stone and Demby both reserved the right to make a motion for a new trial, Lasting's absence did not prevent him from moving for a new trial. The record shows he eventually made a lengthy new trial motion, although he did not rely on Morgan's illness as a ground for a new trial.

Later in this same hearing, the parties engaged in what Reilly terms "argument on the notice in aggravation." Lasting's absence from the hearing, however, was inconsequential. The disputed notice concerned *Hardy*'s prior confrontation with police when he possessed the nunchakus. This notice, even if defective, could not have affected Reilly's penalty phase trial.

Reilly also complains Lasting was absent from a September 19th discussion of penalty phase instructions. The "discussion," however, consisted of the trial court informing the parties that it would not instruct the jury about the Governor's commutation power. (See *People* v. *Ramos* (1984) 37 Cal.3d 136 [207 Cal.Rptr. 800, 689 P.2d 430] [*Ramos II*]; *People* v. *Ramos* (1982) 30 Cal.3d 553 [180 Cal.Rptr. 266, 639 P.2d 908] [*Ramos I*].) Lasting's absence did not affect Reilly's defense, however, because it is unreasonable to assume Lasting would have argued in favor of giving the *Ramos* instruction.

Finally, Reilly argues Lasting was absent from a hearing, held at a Los Angeles hospital, at which the trial court took evidence in support of Stone's

mistrial motion. It is unclear how Lasting's presence at this hearing would have affected Reilly's defense inasmuch as the hearing was on Stone's motion, and the grounds of the motion—Morgan's deteriorating physical condition—were unrelated to Reilly's defense.

In sum, we find Lasting's absence at these foregoing hearings did not deprive Reilly of his Sixth Amendment right to counsel.

### 4. *Failure to Strike the Allegedly Improper Special-circumstance Findings*

Reilly argues the trial court erred by failing at the penalty phase to strike, sua sponte, the lying-in-wait special-circumstance findings due to instructional error and insufficiency of evidence supporting the finding. In addition, he claims the court should likewise have stricken the multiple-murder special-circumstance findings because the jury was not instructed to find the intent to kill. As discussed, *ante* at pages 191-193, we reject these claims with the sole exception that each defendant could be convicted of only one multiple-murder special circumstance. We find, however, that there is no reasonable possibility that the jury's consideration of this "extra" special circumstance affected the penalty verdict. (*Jennings, supra,* 53 Cal.3d at pp. 390-391.)

### 5. *Admission of Photographs*

 Defendants argue they were denied a fair penalty trial by the admission of three photographs of the victims as they were discovered by the police. One photograph showed the victims clutching each other. All three pictures graphically portrayed the bloody crime scene. Defendants claim the admission of these photographs served to inflame the passions of the jury against them and diminished the reliability of the penalty phase.

The decision whether to admit photographs is within the sound discretion of the trial court and its ruling will not be disturbed, " 'unless the probative value of the photographs is clearly outweighed by their prejudicial effect.' " (*Wharton, supra,* 53 Cal.3d at p. 591, quoting *Carrera, supra,* 49 Cal.3d at p. 329.) We have examined the photographs and conclude that although they are indeed gruesome, they are not so horrific or shocking that we can conclude the trial court abused its discretion in admitting them. The jury was, after all, very familiar with the facts of the crime.

We thus conclude there was no error. In light of this conclusion, we also find the admission of the photographs did not violate defendant's right to a

reliable penalty determination under the Eighth Amendment to the federal Constitution.

Moreover, even were we to conclude the trial court abused its discretion, we cannot say it was reasonably possible the admission of the photographs altered the result of the penalty phase. (*People* v. *Brown* (1988) 46 Cal.3d 432, 447-448 [250 Cal.Rptr. 604, 758 P.2d 1135] [reasonable possibility test for state-law error in the penalty phase].) The prosecutor strongly emphasized to the jurors that he did not want them to view the pictures in order that they might become "enrage[d]" or "inflame[d]." Instead, he opined that they should look at the pictures because they "show[] the brute force and violence not only of the act but of the willingness of [defendants] to perform that act." The prosecutor thus disavowed before the jury any intention that they should be emotionally swayed by the photographs, but should instead take them to show more fully the circumstances of the crime. (See § 190.3, factor (a).)

Because any error in admitting the photographs was harmless, we need not address the argument, also raised by defendants, that the prosecution failed to provide adequate notice that it intended to introduce the photographs.

6. *Victim Impact Evidence*

 Defendants contend their rights under the state and federal Constitutions were violated by the admission of irrelevant evidence revealing the good character of the victims. (We note the evidence complained of was admitted at the guilt phase of the trial, not at the penalty phase. The prosecutor, however, urged the jury to consider this evidence at the penalty phase.) We reject the notion that the Eighth Amendment prohibits the admission of such evidence. (*Payne* v. *Tennessee* (1991) __ U.S. __ [115 L.Ed.2d 720, 111 S.Ct. 2597] (*Payne*).) "[A] State may properly conclude that for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant." (*Id.* at p. __ [115 L.Ed.2d at p. 735].)

 Defendants contend *Payne, supra,* __ U.S. __, is inapplicable for two reasons. First, they claim the trial court breached its duty to limit "irrelevant information or inflammatory rhetoric that diverts the jury's attention from its proper role or invites an irrational, purely subjective response." (*People* v. *Haskett* (1982) 30 Cal.3d 841, 864 [180 Cal.Rptr. 640, 640 P.2d 776].) Much of the evidence identified by defendants, however, was relevant at the guilt phase to prove the circumstances of the conspiracy and murder.

To the extent the jury heard other, irrelevant evidence at the guilt phase, such as the fact that Nancy Morgan was raising her cat's kittens at the time she was murdered, we conclude the misstep was harmless. Moreover, we find no prosecutorial argument that could be characterized as "inflammatory rhetoric," nor did either defendant object to any part of the argument now identified as improper.

Second, defendants claim reliance on nonstatutory aggravating evidence was error under state law and takes this case outside of the rule in *Payne*. (*People* v. *Boyd* (1985) 38 Cal.3d 762 [215 Cal.Rptr. 1, 700 P.2d 782].) As stated above, most of the evidence now challenged was admissible under section 190.3, factor (a), which permits consideration of the circumstances of the crime. Admission of the balance of the evidence was harmless. Accordingly, we find the decision in *Payne, supra*, ___ U.S. ___, fully applicable.

### 7. *Alleged Brown Error*

 Both Hardy and Reilly contend the penalty phase instructions misled the jury into believing it was legally obligated to return a death sentence. Specifically, the jury was informed of the statutory aggravating and mitigating factors and then instructed: "If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you *shall* impose a sentence of death." (Italics added.) The language of this instruction essentially tracks the wording of section 190.3.

 We have addressed this issue often in recent cases. Thus, in *People* v. *Sanders, supra*, 51 Cal.3d 471, we explained: "In *People* v. *Brown* [(1985)] 40 Cal.3d 512 [220 Cal.Rptr. 637, 709 P.2d 440], reversed on another issue *sub nomine California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837], we concluded use of the word 'outweigh' in the statute 'connotes a mental balancing process, but certainly not one which calls for a mere mechanical counting of factors on each side of the imaginary "scale," or the arbitrary assignment of "weights" to any of them. Each juror is free to assign whatever moral or sympathetic value he deems appropriate to each and all the various factors he is permitted to consider, including [section 190.3,] factor "k" as we have interpreted it [in *People* v. *Easley* (1983) 34 Cal.3d 858 (196 Cal.Rptr. 309, 671 P.2d 813)]. By directing that the jury "shall" impose the death penalty if it finds that aggravating factors "outweigh" mitigating, the statute should not be understood to require any juror to vote for the death penalty unless, upon completion of the "weighing" process, he decides that death is the appropriate penalty under all the circumstances.' (*People* v. *Brown, supra*, at p. 541 [fns. omitted]; [citations].)

"Whether the unadorned 'shall' instruction requires reversal depends on the facts of each individual case. Every case 'must be examined on its own merits to determine whether, in context, the sentencer may have been misled to defendant's prejudice about the scope of its sentencing discretion under the 1978 law.' (*People* v. *Brown, supra,* 40 Cal.3d at p. 544, fn. 17; [citation].) Our inquiry on appeal requires us to consider whether the jury instructions, read in conjunction with the prosecutor's arguments, adequately informed the jury of 'its weighing and decision-making responsibility.' (*People* v. *Williams* (1988) 44 Cal.3d 1127, 1148 [245 Cal.Rptr. 635, 751 P.2d 901]; [citation].)" (*Sanders, supra,* 51 Cal.3d at pp. 521-522.)

■ We begin by scrutinizing the jury instructions. It is significant in this case that the trial court did not limit itself to the standard jury instructions. In addition to those instructions, the court told the jury that (1) it could consider mercy and sympathy at the penalty phase, (2) it should not simply count the number of applicable aggravating and mitigating factors, (3) "[t]he final test is in the relative weight of the circumstances not the relative number," (4) the number of mitigating circumstances was unlimited, and (5) any single mitigating circumstance "may be sufficient to support a decision that life without the possibility of parole is the appropriate punishment." Thus, the instructions considered as a whole were not misleading. (See *People* v. *Beardslee, supra,* 53 Cal.3d at p. 114; *People* v. *Melton* (1988) 44 Cal.3d 713, 761 [244 Cal.Rptr. 867, 750 P.2d 741].)

■ Defendants emphasize the prosecutor's closing arguments, noting that at one point he referred to a chart and remarked: "Once you cross the line, you are obligated as members of this society and as member of this jury of 12 to, if you conclude as I do that the state of evidence so shows, *that you are bound and obligated by law* and by the commitment that you made when you first took an oath as a juror, to return a verdict of death." (Italics added.) Just after this comment, however, the prosecutor urged the jury to, "weigh all the things carefully," noting that it had an opportunity "to be merciful." On this record, we cannot conclude a reasonable jury would have been led astray by the sole passage quoted above, especially in view of the additional jury instructions that clearly described the scope of the jury's discretion.

For similar reasons, we reject Hardy's additional (and apparently separate) claim that the jury instructions prevented the jury "from giving independent mitigating weight to all relevant mitigating evidence" in violation of his rights under the Eighth and Fourteenth Amendments to the federal Constitution. Finally, because we find the jury was not misled by the instructions and argument in this case, we decline the People's invitation to reconsider *People* v. *Brown* (1985) 40 Cal.3d 512 [220 Cal.Rptr. 637, 709 P.2d 440], in

light of *Boyde* v. *California, supra,* 494 U.S. 370. (See *Beardslee, supra,* 53 Cal.3d at p. 114.)

8. *Other Alleged Instructional Errors*

a. *Sympathy Instruction*

 Prior to closing arguments at the penalty phase, the jury was given the following instruction: "At the first phase of this trial, I instructed you that you were not to be swayed by sympathy. However, in this part of the trial the law permits you to be influenced by mercy, sentiment, and sympathy—but not prejudice or public opinion—in arriving at the proper penalty in this case." Defendants contend this instruction was erroneous because it permitted the jury to consider sympathy *for the victims* in determining the appropriate penalty. (See *People* v. *Easley, supra,* 34 Cal.3d 858, 886 [conc. opn. of Mosk, J.]; *People* v. *Lanphear* (1984) 36 Cal.3d 163, 170 [203 Cal.Rptr. 122, 680 P.2d 1081] [dis. opn. of Mosk, J.].)

We find no error because defendants' interpretation of the instruction is flawed. "A reasonable juror would have understood the language in question to allow consideration of sympathy *for defendant.*" (*People* v. *Mickey* (1991) 54 Cal.3d 612, 695 [286 Cal.Rptr. 801, 818 P.2d 84] [italics in original].) We thus perceive no error under either state or federal law.

b. *Failure to Delete Assertedly Inapplicable Factors*

 Defendants argue the trial court erred by failing to delete from the penalty phase instructions assertedly inapplicable factors. We reject the claim: "it is well settled that the trial court has no duty to delete assertedly inapplicable mitigating factors." (*People* v. *Lewis* (1990) 50 Cal.3d 262, 280 [266 Cal.Rptr. 834, 786 P.2d 892].)

Hardy suggests the prosecutor committed *Davenport* error (*People* v. *Davenport* (1985) 41 Cal.3d 247, 288-290 [221 Cal.Rptr. 794, 710 P.2d 861]), because he "clearly suggest[ed] to the jury that they should find this crime to be an aggravated one because none of these four types of inapplicable mitigation existed here." The record, however, does not disclose that the prosecutor engaged in such argument.

c. *Failure to Clarify Factor (b)*

In determining the appropriate penalty, the jury was instructed to "consider . . . (b) The presence or absence of criminal activity by each defendant

which involved the use or attempted use of force or violence or the expressed or implied threat to use force or violence." (See § 190.3, factor (b) [hereafter factor (b)].) Defendants claim several instructional errors related to this provision.

### (i) Alleged Robertson Error

■ Defendants first claim they are entitled to a new penalty phase hearing because the trial court failed to instruct the jury that it should not consider evidence of other crimes unless it found defendants were guilty of those crimes beyond a reasonable doubt. (*People v. Caro* (1988) 46 Cal.3d 1035, 1057 [251 Cal.Rptr. 757, 761 P.2d 680]; *People v. Robertson* (1982) 33 Cal.3d 21, 53 [188 Cal.Rptr. 77, 655 P.2d 279] [plur. opn.], 60 [conc. opn. of Broussard, J.].) In particular, they point to evidence of 10 alleged other crimes that the jury could have erroneously concluded were aggravating factors.[35]

Many of these alleged "other crimes," however, were so trivial or irrelevant to a determination of an appropriate penalty that the jury's consideration of them was harmless even if we assume the trial court should have delivered a *Robertson* instruction. (*People v. Brown, supra,* 46 Cal.3d at pp. 446-449.) For example, Debbie Sportsman's refusal to speak to Reilly's investigator or Cliff Morgan's attempt to bribe a witness could not have had even a marginal effect on the jury's penalty deliberation.

Other evidence, such as Reilly's alleged threat to Debbie Sportsman, her parents, and others, was slightly more substantial. We nevertheless find no error because the alleged other crimes were either part of the conspiracy (such as the destruction of evidence) or inextricably intertwined with the crimes of which defendants were convicted. Significantly, the prosecutor mentioned the threats in connection with his summary of the circumstances of the *present* crime, i.e., under section 190.3, factor (a).[36] He did not explicitly invite the jury to consider the threats as evidence of a separate

---

[35]Defendants identify 10 instances of other crimes: (1) the threat to kill Debbie Sportsman to prevent her from testifying; (2) possible "witness tampering involving Joe Dempsey, Mike Mitchell, and John Hardy"; (3) defendant Hardy's attempt to dispose of a gun; (4) an alleged threat to Sportsman's parents; (5) Cliff Morgan's alleged attempt to bribe a witness; (6) Morgan's alleged plan to throw blame on Reilly; (7) "Hardy's alleged improper communication with Ron Leahy and Colette Mitchell"; (8) Debbie Sportsman's refusal to talk to Reilly's investigator; (9) Hardy's efforts to dispose of some boots; and (10) Mike Mitchell's sale of his car.

[36]After noting the special circumstances, the prosecutor stated: "The conduct of the defendants after. Was there remorse or sorrow? Was there a repentant attitude? Was there an attempt after to resort to further violence to cover up the previous wrongful act? [¶] And I submit to you that falls directly in the lap of Mr. Reilly, after careful consideration that there

aggravating factor under factor (b).[37] To the extent a *Robertson* instruction was required, its omission was harmless. (*Brown, supra,* 46 Cal.3d at pp. 446-449.)

### (ii) *Overlap between Factors (a) and (b)*

Defendants argue the trial court erred by failing to instruct the jury that factor (b) referred to crimes of violence other than those of which the defendants were convicted in the guilt phase. (*Melton, supra,* 44 Cal.3d at p. 763.) "However, we think any ambiguity in the language of the statute or current instructions will rarely have caused prejudice. Absent improper argument, jurors are unlikely to give the circumstances of the current crime greater weight in the penalty determination simply because they appear to be included in two separate categories of statutory 'aggravation.' " (*Ibid.; People* v. *Miller* (1990) 50 Cal.3d 954, 1009 [269 Cal.Rptr. 492, 790 P.2d 1289].)

Defendants do not direct our attention to any improper argument in this regard and we have found none. They claim, however, that three photographs of the victims were admitted at the penalty phase based on their relevance to factor (b). The record shows the prosecutor sought the admission of the pictures to enable the jury to better understand the force and violence that was necessary to kill the victims. It is clear, however, that the photographs were admitted under section 190.3, factor (*a*), i.e., "The circumstances of the crime of which the defendant was convicted in the present proceeding." Under the circumstances, we find there is no reasonable possibility that the failure to clarify the scope of factor (b) could have affected the outcome of the trial. (*Brown, supra,* 46 Cal.3d at pp. 447-448.)

### (iii) *Specifying Evidence*

Defendants next contend the prosecutor and the trial court should have specified what evidence could be considered by the jury under factor (b). We faced an analogous situation in *People* v. *Phillips* (1985) 41 Cal.3d 29 [222 Cal.Rptr. 127, 711 P.2d 423], where the defendant claimed the trial

---

was an attempt after to resort to this, or at least to feel it out to see if it would work, based upon the difficulty that he found himself in, which included the solicitation of at least threats or the possible murder of Debbie Sportsman. [¶] Debbie testified to the threat of harm to the parents, and if I recall the quote accurately, 'Your parents should be afraid of me.' "

[37]Defendants claim the prosecutor—at another point in his argument—encouraged the jury to view the threats as evidence under factor (b). We have reviewed those comments and find the prosecutor's meaning was very ambiguous. It seems unlikely the jury would have drawn an impermissible inference from such a vague argument. In light of the fact that the jury was instructed not to merely count the aggravating factors, we conclude that even if this argument was improper, there was no prejudice.

court should have instructed sua sponte on the elements of the other crimes. We rejected that notion, explaining that "a defendant for tactical considerations may not want the penalty phase instructions overloaded with a series of lengthy instructions on the elements of alleged other crimes, perhaps because he fears that such instructions could result in the jury placing undue significance on such other crimes rather than on the central question of whether he should live or die." (*Id.* at pp. 72-73, fn. 25.) The same reasoning applies here: because detailed instructions delimiting the evidence the jury could consider concerning other crimes could be detrimental to defendants, a trial court is under no sua sponte duty to so instruct.

Defendants also argue that by failing to identify which of their actions constituted "other crimes" that the jury could properly consider, the trial court encouraged the jury to consider nonstatutory aggravating evidence in the form of prior bad acts that did not involve violence or the threat of violence. (See *Boyd, supra,* 38 Cal.3d at pp. 775-776.) Inasmuch as the jury instruction explicitly required consideration of evidence only if it involved violence or the threat of violence, we reject the claim.

We also reject the notion that factor (b) created a liberty interest—complete with due process protections—that was violated by the trial court's failure to more fully instruct on the scope of factor (b). We thus find unavailing defendants' attempted analogy to *Hewitt* v. *Helms* (1983) 459 U.S. 460 [74 L.Ed.2d 675, 103 S.Ct. 864].

(iv) *Prior Felony Convictions*

 Defendants complain the instructions failed to inform the jury that it could not consider the present crimes under section 190.3, factor (c) (prior felony convictions). Any instructional error in this regard was harmless: the prosecutor clearly informed the jury that neither defendant had a prior felony conviction and that this fact was mitigating. We thus have no occasion to determine whether the alleged instructional error violated defendants' rights under the Fifth, Eighth, and Fourteenth Amendments of the federal Constitution.

(v) *Elements of Other Crimes*

 Defendants argue the trial court should have instructed, sua sponte, on the elements of the alleged other crimes falling within factor (b). Although defendants concede such is not the law (*Miranda, supra,* 44 Cal.3d at p. 99), they characterize *Miranda* (and other precedents) as outlining the limits of *state* law. Thus, they contend failure to instruct on the elements of

other crimes violates their rights under the federal Constitution to due process, equal protection, a jury trial, and a reliable penalty determination. (U.S. Const., Amends. V, VI, VIII, XIV.)

As we previously explained, a criminal defendant may have tactical reasons to forgo lengthy instructions on the elements of alleged other crimes. (*Phillips, supra,* 41 Cal.3d at pp. 72-73, fn. 25.) We fail to see how forcing a capital defendant to forgo this tactical option vindicates his federal constitutional rights. As we made clear in *Phillips, supra,* if a defendant requests an instruction explaining the elements of the other crimes at issue, he is entitled to have the jury so instructed. (*Ibid.*)

### (vi) *Jury Unanimity of Other Crimes*

Defendants also complain the trial court erred by failing to instruct, sua sponte, that the jury must unanimously conclude defendants were guilty of the other crimes before considering those crimes. We reject the claim under both state (*Sully, supra,* 53 Cal.3d at pp. 1246-1247) and federal constitutional law (*People v. Benson* (1990) 52 Cal.3d 754, 810-811 [276 Cal.Rptr. 827, 802 P.2d 330]).

### d. *Background Evidence as Mitigating Only*

Reilly complains that the trial court should have instructed the jury that evidence of his background could be considered as mitigating evidence only. The court's failure to do so prejudiced him, he claims, because there was much evidence presented at the guilt phase that he was frequently unemployed, often abused alcohol and illegal drugs, and in general led a dissolute and aimless life. We find no prejudicial error.

Reilly correctly asserts that evidence of his background can be only a mitigating factor because the permissible aggravating factors are limited to those listed in section 190.3. (*Keenan, supra,* 46 Cal.3d at p. 518; *Boyd, supra,* 38 Cal.3d at pp. 775-776.) Even if we assume the court erred, however, we see no reasonable possibility that the jury improperly considered evidence of Reilly's life-style as an aggravating circumstance. Significantly, the jury was instructed that the enumerated mitigating circumstances were merely examples and that, "you should not limit your consideration of mitigating circumstances to these specific factors. *You may also consider any other circumstances relating to the case or to defendant Reilly . . . as reasons for not imposing the death sentence.*" (Italics added.) No comparable instruction regarding aggravating factors was given. Similarly, no instruction authorized consideration of evidence of Reilly's life-style as an aggravating

factor. Finally, the prosecutor in his closing argument did not urge the jury to find the case was aggravated by Reilly's unemployment, drug use, or aimless life-style. There was thus no prejudice.

### e. *Ramos*

Consistent with our decision in *Ramos I, supra,* 30 Cal.3d 553, the parties agreed the jury would not be instructed on the Governor's commutation power and the oral instructions conformed to this agreement. (See also, *Ramos II, supra,* 37 Cal.3d 136.) On the written copies of the instructions provided to the jury, the offending paragraph was blacked out. Defendants contend they are entitled to reversal because the passage describing the Governor's commutation power was not totally obliterated and was, they allege, readable.

The record fails to bear out defendants' claim that the critical passage was legible. That being the case, we assume the jury followed the oral instructions and those written instructions that were clearly readable. (See *Bonin, supra,* 46 Cal.3d 699 [jury presumed to follow instructions].)

### 9. *Lack of Remorse*

▮▮ Hardy complains the prosecutor committed misconduct when, in closing argument, he referred to Hardy's lack of remorse for his crimes. In particular, Hardy contends (1) such comment was impermissible because it was unreasonable to expect him to express remorse when he claimed at trial that he was innocent, (2) comment on his failure to express remorse was *Griffin* error (*supra,* 380 U.S. 609), (3) the trial court should have instructed the jury, sua sponte, not to draw any adverse inferences from Hardy's failure to testify at the penalty phase of the trial, (4) the prosecutor, by urging the jury to return a death verdict based on Hardy's failure to show remorse, improperly relied on a nonstatutory aggravating factor, and (5) the prosecutor's reliance on Hardy's lack of remorse, raised for the first time in closing argument, violated his due process right to notice of the aggravating evidence. In his reply brief, Hardy raises a sixth ground: the prosecutor's statements in closing argument improperly equated the absence of a mitigating factor as an aggravating circumstance. (*Davenport, supra,* 41 Cal.3d at pp. 288-290.) Hardy relies generally on the Fifth, Eighth, and Fourteenth Amendments to the federal Constitution.

▮▮ We first note that Hardy failed to object at trial to the prosecutor's statements. Because a timely objection and admonition could have cured any harm flowing from the challenged statements, we conclude Hardy waived

this issue for appeal. (*People* v. *Bell* (1989) 49 Cal.3d 502, 548 [262 Cal.Rptr. 1, 778 P.2d 129].) Hardy claims, however, that counsel's failure to object constituted ineffective assistance of counsel and thereby denied him his rights under the state and federal Constitutions.

Rather than confront the ineffective assistance of counsel contention, we consider Hardy's remorse claims on the merits and conclude they are baseless. The prosecutor never made the argument condemned in *People* v. *Coleman* (1969) 71 Cal.2d 1159 [80 Cal.Rptr. 920, 459 P.2d 248], that the "defendant's failure to confess his guilt after he . . . [was] found guilty demonstrate[d] his lack of remorse." (*Id.* at p. 1168.) Instead, the prosecutor simply noted that Reilly had expressed remorse after the crimes but that Hardy had not. (See *Keenan, supra,* 46 Cal.3d at p. 509.)[38] Similarly, the prosecutor never suggested that the jury should consider the fact that Hardy did not testify at the penalty phase. The comment that, "Not once do you ever have *that type* of response from Mr. Hardy" (italics added) refers to the immediately preceding comment concerning Reilly's remorseful comments to Debbie Sportsman. Thus, the comment can be reasonably construed as comment on the fact that Hardy never expressed *to his friends* his sorrow for the crimes, and not that he failed to express such remorse *at trial*. We cannot say counsel was deficient in failing to object at that point.

Although the trial court failed to reinstruct the jury not to draw any adverse inference from Hardy's silence at the penalty phase, it had no duty to do so. (*Morales, supra,* 48 Cal.3d at p. 570.) Inasmuch as the prosecutor never invited the jury to draw an impermissible inference from Hardy's silence, there is no occasion to reconsider this rule.

Although lack of remorse is not a statutory aggravating factor, a prosecutor may direct the jury's attention to evidence which reveals a defendant's

---

[38]"The one thing that can be said for Mr. Reilly is that at one point in time a few days after that crime there was some sense of at least shedding, getting it off, with a repentant attitude, perhaps a wish in his mind that it hadn't have happened; that it was terrible; it was a horrible occurrence, something that he couldn't cope with and had to get rid of it some way. 'You don't know what it's like to stab somebody,' the attempt to get some type of solace or comfort from somebody else, which is a natural human response.

"Not once do you ever have that type of response from Mr. Hardy. And, ladies and gentlemen, I submit to you that, that is extremely frightening because it shows two things, one a total lack of care from himself as a human being, a lack of care for himself as an entity, and if you don't care for yourself, it's very difficult to care from someone else. And secondly, that shows a total lack of respect for the human as an individual. And he can go jump off a cliff. He can go stab a young boy. He can stab the mother. He can make love to Colette. And it's all the same. It's all the same. There is no conscience, no remorse. 'It's what I want to do. It's what my attitude tells me to do,' or 'I'm mad about this. This is what I'm going to do. This is what I'm going to take. I'm doing it.'

"And I submit to you, ladies and gentlemen, that our law provides for that type of attitude."

lack of remorse. (*Williams, supra*, 44 Cal.3d at pp. 966-967.) In any case, there was no prejudice. "[R]emorse is universally deemed a factor relevant to penalty. The jury, applying its common sense and life experience, is likely to consider that issue in the exercise of its broad constitutional sentencing discretion no matter what it is told." (*Keenan, supra*, 46 Cal.3d at p. 510.)

Hardy also claims the prosecutor's argument regarding remorse was akin to presenting new penalty phase evidence without giving him notice and an opportunity to rebut the evidence. The prosecutor's argument regarding remorse, however, was simply fair comment on the evidence already presented. We thus reject Hardy's claim that the argument violated his right to notice of the aggravating evidence.

Finally, we perceive no *Davenport* error. (*Davenport, supra*, 41 Cal.3d at pp. 288-290.) Instead, the prosecutor merely noted the absence of remorse, and did not suggest such absence was an aggravating factor. (*Carrera, supra*, 49 Cal.3d at p. 339.) Finding nothing impermissible in the prosecutor's closing argument, we conclude Hardy's trial counsel was not deficient by failing to object to the prosecutor's statements regarding remorse.

10. *Other Alleged Prosecutorial Misconduct*

Both defendants contend several of the prosecutor's comments in his closing argument constituted prejudicial misconduct. Because neither defendant objected or requested an admonition to any of the alleged instances of misconduct, they waived the issue for appeal. (*Sully, supra*, 53 Cal.3d at p. 1247.)

 Even had the issue not been waived, the claims of misconduct are baseless. Defendants first complain of the prosecutor's statement that the district attorney had the obligation to present mitigating evidence. Defendants argue this statement was a misstatement of law and impliedly informed the jury that defendants had no mitigating evidence. Because defendants both presented mitigating evidence and emphasized it in closing argument, however, the prosecutor's implication—even if true—was of little consequence. (We also note that the prosecutor argued that there were several factors shown by the evidence that mitigated Reilly's case, including his expressions of remorse, the lack of any evidence of violence in his past, his lack of prior felony convictions, and the difficult childhood he endured.) We thus reject the premise of their first argument.

Second, both defendants point to a brief passage at the beginning of the prosecutor's argument where he stated: "I've contemplated arriving at this

point and making a determination based upon profession [*sic*], based upon the office policy and based upon my own personal commitment as to what I would resolve in my mind based upon aggravation and mitigation and where each of the defendants stand." Defendants claim the prosecutor was advising the jury of his personal opinion that they deserved the death penalty. We disagree. A reading of the prosecutor's entire argument reveals he was merely saying that based on the aggravating and mitigating evidence, the appropriate penalty was death. In addition, we disagree that the prosecutor was relying on evidence outside the record to support his thesis, or that he was trading on the prestige of the district attorney's office in an attempt to convince the jury to return a verdict of death.

Third, defendants contend the prosecutor urged the jury to return a death verdict because defendants had led a hedonistic life-style. Read in context, however, the prosecutor was merely saying that although extreme emotional disturbance would mitigate the crimes, defendants had led a very relaxed life-style.

Fourth, Reilly contends the prosecutor argued the lack of any evidence of extreme mental disturbance or moral justification was an aggravating factor. (*Davenport, supra*, 41 Cal.3d at pp. 288-290.) The record is not, however, reasonably susceptible to this interpretation; the prosecutor merely noted the absence of any such mitigating evidence.

Fifth, Reilly argues the prosecutor improperly referred to several aspects of the crimes, including his threats to the Sportsmans and his request that Debbie Sportsman lie for him. Reilly claims these facts constituted nonstatutory aggravating evidence in violation of the rule established in *People* v. *Boyd, supra*, 38 Cal.3d at pages 775-776. He is mistaken; such facts constitute "[t]he circumstances of the crime of which the defendant was convicted." (§ 190.3, factor (a).)

Sixth, Reilly urges we find prejudicial misconduct in the prosecutor's statement that the jury was "obligated as members of this society and as members of this jury" to return a death verdict if it found the aggravating evidence outweighed the mitigating evidence. We have already concluded this statement, considered with the instructions, did not mislead the jury about the scope of its sentencing discretion.

We also reject Reilly's claim that this argument tended to diffuse the jury's sense of responsibility for its verdict. (Cf. *Caldwell* v. *Mississippi* (1985) 472 U.S. 320 [86 L.Ed.2d 231, 105 S.Ct. 2633].) Significantly, the prosecutor immediately cautioned the jury to "weigh all of the things carefully, without

the biases that may occur." It is clear that the prosecutor's argument did not mislead the jury into believing the responsibility for the verdict lay elsewhere.

Seventh, Reilly challenges the prosecutor's remark that he personally would not have sought the death penalty against him had he withdrawn from the conspiracy after the aborted attempt to have Marc Costello kill the victims.[39] We agree this remark was probably improper. The statement however, was brief and was immediately followed by the argument that Reilly was blameworthy because he had an opportunity to withdraw after he unsuccessfuly attempted to hire Costello and did not. We conclude the misstep could not have prejudiced Reilly. (*Sully, supra,* 53 Cal.3d at p. 1249.)

Eighth, defendants complain of a story the prosecutor told at the end of his closing argument. The prosecutor related a conversation between a reporter and a county sheriff who had just witnessed an execution. When asked how he felt, the sheriff said, "I feel good. I feel right." When asked to explain, he replied, "Because our system, myself included, gave this defendant far more chances . . . than he gave the victims." Defendants claim these remarks were prejudicial because they "emphasized a non-statutory factor in aggravation, i.e., the defendants were given due process of law, while the victims were not."

Defendants misinterpret the message the prosecutor sought to convey. Immediately after relating this story, the prosecutor said: "And I submit to you that every one of the defendants in this case [has] received every opportunity afforded by law." The prosecutor concluded his argument shortly thereafter. The prosecutor did not ask the jury to find the provision of due process was an aggravating factor. Nor did the prosecutor emphasize that fact or otherwise build on that idea. We thus find no misconduct. Even if we assume some impropriety, the brevity of the story, coupled with its rather obtuse message, convinces us any misconduct was harmless.

In sum, even assuming that we may excuse defendants' failure to object to the alleged misconduct, their claims of prosecutorial misconduct are meritless.

---

[39]The prosecutor said: "Reilly hires Marc Costello. At that point in time I've asked myself would the People under the given circumstances of this case, if that were all that Mr. Reilly became involved in; he went out and hired Marc Costello, would the People, would I personally ask 12 individuals to return the death penalty? And I came to the conclusion that I would not do that. But I want you to know that I had a lot of difficulty in arriving at that determination, but honestly I made the determination no, and I want you to know that it was yes as to the other two [Morgan and Hardy] all the way down the line."

## 11. *New Trial Motion*

Defendants contend the trial court abused its discretion in denying their motion for new trial. They claim they were not afforded their due process right to a fair trial and were instead "tried in a milieu of overwhelming prejudice." In support, they rely on the trial court's failure to grant a severance, Stone's closing argument, the allegedly prejudicial impact of Cliff Morgan's medical condition, the alleged prosecutorial misconduct, and, especially, the decision to sever Morgan's penalty phase trial from theirs. We address the first two points earlier in this opinion. The alleged impact of Morgan's medical condition on the jury's view of *defendants'* guilt or innocence was negligible, even if we assume Morgan's deteriorating health somehow affected his credibility before the jury.

The trial court necessarily decided that any prosecutorial misconduct did not require a new trial, and that court was in a better position to make that decision. Because the decision was not "plainly wrong," we have no occasion to upset it. (*People* v. *Sarazzawski* (1945) 27 Cal.2d 7, 15 [161 P.2d 934].) Finally, defendants did not object to the decision to sever Cliff Morgan from the penalty phase. In any event, that decision could not have affected the jury's deliberation at the guilt phase of the trial.

Defendants also claim their counsel was constitutionally deficient for failing to marshal facts to show Cliff Morgan's medical condition affected their ability to obtain a fair penalty trial. There is, however, nothing on this record to indicate such evidence was available. Indeed, to the extent defendants claim the prosecutor took advantage of Morgan's medical condition to suggest he had a guilty conscience, that may have inured to defendants' benefit inasmuch as Morgan's defense was that he was not involved and that Reilly must have done the killing. In other words, to the extent Morgan's credibility was undermined, Reilly's claim that Morgan was the killer was enhanced.

Defendants also argue counsel were incompetent for failing to move for a mistrial when they learned Cliff Morgan would be severed from the penalty phase. (Reilly observes that Lasting was not even present at the hearing when evidence was taken regarding the severity of Morgan's condition.) As we stated, *ante*, at page 197, we assume the jury followed the instruction not to consider Morgan's absence from the penalty phase. We thus find no apparent prejudice to defendants from Morgan's absence. In sum, we find (i) the trial court did not abuse its discretion when it denied defendants' motion for a new trial, (ii) neither Lasting nor Demby provided deficient representation for failing to marshal facts to support either a mistrial or a new trial

motion, and (iii) neither Lasting nor Demby provided deficient representation when, on learning that Morgan's case would be severed from the penalty phase, they failed to move for a mistrial.

12. *Constitutionality of the Death Penalty*

Defendants urge that we find the 1978 death penalty law is unconstitutional because it fails: (i) to distinguish which penalty phase factors are aggravating and which are mitigating; (ii) to exclude "non-statutory unspecified aggravating factors"; (iii) to require written findings of the existence of the aggravating factors supporting the death penalty; (iv) to require proof of each aggravating factor beyond a reasonable doubt; (v) to require jury unanimity on the dispositive aggravating factors; and (vi) to require proportionality review by the appellate courts. We have previously rejected these claims (*Sully, supra,* 53 Cal.3d at pp. 1250-1251, and cases cited) and defendants do not provide any reasons why we should reconsider that decision other than to suggest each alleged requirement is mandated by the federal Constitution.

13. *Other Claims*

We have reviewed the following additional claims, raised by the parties or amicus curiae, and find them meritless:

(i) The trial court violated defendants' constitutional and statutory rights by failing "to make an adequate record of the venire pool and the reasons for excusing prospective jurors on the basis of hardship."

(ii) Failure to increase juror fees violated defendants' "right to a fair jury drawn from a representative cross-section of the community." (See *Cooper, supra,* 53 Cal.3d at p. 808.)

(iii) Reilly's due process rights were violated because the information charged two distinct objects of the conspiracy.

(iv) The trial court's failure to instruct the jury when the conspiracy terminated permitted the jury to consider many statements that were not made in furtherance of the conspiracy.

(v) CALJIC No. 6.10 permitted the jury to convict defendants of a conspiracy to commit "any public offense" in violation of their right to due process of law.

(vi) The trial court's conclusion that the conspiracy was ongoing at the time of trial unconstitutionally converted the jurors into crime witnesses, thereby compromising their ability to remain impartial.

(vii) The prosecutor committed misconduct by suggesting that the jury would be deciding whether Cliff Morgan collected the insurance proceeds.

(viii) Due process required the trial court to sua sponte instruct the jury that the issue of payment of the insurance proceeds was not before it.

(ix) The prosecutor's numerous remarks in closing argument that "no one explained" certain aspects of the evidence violated Reilly's Fifth Amendment rights.

(x) Additional comments by both the prosecutor and Stone, counsel for Cliff Morgan, constituted *Griffin* error.

(xi) The trial court's failure to limit application of CALJIC No. 2.62 (1979 rev.) to Cliff Morgan violated a number of Reilly's rights under the federal Constitution.

(xii) CALJIC Nos. 2.01, 2.02, and 2.90 (4th ed. (1979 rev.)) undermined the jury's understanding of reasonable doubt in violation of defendants' rights under the Fifth, Sixth, Eighth and Fourteenth Amendments. (*Jennings, supra*, 53 Cal.3d at pp. 385-386).

(xiii) CALJIC No. 3.34 (4th ed. (1979 rev.)), establishing a presumption that defendants were of sound mind, violated defendants' right to due process by impermissibly shifting to defendants the burden to disprove intent. (See *Mickey, supra*, 54 Cal.3d at pp. 669-671.)

(xiv) The interplay between CALJIC Nos. 2.21 and 2.27 (4th ed. (1979 rev.)) undermined the jury's understanding of reasonable doubt in violation of defendants' constitutional rights by permitting the jury to credit a portion of a witness's testimony, even where that witness had given false testimony in other respects, so long as the jury concluded a preponderance of the evidence supported the veracity of the witness.

(xv) The prosecutor engaged in argument that undermined the jury's understanding of reasonable doubt and impermissibly shifted the burden of proof to defendants in violation of defendants' rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.

(xvi) The trial court should have replaced Juror Save or held a hearing upon learning that the juror spoke to a spectator.

(xvii) Jurors committed misconduct by reading newspaper articles that discussed other trials.

(xviii) Alternate juror Segal committed misconduct by discussing with other jurors her job as an investigator for the Department of Social Services.

(xix) Defendants' due process rights were violated when the trial court permitted the prosecutor an in camera hearing on the severance issue, after the court had held such hearings for each of the three defendants.

(xx) The trial court should have granted a new trial because defendants were prejudiced by the admission of a large amount of evidence relevant to Cliff Morgan's guilt that would not have been admitted in a separate trial against defendants.

CONCLUSION

For the foregoing reasons, we conclude one multiple-murder special-circumstance finding should be vacated as to each defendant. The guilt and penalty judgments of both defendant Hardy and Reilly should otherwise be affirmed in their entirety.

Panelli, J., Arabian, J., Baxter, J., and George, J., concurred.

**MOSK, J.**—I concur in the judgment. After review, I have found no error requiring reversal.

I write separately because I disagree with the majority's analysis of the claim of error that defendants James Edward Hardy and Mark Anthony Reilly raise under *Griffin* v. *California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229].

The Fifth Amendment to the United States Constitution grants every person a privilege against compelled self-incrimination. This right is applicable to the states through the due process clause of the Fourteenth Amendment. (*Malloy* v. *Hogan* (1964) 378 U.S. 1, 8 [12 L.Ed.2d 653, 659, 84 S.Ct. 1489].) It operates, of course, when the government is the agent that seeks to compel. But it functions as well when others are in that position. Such others include, as relevant here, codefendants in a joint criminal trial. (E.g., *Coleman* v. *United States* (D.C. Cir. 1969) 420 F.2d 616, 625 [137 App.D.C. 48]; *United States* v. *Housing Foundation of America* (3d Cir. 1949) 176 F.2d 665, 666.) Compulsion directly violates the privilege.

In *Griffin*, the United States Supreme Court held that the self-incrimination privilege prohibits any comment on a defendant's failure to testify at trial that invites or allows the jury to infer guilt therefrom, whether in the

form of an instruction by the court or a remark by the prosecution. (380 U.S. at pp. 611-615 [14 L.Ed.2d at pp. 108-110].) Comment of this sort indirectly violates the privilege. "It is a penalty imposed . . . for exercising a constitutional privilege. It cuts down on the privilege by making its assertion costly." (*Id.* at p. 614 [14 L.Ed.2d at pp. 109-110].)

After *Griffin,* the self-incrimination privilege's prohibition against comment on a defendant's silence has been held to reach beyond judge and prosecutor to codefendant. (E.g., *People* v. *Jones* (1970) 10 Cal.App.3d 237, 243-244 [88 Cal.Rptr. 871]; *People* v. *Haldeen* (1968) 267 Cal.App.2d 478, 481 [73 Cal.Rptr. 102]; *U.S.* v. *Kane* (5th Cir. 1989) 887 F.2d 568, 575; see generally 3 LaFave & Israel, Criminal Procedure (1991 pocket supp.) § 23.4, p. 21, fn. 28 [stating that "the *Griffin* principle also applies to one codefendant's comment on the failure of the other to testify"]; but see *U.S.* v. *Anderson* (8th Cir. 1989) 879 F.2d 369, 379, fn. 4 [declining to address the issue].)

The reason for the extension of *Griffin* is plain. "It is the fact of comment rather than the source of comment that effects denial of the right." (*People* v. *Haldeen, supra,* 267 Cal.App.2d at p. 481; accord, *U.S.* v. *Kane, supra,* 887 F.2d at p. 575.)

The extension of *Griffin* was anticipated by Judge John Minor Wisdom in his seminal opinion for the court in *De Luna* v. *United States* (5th Cir. 1962) 308 F.2d 140. "If comment on an accused's silence is improper for judge and prosecutor, it is because of the effect on the jury, not just because the comment comes from representatives of the State. Indeed, the effect on the jury of comment by a co-defendant's attorney might be more harmful than if it comes from judge or prosecutor. A judge, in keeping with his high degree of responsibility to conduct a fair trial, would be expected to give a balanced, moderate explanation of the inferences to be drawn from silence. Similarly, but to a lesser degree, a prosecutor would be expected to recognize his responsibility for fair comment. But much less restraint can be expected from an attorney to whom no little latitude is allowed when zeal, emotion, eloquence, and the advocate's afflatus take hold of a jury argument." (*Id.* at p. 152, fn. omitted.)

As Professors LaFave and Israel have noted, "Courts agree on the standard to be applied in determining whether a comment should be viewed as impermissibly referring to defendant's silence—'whether the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the accused's failure to testify.' " (3 LaFave & Israel, Criminal Procedure (1991 pocket supp.) § 23.4, p. 21, fn. 28.)

In his summation in the case at bar, Jack Stone, who was counsel for codefendant Cliff Morgan, assumed the role and interest of the prosecutor against Hardy and Reilly, and attempted to prove their guilt in order to prove his client's innocence.

At one point, Stone remarked: "All those witnesses that got up there, Debbie, Calvin, Costello, they were accusers not only of Cliff but they accused Buck [Reilly]. Mr. Lasting [who was Reilly's counsel] got up, had a chance to cross-examine every one of them—." The sentence was not completed because Lasting interposed an objection.

At another point, Stone said: "What is the defense of Mr. Morgan in this case? Sometime back in April when Cliff Morgan and Buck Reilly meet, there is a conversation at lunch. There is where it all starts. Buck told the police that during this conversation he made the statement, 'You could knock off your wife for that amount of money.' . . . During that lunchtime conversation, we weren't there. There were only two people there. Cliff Morgan and Buck Reilly. Cliff Morgan got up on the witness stand and told you what his side of it was. We have to guess at what Mr. Reilly's side of that conversation was other than the fact that we know that he initiated the thought of knocking off Nancy Morgan for the insurance money." (Paragraphing omitted.)

At yet another point, Stone declared: "If you know a man has nothing to hide, he gets up on that witness stand and he tells you what's in his mind. And that's what Cliff did. He got up there, he let Mr. Jonas [who was the prosecutor] whack away at him for three days, the other two attorneys whacked away at him for three days, and then he bared his soul in front of you, and that's the soul of a man who's been in jail for two years for a crime he did not commit; he has wasted away physically and mentally, and he is frustrated. But he can't get the one person that's accusing him to tell him what went on. That's why Mr. Morgan looks the way he does."

Hardy and Reilly now claim that by arguing as he did, Stone committed *Griffin* error.

As to the first comment, was Stone's language "manifestly intended" to refer to Reilly's failure to testify or would it have been "naturally and necessarily" taken to carry such a reference?

The answer is negative. That Reilly's counsel "had a chance to cross-examine every one of" his "accusers" does not bear on his silence in any significant way.

As to the second comment, was Stone's language "manifestly intended" to refer to Reilly's failure to testify or would it have been "naturally and necessarily" taken to carry such a reference?

Here, the answer is affirmative. Recall Stone's "prosecutorial" role and interest and the core of his remark: "During that lunchtime conversation, we weren't there. There were only two people there. Cliff Morgan and Buck Reilly. Cliff Morgan got up on the witness stand and told you what his side of it was. We have to guess at what Mr. Reilly's side of that conversation was other than the fact that we know that he initiated the thought of knocking off Nancy Morgan for the insurance money." (Paragraphing omitted.)

The message that Stone sent and the jury received was: "We know what Morgan's story is because he testified. His tale showed his innocence. By contrast, we don't know what Reilly's story is because he didn't testify. We do know, however, that he conceived the insurance fraud scheme. His silence suggests his guilt."

As to the third comment, was Stone's language "manifestly intended" to refer to Reilly's failure to testify or would it have been "naturally and necessarily" taken to carry such a reference?

Here too, the answer is affirmative. "If you know a man has nothing to hide," remarked "prosecutor" Stone, "he gets up on that witness stand and he tells you what's in his mind. And that's what Cliff did. . . . But he can't get the one person that's accusing him"—namely, Reilly—"to tell him what went on."

To be sure, in part the message sent and received was unobjectionable: "An innocent man testifies. That's Morgan." But in part, it was improper: "A guilty man refuses to testify. That's Reilly." In passing on Hardy and Reilly's related motion for mistrial, the trial court stated that only the former sense was apparent. The words Stone used—even if considered apart from his "prosecutorial" role and interest—are to the contrary.

Thus, *Griffin* error was committed in this case: the second and third comments indirectly violated the self-incrimination privilege.

*Griffin* error, however, is not automatically reversible, but is subject to harmless-error analysis under the "beyond-a-reasonable-doubt" standard. (*United States* v. *Hasting* (1983) 461 U.S. 499, 507-509 [76 L.Ed.2d 96, 105-106, 103 S.Ct. 1974] [dealing with comment by a prosecutor]; *Chapman*

v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065] [same].)

The question that must be asked is: Absent the error, "is it clear beyond a reasonable doubt that the jury would have returned a verdict of guilty?" (*United States* v. *Hasting, supra,* 461 U.S. at p. 511 [76 L.Ed.2d at p. 107].)

The answer that must be given is: Yes. Whereas the evidence inculpating Hardy and Reilly was literally voluminous, that exculpating them was virtually nonexistent. Moreover, the improper comments were isolated and relatively brief. It was the evidence that determined the outcome. The remarks were of no marginal significance.

For their part, however, the majority conclude that *Griffin* error was not, in fact, committed. Their reasoning implicates the separate issues of error and prejudice and a conflation of the two.

To begin with, the majority seem to say, one codefendant must be given some (undefined) latitude to violate the self-incrimination privilege of another in order to exercise his own right under the Sixth Amendment to present a defense.

It is undisputed—and manifestly, indisputable—that notwithstanding the Sixth Amendment, one codefendant may not *directly* violate the self-incrimination privilege of another by applying compulsion. An accused suffers no undue restriction of his right to present a defense as a result. Like the prosecutor, he remains altogether free to attempt to prove his coparty's guilt—only *not* by directly violating the latter's privilege.

Similarly, notwithstanding the Sixth Amendment, one codefendant may not *indirectly* violate the self-incrimination privilege of another by commenting on his failure to testify. This proposition is hardly problematical. An accused must, of course, present his defense subject to a myriad of substantive and procedural rules, including local court policies and practices that rise barely, if at all, above the level of "housekeeping" arrangements. A fortiori, he must do so subject to his coparty's self-incrimination privilege, which is of federal constitutional dimension. Again, an accused suffers no undue restriction of his right to present a defense as a result. Like the prosecutor, he remains altogether free to attempt to prove his coparty's guilt—only *not* by indirectly violating the latter's privilege.

In reasoning to the contrary, the majority rely on *U.S.* v. *Castro* (9th Cir. 1989) 887 F.2d 988, *U.S.* v. *Patterson* (9th Cir. 1987) 819 F.2d 1495, *United*

*States* v. *Alpern* (7th Cir. 1977) 564 F.2d 755, and *United States* v. *Shuford* (4th Cir. 1971) 454 F.2d 772. These cases—it is implied—establish the legitimacy of "balancing" one codefendant's self-incrimination privilege against another's Sixth Amendment right to present a defense by undertaking such an endeavor. Not so. None of the cited decisions even purports to address the question of "balancing."

Next, the majority seem to say, a reviewing court must be given some (undefined) latitude in applying harmless-error analysis after one codefendant has violated the self-incrimination privilege of another in order to protect the former's Sixth Amendment right to present a defense.

But by definition, harmless-error analysis considers whether the codefendant whose self-incrimination privilege was violated has suffered prejudice. Immaterial to the question is any benefit that the codefendant who violated the privilege may have derived therefrom.

Lastly, the majority seem to say, the distinct questions of error and prejudice must be intertwined. To this end, they rely on *U.S.* v. *Mena* (11th Cir. 1989) 863 F.2d 1522. There, the court declined to apply the "manifestly intended/naturally and necessarily taken" standard on the ground that it "is derived from cases in which the allegedly improper comment was made by a prosecutor. Given the prosecutor's institutional role, when the prosecutor merely 'comments' on the failure of an accused to testify, the reference is in all likelihood calculated to encourage the jury to equate silence with guilt; reasonable judicial economy thus permits a finding of reversible error. When the 'comment' comes from an actor (such as counsel for a codefendant) without an institutional interest in the defendant's guilt, however, it would be inappropriate to find reversible error as a matter of course. Instead, the court should ask whether the comment *actually* or *implicitly* invited the jury to infer guilt from silence." (*Id.* at p. 1534, citations omitted, italics in original.)

The issues of error and prejudice, however, are indeed separate and accordingly should not be conflated.

Further, when it is given meaningful scrutiny, *Mena* proves to be unpersuasive.

The *Mena* court does not adequately justify its conclusion that there should be a stricter standard for a prosecutor's comment and a more tolerant standard for a codefendant's. There is a tendency for a juror, as for anyone, to infer guilt from silence. Virtually any significant allusion to a defendant's absence from the witness stand—no matter who the speaker—is enough to

suggest culpability. Indeed, in many joint trials, such as that below, counsel for one of the codefendants assumes an "institutional role and interest" similar to the prosecutor's.

Also, even apart from its intertwining of error and prejudice, the *Mena* opinion is mischievous and indeed wrong. Contrary to its plain implication, *Griffin* error by a prosecutor is simply *not* presumptively reversible. (See *United States* v. *Hasting, supra,* 461 U.S. at pp. 507-512 [76 L.Ed.2d at pp. 105-108].)

Be that as it may, even if I were to follow the majority's reasoning, I would nevertheless conclude that *Griffin* error was indeed committed in this case.

Was there an "actual" or "implicit" "invitation" to infer guilt from silence?

Clearly, there was an at least implicit invitation in the second comment. Recall again Stone's "prosecutorial" role and interest and the core of his remark, quoted above. As noted, the message was: "We know what Morgan's story is because he testified. His tale showed his innocence. By contrast, we don't know what Reilly's story is because he didn't testify. We do know, however, that he conceived the insurance fraud scheme. His silence suggests his guilt."

More clearly still, there was an at least implicit invitation in the third comment. "If you know a man has nothing to hide," remarked "prosecutor" Stone, "he gets up on that witness stand and he tells you what's in his mind. And that's what Cliff did. . . . But he can't get the one person that's accusing him"—namely, Reilly—"to tell him what went on." True, in part the message was unobjectionable: "An innocent man testifies. That's Morgan." But in part, it was improper: "A guilty man refuses to testify. That's Reilly."

In conclusion, having found no *Griffin* error—or any other—that requires reversal, I concur in the judgment.[1]

**KENNARD, J.**—I concur in the judgment and in most of the majority's reasoning. I dissent only from that part of the majority opinion holding that

---

[1]In my concurring and dissenting opinion in *People* v. *Morales* (1989) 48 Cal.3d 527, 574 [257 Cal.Rptr. 64, 770 P.2d 244], I set out my view that lying in wait as a theory of first degree murder (Pen. Code, § 189 and lying in wait as a special circumstance establishing eligibility for the penalty of death (*id.,* § 190.2, subd. (a)(15)) each require waiting, watching, and actual *physical* concealment—I did so impliedly as to the theory and expressly as to the special circumstance. Put simply, concealment of purpose as distinguished from concealment

trial counsel for codefendant Morgan made no improper reference to defendant Reilly's decision not to testify at trial. (Maj. opn., *ante*, pp. 159-160.)

The prosecution used defendant Reilly's out-of-court statements to make its case against codefendant Morgan.[1] Commenting on Reilly's failure to take the witness stand, Morgan's counsel argued to the jury: "If you know a man has nothing to hide, he gets up on that witness stand and he tells you what's on his mind. . . . But [Morgan] can't get the one person that's accusing him to tell him what went on." The majority concludes that this statement did not invite the jury to infer Reilly's guilt from his silence at trial. I disagree.

I

A defendant in a criminal case cannot be compelled to testify. (U.S. Const., 5th and 14th Amends.; Cal. Const., art. I, § 15.) Thus, those who wish to rely on the presumption of innocence, which our system of justice affords to every person accused of a crime, can do so without having to take the witness stand.

To ensure that juries will not treat a defendant's decision not to testify as an admission of guilt, thereby penalizing the defendant for exercising the constitutional right to remain silent, the United States Supreme Court in *Griffin* v. *California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229] [hereafter *Griffin*] prohibited prosecutors and judges from adversely commenting on a defendant's silence. Later cases, applying *Griffin*, have similarly prohibited comments by one codefendant's counsel on another defendant's failure to testify. (See, e.g., *De Luna* v. *United States* (5th Cir. 1962) 308 F.2d 140, 141; *People* v. *Jones* (1970) 10 Cal.App.3d 237, 243 [88 Cal.Rptr. 871]; *People* v. *Haldeen* (1968) 267 Cal.App.2d 478, 481 [73 Cal.Rptr. 102].) These cases, however, have not clearly established whether the limits on adverse comment imposed on defense attorneys are as great as those imposed on prosecutors and judges.

One recent federal case holds that when the reference to a defendant's silence is made by a codefendant's attorney, reversal is required only if the comment "actually" or "implicitly" invited the jury to infer the defendant's

---

of the person is not enough. "I continue to adhere to that view as a matter of personal belief. I have not succeeded, however, in persuading my colleagues of the soundness of my position. After reflection, I have decided not to beat a rataplan." (*People* v. *Morales, supra,* at p. 574, fn. 1 (conc. & dis. opn. of Mosk, J.).)

[1]Morgan, the instigator of the plot to kill the two victims in this case (his wife and son) was tried together with defendants Reilly and Hardy during the guilt phase. He is not a party to this appeal.

guilt from silence. (*U.S.* v. *Mena* (11th Cir. 1989) 863 F.2d 1522, 1534 [hereafter *Mena*].) As the *Mena* court explained its view: "Given the prosecutor's institutional role, when the prosecutor merely 'comments' on the failure of an accused to testify, the reference is in all likelihood calculated to encourage the jury to equate silence with guilt . . . . When the 'comment' comes from an actor (such as counsel for a codefendant) without an institutional interest in the defendant's guilt, however, it would be inappropriate to find reversible error as a matter of course. Instead, the court should ask whether the comment *actually* or *implicitly* invited the jury to infer guilt from silence." (*Id.* at p. 1534, italics in original.)

Relying on this passage in *Mena, supra,* 863 F.2d 1522, the majority concludes that counsel for a codefendant should be allowed greater latitude than a prosecutor or judge to comment on a defendant's failure to testify. Justice Mosk disagrees with the majority, arguing that in evaluating such comments no distinction should be drawn between defense counsel on the one hand and prosecutors and judges on the other. I see no reason to resolve this dispute here; as I shall explain, the comment at issue was improper even under the more permissive standard established by the majority.

## II

As I mentioned at the outset, the prosecution used defendant Reilly's out-of-court statements to prove its case against codefendant Morgan. Against that background, Morgan's counsel made the following comment regarding Reilly's failure to testify at trial: "If you know a man has nothing to hide, he gets up on that witness stand and he tells you what's on his mind . . . . But [Morgan] can't get the one person that's accusing him to tell him what went on." The majority concludes this comment was not "*Griffin* error" because it did not "actually" or "implicitly" invite the jury to infer Reilly's guilt from his silence. (Maj. opn., *ante,* p. 160.) I disagree.

In arguing to the jury that if defendant Reilly had "nothing to hide" he would have testified, Morgan's counsel in effect told the jury that Reilly did have something to hide, thereby equating Reilly's silence with guilt. Because counsel's comment "implicitly" invited the jury to infer Reilly's guilt from his failure to testify at trial, it was improper even under the less stringent standard articulated by the majority.[2]

---

[2]Defendants Hardy and Reilly contend that two other statements made by counsel for codefendant Morgan were impermissible comments on their decisions not to testify at trial. I agree with the majority that neither of those two statements was improper. (Maj. opn., *ante,* p. 159.)

Although the comment violated Reilly's constitutional right against self-incrimination, reversal is not required. As the majority concludes, the evidence of Reilly's guilt was overwhelming. (See maj. opn., *ante*, pp. 160-161.) In light of that evidence, counsel's improper comment was harmless beyond a reasonable doubt. (*Chapman* v. *California* (1965) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065].)

Appellants' petitions for a rehearing were denied May 14, 1992, and the opinion was modified to read as printed above.